1
2
3                      UNITED STATES DISTRICT COURT
4                            DISTRICT OF NEVADA
5                                  * * *
6   WILLIAM BRYON LEONARD,                     Case No. 2:99-cv-00360-MMD-DJA
7                         Petitioner,               ORDER
8        v.
9   WILLIAM GITTERE, *et al.*,
10                        Respondents.
11
12  **I.    SUMMARY**
13          Petitioner William Bryon Leonard was sentenced in Nevada state court to death
14  after being found guilty of first-degree murder with the use of a deadly weapon, battery
15  with the use of a deadly weapon by a prisoner, and possession of a dangerous weapon
16  by a prisoner. (ECF No. 156-1.) This matter is before the Court for adjudication of the
17  merits of the remaining grounds in Leonard's counseled amended petition for writ of
18  habeas corpus under 28 U.S.C. § 2254 ("the Petition"), which allege that Leonard's trial
19  counsel were ineffective at the guilt and penalty phases of his trial, trial counsel had a
20  conflict of interest, there were excessive security measures at his trial, the prosecutor
21  committed misconduct, a penalty phase jury instruction was erroneous, the trial judge
22  was biased, appellate counsel was ineffective, and there were cumulative errors. (ECF
23  No. 138, 184.)[1] For the reasons discussed below, the Court (1) grants the Petition as to
24  grounds 3(a)(2) and 3(f)(3), vacating Leonard's death sentence due to his counsel's

25
26          [1]As noted in the Court's order on Respondents' motion to dismiss, Leonard's
    amended petition, filed on March 19, 2018 (ECF No. 138), contains numerous claims that
    do not follow a sequential numbering scheme. On September 25, 2019, Leonard filed a
27  corrected image that remedied that flaw. (ECF No. 184.) Hereinafter, the Court cites to
    the latter document when referring to Leonard's first amended petition.
28

1   ineffectiveness during the penalty phase of the trial, (2) denies the Petition as to the

2   remaining grounds, determining that Leonard is not entitled to a new trial, (3) grants a

3   certificate of appealability for grounds 1(a), 2, and 1(d)(2), and (4) denies a certificate of

4   appealability as to the remaining grounds.

5   **II.    BACKGROUND**

6           **A.    Factual background**[2]

7                   **1.    Guilt phase**

8           Leonard was found to have killed another inmate, Joseph Wright, at Nevada State

9   Prison in Carson City Nevada.

10          Correctional Officer ("C/O") Leonard Bascus testified that on the evening of

11  October 22, 1987, he was working as a "shower officer" in Unit 7 of D Wing at Nevada

12  State Prison. (ECF No.154-29 at 14, 17-18, 20, 23.) Joseph Wright, the wing porter,

13  showered first, and then the other inmates showered one-by-one based on a schedule—

14  known to the inmates—that would rotate daily. (*Id*. at 24-25, 31.) Leonard was the last

15  inmate to shower in D Wing that evening, coming out of his cell at 8:00 p.m. (*Id*. at 34.)

16          After C/O Bascus let Leonard out of his cell, C/O Bascus went to C Wing to pick

17  up some cleaning supplies. (*Id*. at 34-35.) C/O Bascus got stuck in C Wing for

18  approximately 10 to 15 minutes because the control officer, Senior C/O Thomas Edwards,

19  was using the restroom and unable to let C/O Bascus out of C Wing.[3] (*Id*. at 35, 40.) C/O

20  Bascus went back to D Wing to lock Leonard in his cell. (*Id*. at 40.) C/O Bascus went to

21  the shower, and, not seeing Leonard in the shower area, yelled for Leonard to "lock up."

22  (*Id*. at 40-42.) Although C/O Bascus did not see Leonard enter his cell, C/O Bascus

23

24          [2]The Court makes no credibility or other factual findings regarding the truth or
falsity of this evidence from the state court. The Court's summary is merely a backdrop
25  to its consideration of the issues presented in the Petition. Any absence of mention of a
specific piece of evidence does not signify the Court overlooked it in considering
26  Leonard's claims.

27          [3]Senior C/O Edwards was later found to have committed misconduct by leaving
his post without permission or relief. (*See* ECF No. 138-77 at 47.)

28                                          2

"walk[ed] out the first door [to] get back by the control box" and shut Leonard's cell door. (*Id*. at 42-43.) C/O Bascus then unlocked Wright's door from the control box because it was time for him to perform his porter duties. (*Id*. at 45.)

Hypothesizing that Leonard hid behind a trash can in the wing hallway so that he would not be seen, C/O Bascus testified that he looked through a window and "saw inmate Leonard running towards inmate Wright's cell." (*Id*. at 46.) Leonard "was running as fast as he could." (*Id*. at 46.) C/O Bascus tried to close "Wright's door as fast as [he] could," but "Leonard just barely made it in there" before it shut. (*Id*. at 47.) C/O Bascus never saw Wright out in the hallway and did not see anything in Leonard's hands. (*Id*. at 48.) C/O Bascus heard "banging around" and "struggling like somebody was fighting in the cell." (*Id*. at 49-50.)

After "at least a minute or two" and after reopening Wright's door, C/O Bascus saw Wright backing out of his cell with his fists up and blood on his right leg and right arm. (*Id*. at 51-53.) Leonard rushed out of Wright's cell and tackled Wright in the middle of the hallway. (*Id*. at 53.) At that point, C/O Bascus ran to his supervisor, Senior C/O Edwards, in the control room to inform him about the fight and the need for a nurse. (*Id*. at 53.) C/O Bascus then ran back to watch what was happening with Wright and Leonard. (*Id*. at 54.)

C/O Bascus saw Wright and Leonard on their knees with "their arms around each other's heads." (*Id*. at 55.) "Wright had his left arm up over inmate Leonard's neck, and . . . inmate Leonard's right arm was underneath inmate Wright's left arm, up over inmate Wright's back and neck." (*Id*. at 56.) Wright and Leonard where in that position "for about almost a minute," and then "Leonard got up and he went right into his cell." (*Id*. at 57.) As Leonard was walking back to his cell, C/O Bascus heard him say, "'[w]ell, a little bit longer and I would have killed him.'" (*Id*. at 58.) Wright was "still on his knees, kind of slouched on his knees." (*Id*. at 59.) Soon thereafter, Lieutenant Budge and other officers entered the wing, at which point Wright was laying on the floor. (*Id*. at 59-60.)

3

C/O Gary Jackson was one of the officers to respond to the wing "and observed [Wright] laying on his side against the door, not moving at all" and Leonard "washing blood off his arms and his hands." (ECF No. 154-29 at 113, 115, 117, 122.) About a half hour after the incident, C/O Jackson made eye contact with Leonard, and Leonard looked "[j]ust like he always does, just normal." (*Id*. at 122-23.) Associate Warden of Operations of Nevada State Prison, Harry Koon testified that he saw Leonard in his cell after the incident and Leonard "[a]ppeared to be very calm, very relaxed." (ECF No. 154-29 at 134, 139.) Nurse Lula Spencer testified that Leonard had scratches on his arm following the incident. (ECF No. 154-35 at 54-55.)

C/O Anthony Caito testified that he searched the cell of Donald Hill, another inmate who resided in D Wing, after the incident with Leonard and Wright and found two "inmate-made weapons" that were "inside a pair of black shoes." (ECF No. 154-29 at 194, 198.) Hill was also observed "yelling and hollering and singing" after the incident, and Frank Armijo, another inmate who resided in the same wing, "was more or less celebrating" by singing "'Another One Bites the Dust' and 'Wipeout.'" (*Id*. at 124-25.) Hill and Armijo were both interviewed following the incident and stated that they did not see the fight, know anything about the fight, or hear the fight. (ECF No. 155-11 at 67-68.)

Leon Leet, a maintenance plumber at Nevada State Prison, testified that less than two days after the incident, on October 24, 1987, he was called to Unit 7 to look for a weapon. (ECF No. 154-29 at 150-52.) Leet was unable to find anything in the toilets and used a snake to see if there was anything in the sewer lines. (*Id*. at 154-55.) Leet found the following object in a sewer line: "a piece of metal, approximately eight to ten inches long, about an inch wide, and possibly a 16th of an inch thick with a notch in it" that was sharpened to a point and "was bent at a nearly 90-degree angle." (*Id*. at 165, 168.) Leet testified that the object came from the north side of D Wing or the south side of C Wing, meaning it could have come from 10 cells. (*Id*. at 167-68.) Correctional Case Worker

4

Specialist James Baca testified that after the incident, he noticed that the legal lockers in the unit had flexible legs that were "not really attached," observing that those locker legs appeared to be the same material as the object found by Leet in the sewer line. (ECF No. 154-35 at 60, 72.)

In his defense, Leonard presented the testimony of Armijo. Armijo testified that Wright had made a homosexual advance at him, and when Armijo turned Wright down, Wright threatened to kill Armijo. (ECF No. 155-7 at 18.) Armijo testified that Leonard knew about Wright's homosexual advances towards Armijo, and Wright threatened that he would kill Leonard if Leonard did not mind his own business. (*Id*. at 19-20.) On the evening in question, Armijo testified that Leonard was in the wing hallway talking to Hill, and even though he never heard anyone tell Leonard to "lock up," he saw Wright's cell door open. (*Id*. at 4, 12-13.) Wright came out of his cell holding a shank, and Hill warned Leonard to look out. (*Id*. at 14.) Wright rushed at Leonard, but Leonard blocked him and pushed him back into his cell. (*Id*. at 15.) Wright's door then shut. (*Id*.) Wright and Leonard were in Wright's cell for a minute, and then Leonard came out "and Wright came out after him to try to grab him by the hair and pulled him back in." (*Id*. at 16.) Wright and Leonard then continued to fight in the hallway. (*Id*. at 17.) Armijo testified that the shank used in the fight could have been slipped under a cell doorway because there is a small space under the cell doors which the inmates commonly use to slide items back and forth to other inmates. (*Id*. at 44, 47-48.)

Hill also testified for the defense. Hill testified that he saw Wright take the legal locker into his cell to remove its metal legs and that Wright sold him a shank a month or two before the killing. (ECF No. 155-7 at 55, 58, 63.) Later, a few days before the killing, Wright had jumped Hill on the yard. (*Id*. at 60.) Hill had warned Leonard to be careful of Wright because Wright was a homosexual, dangerous, and had previously raped another inmate. (*Id*. at 66-67.)

5

On the night in question, Hill testified that Leonard was using the remainder of his shower time to talk to Hill outside of Hill's cell door. (*Id*. at 73.) Leonard's cell door then closed, and Wright's cell door opened. (*Id*.) Wright came out of his cell with a knife "and a cup of bleach or something, . . . a powdery substance" and threw the cup at Leonard. (*Id*. at 76.) Leonard grabbed Wright, and they proceeded to fight. (*Id*.) Once they fought their way into Wright's cell, the door was shut. (*Id*. at 79.) And once Wright's cell door was reopened, Leonard had the shank in his hand. (*Id*. at 81.) Hill saw Leonard stabbing Wright in the leg, "[a]nd then it looked like . . . the fight was left out of [Wright], then Leonard threw the knife down and came out of the cell." (*Id*. at 82.) After Leonard exited Wright's cell, Wright grabbed the shank, came out of his cell, and tried to attack Leonard again, grabbing Leonard's hair. (*Id*. at 83.) Wright "tried to stab [Leonard, but] Leonard was able to spin around." (*Id*. at 160.) At that point, Wright and Leonard were out of Hill's sightline but eventually "landed on the ground" with Wright bleeding to death. (*Id*.)

Leonard presented testimony of Wright's history. Associate Warden John Ignacio testified that Wright "had been sentenced to two life terms for murder." (ECF No. 155-5 at 137, 141.) Ignacio also testified that an inmate had accused Wright of sexually assaulting him in the jail and then threatened to kill that inmate for pressing charges. (*Id*. at 141, 144.) Gerald Emde, who was the inmate previously housed with Wright at the jail, testified that on December 21, 1985, Wright propositioned him for sex, but Emde declined. (ECF No. 155-11 at 28, 30, 31, 33.) Wright grabbed Emde's testicles, threatened him, and struck him. (*Id*. at 33.) The next day, Wright again propositioned Emde for sex, and Emde again declined. (*Id*. at 35.) A few minutes later, Wright obtained something from under his bed, put his hand under Emde's blanket, and told Emde that if he "didn't cooperate in the way that [Wright] . . . wanted, that [Emde would] have no use for [his] testicles or would . . . have [no] reason to live." (*Id*.) Emde pulled back the blanket and saw that Wright had a razor blade "and there was a white powdery substance all over his

6

1  hand and all over the blade." (*Id*. at 36.) Wright then forced Emde to "oral[ly] copulate
2  him" while Wright held a "razor blade against [Emde's] throat." (*Id*. at 38.)

3        Leonard presented the testimony of Dr. Vasco Salvadorini, a forensic pathologist,
4  who testified that he reviewed Wright's autopsy and found that Wright suffered 15 stab
5  wounds and 6 cuts. (ECF No. 155-11 at 4-5, 9.) Dr. Salvadorini testified that it would have
6  taken "[m]inutes" for a person to die from the type of cut to the heart that Wright suffered,
7  explaining that "he would not immediately keel over." (*Id*. at 27.)

8        In rebuttal, the prosecution called C/O William Humphrey, who testified that on
9  October 24, 1987, Hill asked him if they had found a shank in Unit 7. (ECF No. 155-11 at
10  59, 61, 62.) When C/O Humphrey responded that he did not know, Hill told C/O Humphrey
11  that they should not bother looking in Unit 7 because "it was no longer in the unit." (*Id*. at
12  62.) Hill then "stated that the shank . . . had left the unit that night" and "had been shoved
13  up inmate Wright's rectum." (*Id*.)

14            **2.**    **Penalty phase**
15        Several witnesses offered evidence of Leonard's prior criminal history.

16        Lieutenant Jay Steven Litschauer of the Manatee County Sheriff's Office in
17  Bradenton, Florida testified that on February 25, 1981, Russell Williams went missing.
18  (ECF No. 155-21 at 49-50, 53, 55.) Leonard told Lieutenant Litschauer that Williams
19  resided in the apartment next to Leonard, and one night Williams complained to Leonard
20  "about the loudness of the party and the music." (*Id*. at 61.) Leonard got upset and "went
21  into the victim's apartment and struck and kicked him." (*Id*. at 62.) Later, while Leonard
22  and some of the partygoers were getting some beer, Williams "yelled some things out the
23  window" and "[a] short time later," Leonard "charged into the apartment and began to
24  strike and hit and kick [Williams] again, picked him up and threw him over a bed,
25  then . . . pull[ed] him out of the apartment." (*Id*.) Leonard dragged Williams "by his feet
26  down a flight of cement stairs," and "[o]nce they reached the bottom of the stairs, he

27
                        7
28

1    kicked him a few more times." (*Id*. at 62-63.) Leonard then dragged Williams 50 yards into

2    a wooded area, threw him over a barbed-wire fence, and stabbed him at least three times.

3    (*Id*. at 64.) Leonard and his roommate later transported Williams's body to a secluded

4    area. (*Id*. at 66.) Leonard, who had been drinking alcohol and using marijuana at the time

5    of the killing, left Florida because "he was in fear of being arrested." (*Id*. at 66, 71.)

6         Phil Harrison, a former Deputy Sheriff for Nevada County, California, testified that

7    on April 17, 1981, the body of Lawrence Dunn, who was 88 years old and who had been

8    stabbed 39 times, was found near Truckee, California. (ECF No. 155-21 at 72-74, 79, 91.)

9    Fingerprints were taken from Dunn's pickup truck and were identified as Leonard's. (*Id*.

10   at 75.) Leonard told investigators that "he was hitchhiking somewhere south of

11   Hawthorne, Nevada," and Dunn had picked him up. (*Id*. at 77.) Dunn and Leonard

12   gambled in Hawthorne and then spent the night at a campground near Walker Lake. (*Id*.)

13   The next morning, "there was some words about some homosexual activity that allegedly

14   came up, and as a result, Mr. Leonard began to stab . . . Dunn." (*Id*. at 78.) Leonard then

15   drove Dunn's vehicle with Dunn's body in it to Reno and then eventually to the Truckee

16   area. (*Id*. at 70.)

17        Frederick Cypher, a criminal investigator for the Nevada Division of Investigations,

18   testified that Leonard told him that he and Dunn got into a physical altercation after the

19   "homosexual pass," and during a break in the fight, Leonard believed that Dunn was

20   reaching for a firearm. (ECF No. 155-21 at 83-84, 88.) Leonard pulled out a pocketknife

21   and stabbed Dunn. (*Id*. at 88.) Dunn then attacked Leonard again, and Leonard "stabbed

22   him 'until he stopped moving.'" (*Id*.) Leonard admitted to "using and abusing alcohol and

23   drugs during this time period." (*Id*. at 93.)

24        James Christy, who was formerly employed as a correctional officer at Nevada

25   State Prison, testified that on the evening of October 6, 1984, approximately three years

26   before the killing of Wright, Leonard had just finished showering, and it was Michael

27

28
                                                    8

Simms's turn to shower next. (ECF No. 155-21 at 100-102.) Mistakenly believing Leonard was in his cell, a correctional officer shut Leonard's door and opened Simms's door. (*Id*. at 102-103.) "As soon as inmate Simms started going up the stairs, inmate Leonard darted out of the shower and started attacking inmate Simms." (*Id*. at 103.) Leonard stabbed Simms with "a three to four-inch metal object." (*Id*. at 104.) "Simms finally was able to break off the attack and run . . . back into his [cell]." (*Id*. at 104-105.) "Leonard then disposed of the weapon in the fourth [cell] up on the upper tier" by "threw[ing] it under the door." (*Id*. at 105.) Leonard then "proceeded to shake everybody's hands." (*Id*.)

C/O John Carter testified that on January 6, 1989, at approximately 3:45 a.m., he observed some individuals crawling very slowly through the snow on the grounds of Nevada State Prison. (ECF No. 155-21 at 120, 123-124.) Knowing it was an escape attempt, C/O Carter notified prison officials. (*Id*. at 124, 125.) C/O James Cupp, Jr. testified that he responded to the report of movement on the upper yard. (*Id*. at 128, 131.) He "saw the two inmates lying in the snow next to a mound of snow" before they surrendered. (*Id*. at 132-33.) The two inmates, Leonard and Hill, "had thermal underwear on over their clothes, and . . . white socks over their shoes, and they had what appeared to be sheets made into hoods over their heads." (*Id*. at 133-34.) It was discovered that Leonard and Hill had "prison-made dumm[ies]" in their cells and had each cut a 2-foot by 2-foot hole in their cell walls. (*Id*. 141–45.)

Ron Wood testified that he prepared Leonard's presentence investigation report in April 1987 following Leonard's previous charge for stabbing a correctional officer. (ECF No. 155-22 at 21-22.) Wood testified that when he told Leonard what his recommended sentence was going to be, Leonard responded "that it really didn't matter" because he was already facing 80 years in prison for his other convictions. (*Id*. at 24.)

Leonard offered mitigating evidence. He called his father, William Scott Leonard, and his mother, Carol Weaver, as witnesses during the penalty phase, and they testified,

9

*inter alia*, about his childhood, their divorce, and Leonard's drug use. (ECF No. 155-22 at 43-44, 65-66.) In addition to his parents, Leonard called Frank DePalma, Raymond Lovell, Sergeant John Coleman, C/O Thomas Crowley, Anthony Cross, C/O Catarino Escobar, Theodore Burkett, Jack McFadden, C/O James Withey, Armijo, Richard Burch, and Joel Burkett.[4] (*See* ECF Nos. 155-22, 155-33, 155-34.) The testimonies of Burch, McFadden, Joel Burkett, C/O Withy, Sergeant Coleman, and Cross are discussed in relevant part in ground 1(e) *infra*. The other inmate witnesses testified, *inter alia*, that the prison unit where Leonard had been housed was violent, weapons could easily be obtained in the prison unit, Leonard was strong and had skills in hand-to-hand combat, and some prisoners, including Leonard, operate under a "convict code" rather than the rules of society. C/O Crowley testified that he found two inmates in the same cell while Senior C/O Edwards was working. (ECF No. 155-33 at 34-37.) And C/O Escobar testified that (1) an inmate, who had previously been accused of assaulting an officer, was mistakenly let out of his cell while he was escorting a law clerk into a wing of the prison and (2) there was a picture of a dead inmate, possibly Wright, hung up in the prison's control center. (ECF No. 155-33 at 48-53.)

## B. Procedural background

The prosecution charged Leonard with murder with the use of a deadly weapon, battery with the use of a deadly weapon by a prisoner, and possession of a dangerous weapon by a prisoner. (ECF No. 152-2.) The prosecution alleged that the murder took place under two alternate theories: (1) "with malice aforethought, deliberation and premeditation," and (2) "with malice aforethought, and while lying in wait." (*Id.* at 3.) The prosecution filed a notice of habitual criminality and notice of intent to seek the death penalty. (ECF Nos. 152-31, 152-32.)

---

[4]This Court will refer to Theodore Burkett and Joel Burkett using their full names to avoid any confusion.

1        In August 1989, a jury in the First Judicial District Court for Nevada found Leonard

2    guilty of first-degree murder with the use of a deadly weapon, battery with the use of a

3    deadly weapon by a prisoner, and possession of a dangerous weapon by a prisoner.

4    (ECF No. 155-14.) In the penalty phase of the trial, the jury found both aggravating factors

5    alleged by the prosecution: (1) the murder was committed by a person while he was under

6    a sentence of imprisonment, and (2) the murder was committed by a person who was

7    previously convicted of another murder or of a felony involving the use or threat of

8    violence to the person of another. (ECF No. 155-38.) The jury also found two mitigating

9    factors: (1) the victim was a participant in the defendant's criminal conduct or consented

10   to the act; and (2) at least one of the aggravating factors was committed while the

11   defendant was under the influence of drugs or alcohol. (*Id*.) Finding the aggravating

12   factors outweighed the mitigating factors, the jury imposed a death sentence. (*Id*.)

13       A judgment of conviction was entered on August 29, 1989. (ECF No. 156-1.)

14   Leonard filed a motion for a new trial, but his motion was denied. (ECF Nos. 156-22, 157-

15   3, 157-28.) Leonard then appealed his conviction. (ECF No. 157-33.) In January 1992,

16   the Nevada Supreme Court affirmed Leonard's conviction and sentence. (ECF No. 158-

17   15.) After the Nevada Supreme Court denied Leonard's petition for rehearing (ECF No.

18   158-19), Leonard filed a petition for writ of certiorari in the United States Supreme Court.

19   (ECF No. 158-25.) That petition was denied. (ECF No. 158-31.) The Nevada Supreme

20   Court issued remittitur on September 21, 1992. (ECF No. 159.)

21       On September 2, 1992, Leonard filed his first petition for writ of habeas corpus with

22   the state district court. (ECF No. 158-36.) With the assistance of counsel, Leonard filed a

23   supplemental petition. (ECF No. 159-17.) After holding an evidentiary hearing, the district

24   court denied relief. (ECF Nos. 160-15, 160-16, 160-17, 160-18, 160-19, 161-23.) Leonard

25   appealed. (ECF No. 161-25.)

26

27

28

1   In May 1998, the Nevada Supreme Court affirmed the state district court's

2   decision. (ECF No. 162-27.) Leonard filed a petition for writ of certiorari in the United

3   States Supreme Court, which the Court denied. (ECF Nos. 163-1, ECF No. 163-9.) The

4   Nevada Supreme Court issued remittitur on March 10, 1999. (ECF No. 163-11.)

5   Leonard initiated this federal proceeding on March 25, 1999. (ECF No. 1.) The

6   Court appointed counsel to represent Leonard. (ECF No. 7.) Respondents filed an answer

7   to Leonard's initial petition, which included the assertion of procedural defenses to several

8   claims. (ECF No. 51.) At the direction of the Court, Respondents filed a supplement to

9   their answer in May 2006. (ECF Nos. 77, 81.) Respondents argued that grounds 15, 16,

10  17, 18, 19, and 23 of Leonard's petition were unexhausted. (ECF No. 81 at 1.) Leonard

11  agreed that grounds 15 through 19 had yet to be exhausted. (ECF No. 86 at 6-7.) On July

12  19, 2006, this Court found grounds 15 through 19 and 23 to be unexhausted and ordered

13  Leonard to abandon his unexhausted claims or file a motion for stay. (ECF No. 86.)

14  Leonard moved for stay and abeyance, which Respondents did not oppose. (ECF

15  Nos. 87, 88.) On September 25, 2006, the Court granted Leonard's motion to stay these

16  proceedings. (ECF No. 89 at 4.) On October 18, 2006, Leonard filed his second state

17  habeas petition. (ECF No. 162-21.) The district court dismissed Leonard's second state

18  petition on procedural grounds. (ECF No. 164-16.) Leonard appealed. (ECF No. 164-18.)

19  The Nevada Supreme Court affirmed the dismissal. (ECF No. 165-7.) Leonard filed a

20  petition for writ of certiorari in the United States Supreme Court, which the Court denied.

21  (ECF Nos. 165-15, 165-19.) The Nevada Supreme Court issued remittitur on October 13,

22  2010. (ECF No. 165-20.)

23  Instead of moving to lift his federal court stay, Leonard filed a third state habeas

24  petition on January 7, 2011. (ECF No. 165-26.) Once again, the state district court

25  dismissed Leonard's petition on procedural grounds. (ECF No. 166-11.) Leonard

26  appealed. (ECF No. 166-13.) The Nevada Supreme Court affirmed the dismissal. (ECF

27

28

No. 166-33.) Leonard filed a petition for writ of certiorari in the United States Supreme Court, which the Court denied. (ECF Nos. 167, 167-5.) The Nevada Supreme Court issued remittitur on October 11, 2016. (ECF No. 167-6.)

In December 2016, the Court reopened these proceedings and entered a scheduling order that allowed Leonard 60 days within which to file an amended petition. (ECF No. 120.) Leonard filed a motion for leave to supplement petition for writ of habeas corpus, a motion to re-impose stay, and a motion for extension of time to file first amended petition pending resolution of motion to re-impose stay. (ECF Nos. 121, 124, 127.) The Court denied Leonard's motion to re-impose stay but permitted him to supplement his petition. (ECF No. 129.) Leonard filed a motion for reconsideration, but the Court denied that motion. (ECF Nos. 130, 133.)

On March 19, 2018, Leonard filed the instant Petition. (ECF No. 138.) In response, Respondents moved to dismiss. (ECF No. 151.) This Court granted, in part, and denied, in part, the motion to dismiss, dismissing the following grounds: 1(G), 1(H), I(L), 1(S), 1(T)(2), 3(A)(1)(d), 3(B), 3(D), 4, 6(B), 6(C), 7, 8, 9(A), 9(B), 9(C), 10(A), 10(B), 11, 12(B-E), 13, 14, 15, 16, 17, 18, 19 (in part), and 20 (in part). (ECF Nos. 205, 207.) This Court further ordered that it would consider arguments under *Martinez v. Ryan*[5] in relation to procedurally defaulted claims of ineffective assistance of trial counsel at the time of merits review. (ECF No. 207 at 2.) Leonard moved for an evidentiary hearing and for discovery. (ECF Nos. 228, 229.) The Court denied both motions. (ECF No. 247.) The Petition is before the Court for a review of the merits. (ECF Nos. 216 (Respondents' answer), 226 (Leonard's reply).)

///

///

///

---

[5]566 U.S. 14 (2012).

III.     **GOVERNING STANDARDS OF REVIEW**

A.     **The Antiterrorism and Effective Death Penalty Act ("AEDPA")**

28 U.S.C. § 2254(d)[6] sets forth the standard of review generally applicable in habeas corpus cases under the AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than

_____

[6]Leonard argues that 28 U.S.C. § 2254 is unconstitutional because its restrictions suspend the writ of habeas corpus and violate the separation of powers. (ECF No. 184 at 24-28.) This argument lacks legal support. *See Crater v. Galaza*, 491 F.3d 1119, 1129 (9th Cir. 2007) (explaining that "the Court's longstanding application of the rules set forth in AEDPA [are considered] to be strong evidence of the Act's constitutionality").

14

incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

## B.   Procedural default

Generally, to overcome a procedural default based upon the actual or projected application of an adequate and independent state law procedural bar, a federal petitioner must show: (a) cause for the procedural default and actual prejudice from the alleged violation of federal law; or (b) that a fundamental miscarriage of justice will result in the absence of review, based on a sufficient showing of actual factual innocence. *See, e.g.*, *Bennett v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003). Under *Martinez v. Ryan*, a petitioner can demonstrate cause to potentially overcome the procedural default of a claim of ineffective assistance of trial counsel by demonstrating that either (a) he had no counsel during the state post-conviction proceedings or (b) such counsel was ineffective. *See* 566 U.S. 1, 14 (2012). To demonstrate "prejudice" under *Martinez*, the petitioner must show that the defaulted claim of ineffective assistance of trial counsel is a "substantial" claim. *Id.* A claim is "substantial" for purposes of *Martinez* if it has "some merit," which refers to

15

1  a claim that would warrant issuance of a certificate of appealability. *Ramirez v. Ryan*, 937

2  F.3d 1230, 1241 (9th Cir. 2019). This standard does not require a showing that the claim

3  will succeed, but instead only that its proper disposition could be debated among

4  reasonable jurists. *See generally Miller-El v. Cockrell*, 537 US. 322, 336-38 (2003).

5  **IV.   DISCUSSION**

6  　　　**A.   Ground 1—ineffective assistance of counsel at guilt phase**

7  　　　　　In ground 1, Leonard alleges that his trial counsel were ineffective during the guilt

8  phase in violation of his Sixth Amendment right to counsel. (ECF No. 184 at 29.)

9  　　　　　　　**1.   Standard for ineffective assistance of counsel claims**

10  　　　　　In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for

11  analysis of claims of ineffective assistance of counsel requiring the petitioner to

12  demonstrate (1) that the attorney's "representation fell below an objective standard of

13  reasonableness," and (2) that the attorney's deficient performance prejudiced the

14  defendant such that "there is a reasonable probability that, but for counsel's

15  unprofessional errors, the result of the proceeding would have been different." 466 U.S.

16  668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel

17  must apply a "strong presumption that counsel's conduct falls within the wide range of

18  reasonable professional assistance." *Id*. at 689. The petitioner's burden is to show "that

19  counsel made errors so serious that counsel was not functioning as the 'counsel'

20  guaranteed the defendant by the Sixth Amendment." *Id*. at 687. Additionally, to establish

21  prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the

22  errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Rather,

23  the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose

24  result is reliable." *Id*. at 687.

25  　　　　　Where state courts previously adjudicated the claim of ineffective assistance of

26  counsel under *Strickland*, establishing that the decision was unreasonable is especially

27

28

16

difficult. *See Richter*, 562 U.S. at 104-05. In *Richter*, the United States Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *See id*. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential.") (internal quotation marks omitted). The Supreme Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

## 2.    General background relating to trial counsel

Norman Herring was originally appointed as Leonard's first-chair trial counsel, and Sue Sanders was appointed as Leonard's second-chair trial counsel. (*See* ECF No. 138-34.) Mr. Herring moved to withdraw, and the state court granted the motion. (ECF No. 138-88.) Thereafter, in January 1989, approximately eight months before trial, James Wessel was appointed as Leonard's first-chair trial counsel. (*See id*.) The Court will refer to Mr. Wessel as Leonard's first-chair trial counsel and Ms. Sanders as Leonard's second-chair trial counsel.

The Court includes the following facts as a backdrop to its consideration of Leonard's ineffective assistance of trial counsel claims. On January 19, 1989, Mr. Herring sent Leonard's first-chair trial counsel a letter, stating, *inter alia*, that it was his "opinion that [Leonard's first-chair trial counsel] should plan to perform a majority of the investigation and trial work as [Leonard's second-chair trial counsel] is very inexperienced in litigation and trial preparation." (ECF No. 138-34.) And in his motion to withdraw, Mr. Herring stated that Leonard's second-chair trial counsel "does not have extensive experience in criminal trials and no experience in death penalty cases." (ECF No. 138-

114 at 11.) During the post-conviction evidentiary hearing, Leonard's first-chair trial counsel testified, *inter alia*, to the following: (1) he was a compulsive gambler starting around 1984 when he moved to Nevada and continuing through Leonard's trial, (2) by January 1988, all of his "credit cards had been maxed out, [and he] had spent virtually every dollar that [he] had" on gambling, (3) in late 1987, Paul LaBudde retained him to represent Louise Callier, who was serving a life sentence without the possibility of parole, in a habeas proceeding, (4) he told LaBudde that it would take $200,000 to get Callier released pending her habeas proceedings, (5) LaBudde paid him $150,000 in three installments, (6) when he received the $150,000, he "promptly gambled it away" before spending any time working on the case, (7) he was later disbarred and convicted of three counts of embezzlement regarding the $150,000 after LaBudde reported him, (8) in late 1988, he was appointed as counsel in a capital murder case involving Vincent DePasquale even though he had never tried a murder case, (9) between January 1989, when he was appointed as counsel for Leonard, and August 1989, when Leonard's trial took place, "[v]irtually all of [his] time was divided between Mr. Leonard and Mr. DePasquale," with Leonard's trial occurring the month before DePasquale's trial, and (10) he moved to San Diego in September 1989, to get away from gambling. (ECF No. 160-18 at 92–93, 95, 99, 101-02, 140.)

### 3. Grounds 1(a) and 2

In ground 1(a), Leonard alleges that his first-chair trial counsel was ineffective for agreeing to jointly represent him and Hill. (ECF No. 184 at 41.) Relatedly, in ground 2, Leonard alleges that his conviction and sentence are invalid due to his first-chair trial counsel's conflict of interest. (*Id*. at 165.)

### a. Background information

Approximately a month after Leonard's trial ended, Leonard's first-chair trial counsel moved to withdraw. (ECF No. 156-21.) Two days later, Leonard's second-chair

trial counsel moved for a new trial, arguing, in part, that Leonard's first-chair trial counsel had a conflict of interest. (ECF No. 156-22.) The trial court granted Leonard's first-chair trial counsel's motion to withdraw and held an evidentiary hearing on the motion for a new trial. (ECF Nos. 156-26, 157-27.)

At the evidentiary hearing, Hill testified, *inter alia*, that (1) his mother retained Leonard's first-chair counsel to represent Hill on his charges of possession of a dangerous weapon by an incarcerated person and attempted escape, (2) Leonard's first-chair trial counsel negotiated a plea bargain with the Attorney General on Hill's behalf,[7] (3) one of the conditions of the plea bargain was that Hill "would provide information regarding what [he] had witnessed in Mr. Leonard's case" on the night Wright was killed and provide information regarding Leonard's attempted escape,[8] (4) before the plea

_____

[7]The prosecutor's letter to Leonard's first-chair trial counsel regarding the plea offer to Hill included the following statement:

> It is certainly not our intention to call Hill as a witness in the state's case-in-chief [at Leonard's trial]. However, despite your assurance that it is not your intention to call him either, the state is not in the position to go into the Leonard case not knowing what damaging information to the state's guilt or sentencing phase evidence that Hill will have to impart.

(ECF No. 138-35 at 3.)

[8]Hill's plea agreement provided the following:

> I understand that after imposition of sentence in both cases by the court, I will be required to give a sworn statement before a court reporter at the time and place designated by the Attorney General regarding my knowledge of the events prior to, during and after the homicide of Joseph Wright in Unit 7 on October 22, 1987. I understand that time is of the essence and that I will be required to make the statement in order for the Attorney General to analyze it prior to the defense case, if any, in the murder trial of William Leonard, which is scheduled to commence on August 7, 1989. My statement must include any knowledge that I may have about any interaction between Joseph Wright and William Leonard, any information regarding motive for the homicide, as well as information about the whereabouts and disposition of the weapon which was used to inflict the fatal wounds on Joseph Wright. I hereby verify that I know that my counsel also represents William Leonard in the murder case and do hereby waive any conflict of interest he may have.

(ECF No. 138-37 at 6-7.)

bargain, Hill had refused to give any information or make any statement about Leonard, (5) Leonard's first-chair trial counsel told Hill that the best thing for Hill to do was help himself and "fuck Leonard" because Leonard had "already killed twice and [the prosecution was] going to get him on this one," (6) the plea bargain provided for an expedited sentencing so that Hill would be sentenced before he testified in Leonard's trial, (7) the department of parole and probation recommended that Hill be sentenced to 6 years for possessing a weapon and 5 years suspended for attempting to escape, (8) as a result of the plea bargain, Hill was sentenced to two 18-month sentences that were ordered to be served concurrent with each other but consecutive to his other sentences, (9) Hill was deposed about Leonard's case the same day that Hill was sentenced,[9] (10) his testimony at Leonard's trial that Leonard had acted in self-defense was not false, (11) he always intended to testify on Leonard's behalf at the trial, and (12) his deposition and trial testimonies were essentially the same. (ECF No. 157-27 at 40-41, 43-46, 48-49, 52-54.)

At the evidentiary hearing, Leonard's first-chair trial counsel testified, *inter alia*, that (1) Hill's mother had already retained him to represent Hill at the time he accepted the appointment to represent Leonard, (2) Hill's plea bargain stated that "Hill was to testify truthfully about his personal knowledge involved with the death of Joseph Wright, [and] the relationship, if any, between Joseph Wright and Mr. Leonard," (3) "the plea negotiation provided that Mr. Hill would make a statement prior to Mr. Leonard's trial for the purpose that the Attorney General would know what his testimony was to be," (4) during his interviews with Hill, Hill's rendition of events were "essentially . . . all exculpatory in nature" regarding Leonard, (5) he wanted Hill to be deposed before Leonard's trial so that the prosecution would not be able to argue at Leonard's trial that Hill's exculpatory testimony

---

[9]At Hill's deposition, Leonard's first-chair trial counsel represented Hill, and Leonard's second-chair trial counsel "ha[d] requested to be [t]here to . . . represent the interests of William Leonard, about whom some of this testimony may be about." (ECF No. 138-54 at 4.)

was "the first time [he had] ever told anyone this story" (*i.e.*, he wanted to "rehabilitate [Hill] before the fact"), (6) Leonard met separately with his second-chair trial counsel to discuss Hill's negotiations and they were in agreement with Leonard's first-chair trial counsel "that this was an opportunity to help Mr. Hill and also solidify his credibility before [Leonard's] jury," (7) Hill was the only witness, besides Leonard himself, who could establish that Leonard acted in self-defense, (8) the defense team "decided that it would be truly fatal to the case to have Mr. Leonard testify because of his prior convictions," and (9) Hill did not reveal any information during his deposition about the attempted escape that was not already known by the prosecution and presented to the jury through officer testimony. (ECF No. 157-27 at 62, 64-66, 80, 83-84, 87, 89.)[10]

At the evidentiary hearing, Leonard testified, *inter alia*, that (1) his first-chair trial counsel's representation of Hill "was never brought to [his] attention as far [as] a conflict of interest," (2) he was aware that Hill's plea agreement regarded Hill "divulging some information to the Attorney General's Office regarding his view or interpretation of the incident [with] Joseph Wright," but it was not revealed that "Hill was going to relate information regarding the attempted escape," (3) he wanted Hill to testify at his trial, and (4) Hill gave favorable testimony at the trial. (ECF No. 157-27 at 99-100, 111.)

---

[10]In June 2017, Leonard's first-chair trial counsel declared the following:

> [I]t was professionally irresponsible for me to represent Donald Hill while I was representing Leonard. There was an obvious conflict of interest in representing both men on their cases. The conflict damaged Leonard's case: because Hill gave a deposition the night before trial, the prosecution knew exactly what Hill would say at trial. The prosecution was able to use his previous testimony and the plea deal to impeach Hill's credibility. Had my mental health been normal in 1989, I never would have compromised Leonard's case by representing Hill at all.

(ECF No. 138-96 at 4.) However, this Court is precluded from considering this declaration because it was not before the Nevada Supreme Court at the time it considered Leonard's direct appeal. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits").

In denying Leonard's motion for a new trial, the trial court stated, *inter alia*, the following:

> At no time during the course of the trial did the State use information provided by Hill regarding how he and Leonard were able to import weapons into the prison, cut their way out of Unit 7 and seek to breach the perimeter fences of the Nevada State Prison in order to make good their escape. The evidence adduced before the trial jury at the penalty phase regarding the escape was information based on the personal knowledge of three officers who were witnesses to various aspects of the escape in progress, e.g. movement on the yard, apprehending Hill and Leonard, and viewing the adjacent cells of Hill and Leonard on the night that they escaped from Unit 7. Virtually no evidence was presented by Leonard and there does not seem to be any indication whatsoever that the State actually used information from Hill regarding the escape to Leonard's detriment. Indeed, it may be said that the authorities' awareness of Leonard's dangerous propensities was heightened not by anything Hill had revealed with regard to the escape. Rather it was heightened by Leonard's background and the fact that he was involved in the escape to begin with, regardless of the details of it.
>
> At all times pertinent hereto, [Leonard's first-chair trial counsel] intended to and did act in the best interests of both clients. He presented the defense case of self-defense through Hill, the only witness that he had available to accomplish that task. He could not have done so had Hill not obtained a bargain from the State prior to Leonard's trial, thus making Hill available to testify after having already completed the pending criminal litigation against him.

(ECF No. 157-28 at 9-10.)

### b.   State court decision

In affirming Leonard's judgment of conviction, the Nevada Supreme Court held:

> Leonard initially contends that his attorney, James Wessel, had a conflict of interest which prejudiced Leonard's defense because Wessel represented another inmate, Don Hill, in a different matter. Hill received a favorable plea bargain on two pending charges in return for his deposition about Leonard's attack on Wright and information regarding an escape attempt by Leonard. Hill's deposition testimony regarding the Wright homicide was favorable to Leonard and supported Leonard's theory of self-defense. The State did not use Hill's testimony affirmatively at trial. Leonard was aware of and did not object to Wessel's representation of Hill, and no actual conflict between Leonard and Hill existed which would have affected Wessel's efforts on behalf of Leonard. "[T]he possibility of conflict is insufficient to impugn a criminal conviction. . . . [A] defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). Because no actual conflict of interest existed, Leonard's argument is without merit.

22

1    (ECF No. 158-15 at 3-4.)[11]

2                         **c.    Standard for a conflict of interest**

3            "Where a constitutional right to counsel exists, our Sixth Amendment cases hold

4    that there is a correlative right to representation that is free from conflicts of interest."

5    *Wood v. Georgia*, 450 U.S. 261, 271 (1981). However, "permitting a single attorney to

6    represent codefendants, often referred to as joint representation, is not per se violative of

7    constitutional guarantees of effective assistance of counsel." *Holloway v. Arkansas*, 435

8    U.S. 475, 482 (1978). Rather, to establish a violation of the right to conflict-free counsel,

9    the petitioner must show that an "actual conflict of interest adversely affected his lawyer's

10   performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348 (1980). "'[A]n actual conflict of

11   interest' [means] precisely a conflict that affected counsel's performance—as opposed to

12   a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002); *see*

13   *also McClure v. Thompson*, 323 F.3d 1233, 1248 (9th Cir. 2003) ("The client must

14   demonstrate that his attorney made a choice between possible alternative courses of

15   action that impermissibly favored an interest in competition with those of the client."). "[A]

16   defendant who shows that a conflict of interest actually affected the adequacy of his

17   representation need not demonstrate prejudice in order to obtain relief." *Cuyler*, 446 U.S.

18   at 350-51; *see also Sanders v. Ratelle*, 21 F.3d 1446, 1452 (9th Cir. 1994) ("Once an

19   actual conflict has been demonstrated, prejudice is presumed since the harm may not

20   consist solely of what counsel does, but of what the advocate finds himself compelled to

21   _____

22           [11]Although as to this determination regards ground 2 of the instant Petition, this
     Court previously concluded that "[c]laim 1(A) appears to have [also] been adjudicated on
23   the merits when the Nevada Supreme Court decided Leonard's direct appeal." (ECF No.
     207 at 2.) This Court is not persuaded by arguments that ground 1(a) is procedurally
24   defaulted because (1) Leonard's conflict claim in ground 1(a) is fundamentally altered
     from the claim presented to the Nevada Supreme Court on direct appeal or (2) the Nevada
25   Supreme Court did not specifically analyze Leonard's conflict claim under the *Strickland*
     standard in its direct appeal order. *See Strickland*, 466 U.S. at 692 (explaining that "an
26   actual conflict of interest" is a "type of actual ineffectiveness claim" in which the
     performance issue deals with counsel's breach of the duty of loyalty and the prejudice
27   issue is "similar, though more limited"). Grounds 1(a) and 2 are both reviewable under the
     foregoing adjudication by the Nevada Supreme Court.

                                            23

28

1   *refrain* from doing, not only at trial but also during pretrial proceedings and preparation."

2   (internal quotation marks omitted) (emphasis in original)).

3                                   **d.      Analysis**

4          The Nevada Supreme Court appears to have reasonably determined that no actual

5   conflict of interest existed which would have affected Leonard's first-chair trial counsel's

6   efforts on behalf of Leonard. Although Leonard was harmed by the prosecution's advance

7   knowledge of Hill's testimony by way of Hill's plea negotiation and deposition, giving the

8   prosecution an advantage during its cross-examination of Hill that it would not otherwise

9   have had, Leonard received at least a minimal benefit from his first-chair trial counsel's

10  representation of Hill. First, as Leonard's first-chair trial counsel testified, representing Hill

11  and having Hill's deposition take place before Leonard's trial was a strategic decision, at

12  least in part, because it allowed Leonard's defense team to build Hill's credibility before

13  Leonard's trial. This strategic decision is entitled to at least some deference. Second, as

14  the Respondents note, because Hill was facing serious charges, having another attorney

15  represent Hill—besides Leonard's first-chair trial counsel—might have resulted in Hill

16  being advised to testify against Leonard in exchange for a reduction of charges. By

17  representing Hill, Leonard's first-chair trial counsel was able to ensure that this did not

18  happen, ensuring Hill's favorable testimony at Leonard's trial. Third, Leonard's first-chair

19  trial counsel was also able to ensure that the charges against Hill were resolved before

20  Leonard's trial, guaranteeing that Hill would be available to testify in Leonard's defense.

21  If Hill had been represented by different counsel, Hill might have been advised to invoke

22  his right to remain silent at Leonard's trial. *See Alberni v. McDaniel*, 458 F.3d 860, 870

23  (9th Cir. 2006) (explaining that "in many situations, dual representation may work in the

24  defendant's favor").[12]

---

25          [12]Regarding waiving a conflict of interest, the waiver must be voluntary, knowing,
26  and intelligent to be valid and should appear on the record. *See Edwards v. Arizona*, 451
    U.S. 477, 482 (1981); *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938). The Nevada

27

28                                          24

1    Because Leonard has not definitively shown that an "actual conflict of interest

2    adversely affected his lawyer's performance," *Cuyler,* 446 U.S. at 348, the Nevada

3    Supreme Court's determination that Leonard's conflict of interest claim lacked merit

4    constituted an objectively reasonable application of federal law and was not based on an

5    unreasonable determination of the facts. Leonard is not entitled to federal habeas relief

6    on ground 2. Similarly, because Leonard has not shown an actual conflict of interest, he

7    fails to demonstrate that his first-chair trial counsel performed deficiently by breaching his

8    duty of loyalty to Leonard. *See Strickland*, 466 U.S. at 692. Because the Nevada Supreme

9    Court's determination also constitutes an objectively reasonable application of *Strickland*,

10   Leonard is not entitled to federal habeas relief on ground 1(a).[13]

11              **4.    Ground 1(b)**

12    In ground 1(b), Leonard alleges that his trial counsel were ineffective for failing to

13   adequately investigate, develop, prepare, and present a defense. (ECF No. 184 at 51.)

14    Defense counsel has a "duty to make reasonable investigations or to make a

15   reasonable decision that makes particular investigations unnecessary." *Strickland*, 466

16   U.S. at 691. Additionally, "[i]n any ineffectiveness case, a particular decision not to

17   investigate must be directly assessed for reasonableness in all the circumstances,

18   applying a heavy measure of deference to counsel's judgments." *Id.* In assessing

19   counsel's investigation, the Court must conduct an objective review of counsel's

20   performance, measured for "reasonableness under prevailing professional norms." *Id*. at

21   688. This includes a context-dependent consideration of the challenged conduct as seen

22

23   Supreme Court did not expressly discuss whether Leonard waived the conflict, merely
     stating that Leonard was aware of his first-chair trial counsel's representation of Hill and
24   did not timely object. This implicit finding of no waiver was reasonable. Although Leonard
     and Leonard's first-chair trial counsel both testified that Leonard met with his second-
25   chair trial counsel to discuss his first-chair trial counsel's representation of Hill and Hill's
     deposition, there was no formal waiver ever made on the record.

26
         [13]For the reasons discussed in the certificate of appealability section of this order,
27   this Court grants Leonard a certificate of appealability for grounds 1(a) and 2.

28

1    "from counsel's perspective at the time." *Id.* at 689; *see also Wiggins v. Smith*, 539 U.S.

2    510, 523 (2003). Furthermore, "strategic choices made after thorough investigation of law

3    and facts relevant to plausible options are virtually unchallengeable." *Strickland,* 466 U.S.

4    at 690.

5                              **a.    Ground 1(b)(1)**

6          In ground 1(b)(1), Leonard alleges that his trial counsel failed to conduct an

7    adequate pretrial investigation, namely (1) failing to investigate and develop evidence to

8    support the argument that the altercation was a set-up, (2) failing to investigate and

9    develop evidence regarding how known enemies were housed in the same wing in

10   adjacent cells and scheduled to be let out of their cells back to back, (3) failing to obtain

11   any videotape or documentation of prison yard fights that occurred approximately 10 days

12   before the homicide, (4) failing to investigate, file a pretrial motion to dismiss the charges,

13   and/or a motion to suppress based on lost or destroyed evidence, (5) failing to conduct

14   an independent examination of the shanks or metal locker, (6) failing to investigate and

15   ensure the preservation of evidence, and (7) failing to present evidence that the prison

16   guards were complicit in the offense. (ECF No. 184 at 51-53.)

17         This Court previously found this ground to be procedurally defaulted. (ECF No. 205

18   at 53.) And this Court further ordered that it would "consider *Martinez* arguments in

19   relation to th[is] claim[ ] when it rules upon the merits of Leonard's petition." (ECF No. 207

20   at 2.) This Court now finds that Leonard fails to demonstrate prejudice to excuse the

21   procedural default because Leonard's ineffective assistance of trial counsel claim is not

22   substantial.

23         First, Leonard's following allegations are insubstantial for the reasons discussed

24   in ground 1(b)(4) *infra*: (1) his trial counsel failed to conduct a pretrial investigation to

25   support the argument that the assault was a "set up," (2) his trial counsel failed to conduct

26   a pretrial investigation regarding how known enemies were housed in the same wing in

27

28
                                              26

adjacent cells, and (3) his trial counsel failed to conduct a pretrial investigation showing that the correctional officers were complicit in the offense. Second, Leonard's following allegations are insubstantial for the reasons discussed in ground 1(n) *infra*: (1) his trial counsel failed to conduct a pretrial investigation based on the lost or destroyed evidence and (2) his trial counsel failed to ensure the preservation of evidence.

Third, regarding Leonard's allegation that his trial counsel failed to conduct a pretrial investigation about prison yard fights that occurred approximately 10 days before the homicide, a memorandum was issued on October 28, 1987, 6 days after the homicide, by C/O Larry Adamson with the Investigation Division of the Nevada State Prison regarding Leonard's possible motive in killing Wright. (ECF No. 138-116 at 67.) The memorandum detailed two fights before the homicide: (1) one on October 12, 1987, between Inmate Culverson, a black inmate, and Leonard, who is white; and (2) one on October 13, 1987, between Wright, who was black, and Hill, who was white. (*Id*.) The memorandum stated that "from the October 12, 1987[,] incident up to and including the October 22, 1987[,] death incident, the inmates involved were all housed in Unit 7, D-Wing, with white inmates attacking black inmates." (*Id*.) The memorandum also stated that "[i]nmate Hill . . . is a known member of the Aryan Warrior Prison Gang" and "[i]nmate Leonard . . . is known to be associated or affiliated with the Aryan Warrior Prison Gang." (*Id*.) Because a pretrial investigation about the prison yard fights that occurred before the homicide would not have been beneficial to Leonard—indeed, they would likely have been detrimental because they appeared to show that the attacks on black inmates by white inmates were racially motivated—Leonard fails to demonstrate that his trial counsel was ineffective.

And fourth, regarding Leonard's allegation that his trial counsel failed to conduct an examination of the shank or metal locker, the prosecution's witness, David Atkinson, testified that the ability to test the shank was "limited" because further testing would

27

1  destroy the evidence. (ECF No. 154-35 at 160.) Given this inability to fully test the shank,

2  Leonard fails to demonstrate that, had his trial counsel conducted his own examination of

3  the shank and metal locker, that the result of the testing would have been fruitful.

4  Additionally, as is discussed in ground 1(f) *infra*, the prosecution was not able to show

5  that the shank found in the sewer was a definite match to the D-Wing locker or the shanks

6  found in Hill's possession, negating Leonard's trial counsel's need to refute the

7  prosecution's evidence in that regard.

8      Based on the record, Leonard's ineffective assistance of trial counsel claim is not

9  substantial because Leonard fails to demonstrate ineffectiveness under *Strickland*.

10 Because Leonard fails to demonstrate requisite prejudice necessary to overcome the

11 procedural default of ground 1(b)(1), that ground is dismissed.

12                           **b.      Ground 1(b)(2)**

13     In ground 1(b)(2), Leonard alleges that his trial counsel failed to develop and

14 present available evidence favorable to Leonard supporting a mutual-combat theory.

15 (ECF No. 184 at 54.) In affirming the denial of Leonard's state habeas petition, the Nevada

16 Supreme Court held:

17              Leonard asserts that the most fundamental error of his two trial
       counsel was relying on a theory of self-defense and rejecting the options of
18     voluntary manslaughter and second-degree murder. Moreover, he argues
       that the offense most appliable to the facts was mutual combat, pursuant to
19     NRS 200.450, which criminalizes fighting "upon previous concert and
       agreement."
20              [FN2] At the time of Leonard's prosecution, NRS 200.450(3)
               provided that if death ensued as a result of such fighting, a
21             person causing the death would be punished by one to ten
               years in prison and could be fined as much as $10,000. The
22             statute now provides that such a death constitutes first-degree
               murder. 1995 Nev. Stat., ch. 443, § 65, at 1189-90.
23              We conclude that Wessel and Saunders were not ineffective in
       arguing self-defense but performed reasonably well given the task they
24     faced. Despite CO Bascus's testimony that Leonard attacked first and the
       fact that Leonard emerged basically unharmed, it was not unreasonable to
25     argue self-defense since defense counsel were able to present other
       testimony that Wright attacked first as well as undisputed evidence that
26     Wright was a convicted murderer with a history of violent behavior. . . .

27                                        28

28

1
2

> Leonard maintains that the defense should have argued that he and Wright engaged in mutual combat. But he offers little if any evidence of an agreement between himself and Wright to fight.

3       (ECF No. 162-27 at 6.)

4            At the time of Leonard's trial, NRS § 200.450 provided that "[i]f any person or

5       persons, upon previous concert and agreement, fight one with the other or give or send .

6       . . a challenge . . . to fight any other person, the person or persons giving, sending or

7       accepting a challenge to fight any other person shall be punished," if "death ensue to any

8       person in such fight," by imprisonment for 1 to 10 years. *See also Pimentel v. State*, 396

9       P.3d 759, 765 (Nev. 2017) (explaining that under NRS § 200.450 "[t]he police and

10      prosecutors need only look to find evidence that the fighters agree to fight beforehand, a

11      fight actually took place, and in the case of murder charges, that one or more of the

12      fighters died as a result").

13           The Nevada Supreme Court reasonably determined that Leonard offered little if

14      any evidence of a previous agreement between him and Wright to fight. Even if Leonard

15      and Wright were enemies and may have been generally amenable to fighting each other,

16      the circumstances of the fight at hand do not substantiate that Leonard and Wright

17      engaged in an agreement to fight on the night in question. Rather, given that a mistake

18      had to be made for Wright and Leonard to both be released from their cells at the same

19      time, the fight between Wright and Leonard was necessarily sudden and unexpected, at

20      least to one party. Because the fight in question lacked warning under the

21      circumstances—unlike, for example, a fight in the prison yard—Leonard fails to

22      demonstrate that the specific fight that took place was agreed to in advance by both

23      parties.[14] Because the evidence did not support a mutual-combat defense, Leonard fails

24      to demonstrate that his trial counsel were ineffective in not developing and presenting

25      such a defense. Because the Nevada Supreme Court's determination that Leonard failed

26

27      [14]Notably, Leonard's trial counsel testified that the defense attorneys and Leonard "were in agreement that this was a self-defense case." (ECF No. 160-18 at 148.)

28

1    to demonstrate ineffectiveness constituted an objectively reasonable application of

2    *Strickland* and was not based on an unreasonable determination of the facts, Leonard is

3    not entitled to federal habeas relief on ground 1(b)(2).

4                        **c.      Ground 1(b)(3)**

5          In ground 1(b)(3), Leonard alleges that his counsel failed to take advantage of and

6    utilize the contents of the critical incident review reports to impeach C/O Bascus and

7    Senior C/O Edwards. (ECF No. 184 at 61.) This Court previously found this ground to be

8    procedurally defaulted. (ECF No. 205 at 53.) And this Court further ordered that it would

9    "consider *Martinez* arguments in relation to th[is] claim[ ] when it rules upon the merits of

10   Leonard's petition." (ECF No. 207 at 2.) This Court now finds that Leonard fails to

11   demonstrate prejudice to excuse the procedural default because Leonard's ineffective

12   assistance of trial counsel claim is not substantial.

13                        **i.      Background information**

14         On November 3, 1987, 12 days after Wright's death, Inspector General R. Bayer

15   issued a memorandum to the Critical Incident Review Board regarding Wright's death.

16   (ECF No. 138-77 at 34.) Inspector General Bayer reported the following: (1) "C/O Bascus

17   did not visually insure [sic] that Leonard had returned to his cell," and "[t]his failure to

18   follow his post orders was the prime human error that resulted in inmate Wright's death,"

19   (2) "[h]ad Edwards been doing his job properly, he would have seen the incident [between

20   Wright and Leonard] develop," (3) Senior C/O Edwards's restroom break while C/O

21   Bascus was in C-Wing was "a clear breach in security" because "[t]here can be no reason

22   why any staff member should remain locked on a tier in this maximum security unit without

23   any observation, back-up, or way to get out of the tier," and (4) Senior C/O Edwards "was

24   not supervising showers correctly" because "[h]e should not have allowed 'D Wing' to

25   shower that night" and "should not have allowed all four wings to shower simultaneously."

26   (*Id*. at 37-38, 42.)

27

28                                    30

1    The following day, November 4, 1987, the Critical Incident Review Board issued a

2    memorandum to Director George W. Sumner. (ECF No. 138-77 at 45.) The Critical

3    Incident Review Board recommended that C/O Bascus be terminated because his

4    "violation of rules resulted in the death of inmate Joe Wright." (*Id*.) Specifically, the Critical

5    Incident Review Board stated that C/O Bascus "did not see inmate Leonard return to his

6    cell and did not have him come out of the cell to verify that Leonard was not hiding" and

7    "was also slow in reporting the fight to the control officer." (*Id*. at 46.) The Critical Incident

8    Review Board also recommended that Senior C/O Edwards be terminated because his

9    "violation of rules resulted in the death of inmate Joe Wright." (*Id*. at 47.) Specifically, the

10   Critical Incident Review Board stated that Senior C/O Edwards (1) "did leave his post to

11   go to the bathroom and left it in such a manner as to seriously endanger C/O Bascus"

12   and "in this case, probably gave Leonard the time he needed to hide behind the trash

13   can," (2) "did not see inmate Leonard on the monitor," (3) "failed to tape record the

14   incident," and (4) "should not have allowed all four wings to be showered at the same

15   time." (*Id*. at 47-49.)

16   At the post-conviction evidentiary hearing, Leonard's first-chair trial counsel

17   testified that although Senior C/O Edwards had been inconsistent regarding what

18   happened the night Wright died, he never implicated Leonard. (ECF No. 160-18 at 168.)

19   As such, Leonard's first-chair trial counsel's sole focus at trial regarding Senior C/O

20   Edwards was to make sure he did "not flip on" Leonard. (*Id*.) And regarding C/O Bascus,

21   Leonard's first-chair trial counsel testified that the defense felt that C/O Bascus's

22   testimony that he was rushed and "never saw a weapon in Mr. Leonard's hand" actually

23   "played perfectly into [the] defense." (*Id*. at 143.)

24                    **ii.      Analysis**

25   The Critical Incident Review Board's report, especially in recommending that C/O

26   Bascus and Senior C/O Edwards be terminated for their roles in Wright's death, was

27
                                                31
28

1    scathing and beneficial to the defense. And because C/O Bascus and Senior C/O

2    Edwards were the prosecution's prime witnesses, it would have been sensible to use the

3    Critical Incident Review Board's reports to impeach their testimony[15] or to better highlight

4    the officers' wrongdoing—and discipline stemming therefrom—regarding Wright's death.

5    However, even if Leonard's trial counsel acted deficiently in this regard, Leonard fails to

6    demonstrate prejudice. The jury was aware that C/O Bascus and Senior C/O Edwards

7    failed to fulfill their job duties on the evening Wright was killed. Although the Critical

8    Incident Review Board's reports may have solidified that point and informed the jury that

9    they were both recommended for termination, Leonard fails to demonstrate that such

10   knowledge would have changed the jury's first-degree murder verdict. Indeed, even

11   though C/O Bascus's and Senior C/O Edwards's mistakes were a precursor to the attack,

12   the attack itself was the basis of the jury's consideration of Leonard's guilt. Based on the

13   record, Leonard's ineffective assistance of trial counsel claim is not substantial because

14   Leonard fails to adequately demonstrate prejudice under *Strickland*. Because Leonard

15   fails to demonstrate requisite prejudice necessary to overcome the procedural default of

16   ground 1(b)(3), that ground is dismissed.

17                    **d.    Ground 1(b)(4)**

18         In ground 1(b)(4), Leonard alleges that his counsel failed to develop and present

19   available evidence that demonstrated the complicity of prison officials in the offense. (ECF

20   No. 184 at 70.)

21   ///

22   ///

23

24         [15]Although Leonard's trial counsel may not have wanted to impeach C/O Bascus's
     favorable testimony that he never saw Leonard with a weapon, C/O Bascus also provided
25   inculpatory testimony that warranted attempts at impeachment. And regarding not
     wanting to impeach Senior C/O Edwards for fear that he would "flip on" Leonard, it seems
26   unlikely that Senior C/O Edwards would have changed his direct examination testimony
     that he did not see much during cross examination simply because Leonard's trial counsel
27   asked him about the Critical Incident Review Board's report.

28

1

i.      **Background information**

2      At the post-conviction evidentiary hearing, Leonard's first-chair trial counsel

3   testified that he did "not pursu[e] the theory of [intentional or negligent] staff involvement"

4   in the killing because the defense team "didn't have any evidence to support such a theory

5   and, quite frankly, [they] thought it was preposterous." (ECF No. 160-19 at 34.) Leonard's

6   first-chair trial counsel also testified that the blunders the officers made on the evening

7   Wright was killed "was a crossover in civil and criminal law" and the defense team "didn't

8   see that that was a defense to a crime." (*Id*. at 32.)

9

ii.      **State court determination**

10      In affirming the denial of Leonard's state habeas petition, the Nevada Supreme

11   Court held:

12          Moreover, Leonard theorizes that Senior CO Edwards, the officer in the
            control room, opened the cell doors so that the fight could occur. He cites a
13          number of circumstances which he considers suspicious, for example:
            Edwards locked CO Bascus in C Wing for a time, Edwards claims that he
14          was unaware of the altercation between the inmates and therefore failed to
            record it, Edwards changed his explanation for this failure, Edwards had
15          been disciplined for concealing a 1985 DUI conviction from prison
            authorities, and Edwards refused to give any information to the investigator
16          working for Leonard's post-conviction counsel. We consider this theory
            completely unconvincing speculation, as the jury likely would have if
17          presented with it. The theory founders most directly on the fact that Bascus
            admitted that he (not Edwards) had mistakenly allowed both inmates out of
18          their cells at the same time. At best, Leonard now simply posits an
            alternative defense strategy; he does not establish that the strategy followed
19          was unreasonable.

20   (ECF No. 162-27 at 6-7.)

21

iii.      **Analysis**

22      The Nevada Supreme Court reasonably determined that Leonard failed to

23   demonstrate that his trial counsel acted deficiently. Numerous errors by prison staff

24   contributed to Leonard having access to Wright, but as the Nevada Supreme Court

25   reasonably determined, it is merely speculation that these errors amounted to a

26   collaboration to have Wright killed. Instead, based on the record, it appears to be a series

27

28                                              33

of unfortunate, coincidental mistakes made by negligent prison staff. This is supported by the version of events as relayed to Leonard's trial counsel by Leonard. (*See* ECF No. 161-23 at 5 (explaining that Leonard "told counsel that he knew how to gain access to Wright through the showering sequence").) This abated Leonard's trial counsel's investigatory duties regarding a collusion defense. *Strickland*, 466 U.S. at 691 ("[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether."). Further, even if C/O Bascus's and Senior C/O Edwards's errors were intentional and made to "set up" Leonard by providing him the opportunity to attack Wright, Leonard would still be liable for his own actions. Alternatively, if C/O Bascus's and Senior C/O Edwards's errors were intentional and made in collusion with Leonard, it would still not support a mutual combat defense, as is further discussed in ground 1(b)(2), because it would be mere speculation that Wright was also a part of the agreement to fight.

Because the Nevada Supreme Court's determination that Leonard failed to demonstrate that his trial counsel were ineffective constituted an objectively reasonable application of *Strickland* and was not based on an unreasonable determination of the facts, Leonard is not entitled to federal habeas relief on ground 1(b)(4).

### 5.      Ground 1(c)

In ground 1(c), Leonard alleges that his trial counsel failed to enhance the credibility of Hill and Armijo by using (1) Hill's prior consistent statements from his deposition about the attack, (2) photographic evidence corroborating Hill's testimony that Wright threw powder at Leonard, and (3) negative test results for Leonard's fingerprints on the trash can. (ECF No.184 at 77.)

In affirming the denial of Leonard's state habeas petition, the Nevada Supreme Court held:

34

1

2

3

4

5

> Leonard also says that his counsel were ineffective in not countering impeachment of Hill by introducing a prior consistent statement by Hill that Wright was the aggressor. NRS 51.035(2)(b) allows a prior consistent statement "to rebut an express or implied charge against [a witness] of recent fabrication or improper influence or motive." Leonard has not shown where the state expressly or impliedly charged Hill with recent fabrication or improper motive. Absent such a charge, prior consistent statements are not admissible under the statute. Therefore, trial counsel were not ineffective in not offering Hill's prior statement.

6

(ECF No. 162-27 at 10.)

7

8

9

10

11

12

13

14

15

16

17

The Nevada Supreme Court reasonably determined that Leonard's trial counsel were not deficient because Leonard failed to demonstrate that the prosecution impliedly charged Hill with recent fabrications. Leonard's contention that there was an implied charge of fabrication against Hill during the prosecution's cross examination of him lacks merit. (ECF No. 226 at 113.) During cross examination of Hill, the prosecutor asked Hill if he "essentially [had given] a false name . . . to the police authorities," and had "given similarly false names to police authorities to further [his] own purposes" on prior occasions. (ECF No. 155-7 at 88.) After Hill responded in the affirmative, the prosecutor asked, "[s]o essentially, when it suits your own purposes, you will be willing to give false information, at least to the police authorities; correct?" (*Id*. at 89.) Hill responded, "I wouldn't say that. I was trying to bail out of jail at the time, and I had warrants." (*Id*.)

18

19

20

21

22

23

24

25

26

Although this exchange potentially amounted to an implied charge of fabrication against Hill, the Nevada Supreme Court's determination that he had "not shown where the state expressly or impliedly charged Hill with *recent* fabrication" was not based on an unreasonable determination of the facts. (*See* ECF No. 162-27 at 10 (emphasis added).) Indeed, the fabrication to which Leonard relies on is Hill's apparent use of alias when he got arrested in the past, before being in prison and seeing the altercation with Leonard and Wright. Because Hill's prior consistent statement—his deposition which occurred on August 7, 1989[16]—did not occur before the alleged fabrication—the use of alias before

27

---

[16]*See* ECF No. 138-54 at 9-10.

28

Hill's prison term—the prior consistent statement cannot be used to rebut the fabrication. *See Patterson v. State*, 907 P.2d 984, 989 (Nev. 1995) (explaining that the party seeking to introduce the prior consistent statement "has the burden to show that the victim's prior consistent statements occurred prior to the alleged fabrication"); NRS § 51.035(2)(b) (providing that a statement is hearsay unless "[t]he declarant testifies . . . and the statement is . . . [c]onsistent with the declarant's testimony and offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive").

Turning to the lack of Leonard's fingerprints on the trash can (ECF No. 138-114 at 2) and the photographs showing Wright's body with a powdery substance on it following his death (ECF No. 138-58), this evidence was consistent with Hill's and Armijo's testimonies and merited emphasis. However, Leonard's trial counsel did emphasize these facts in conjunction with Hill's and Armijo's testimonies during closing argument—albeit not in way Leonard desired. Leonard's counsel argued (1) C/O Bascus, the prosecution's prime witness, "does not testify that Bill Leonard jumped out of a trash can[ or] jumped from behind a trash can" and (2) "when you look at the photographs of Mr. Wright, you can see this powdery substance, the powdery substance that's consistent with what Donald Hill told you about, a powdery substance that Donald Hill said appeared to him to be used by Joe Wright to stun Billy Leonard." (ECF No. 155-11 at 105-06, 126.)

Because the Nevada Supreme Court's determination that Leonard failed to demonstrate deficiency constituted an objectively reasonable application of *Strickland*'s performance prong and was not based on an unreasonable determination of the facts, Leonard is not entitled to federal habeas relief on ground 1(c).

### 6.      Ground 1(d)

In ground 1(d), Leonard alleges that his trial counsel were ineffective for failing to present available documentation and witnesses regarding Wright's violent propensities,

36

tendencies toward initiating aggressive behavior, and history of possessing weapons. (ECF No. 184 at 81.) Specifically, Leonard alleges in grounds 1(d)(1) and 1(d)(2) that his trial counsel were ineffective for failing to present evidence showing that Wright was the initial aggressor and evidence showing that Wright was known to possess weapons in prison. (*Id.* at 82, 85.)

### a.   State court determination

In affirming the denial of Leonard's state habeas petition, the Nevada Supreme Court held:

> Leonard contends that his trial counsel ineffectively failed to present more evidence regarding Wright's aggressive nature, including: Wright's possession of a prison-made weapon in 1985; his complaints of migraine headaches; an inmate who reported that Wright had been shot in a robbery attempt and did not care if he died and who also knew Wright as a homosexual who desired young white males; an autopsy finding of semen in Wright's penis; and two other inmates who reported that Wright had thrown boiling water and chemicals at other inmates.
>
> Leonard simply asserts that "a theory could have been developed" that the migraine headaches caused Wright to behave violently. This assertion fails to demonstrate that counsel were unreasonable in failing to pursue such a theory. Regarding the potential testimony by the three inmates, counsel could have reasonably decided it was largely cumulative to other defense evidence and that further reliance on inmate testimony would not have been productive. Leonard claims that the semen in Wright's penis after his death meant that he intended a violent sexual assault upon Leonard; however, Wessel made this very argument in closing argument. We conclude that counsel were not ineffective in dealing with this possible evidence.
>
> At the post-conviction hearing, Wessel could offer no good reason for not presenting at trial the evidence of Wright's prior possession of a weapon. We conclude that defense counsel performed deficiently in not presenting this evidence, but this failure did not significantly prejudice Leonard because other evidence before the jury indicated that possession of prison-made weapons was almost endemic among inmates in maximum security.

(ECF No. 162-27 at 11.)

### b.   De novo review is unwarranted

Leonard argues that the Nevada Supreme Court's *post hoc* rationalization of why counsel did not present evidence of Wright's violent propensities is not supported by the record, constituting an unreasonable determination of the facts, and is contrary to, or an

1   unreasonable of, *Strickland*. (ECF No. 226 at 117-118.) The Court is not persuaded.

2   "[C]ourts may not indulge '*post hoc* rationalization' for counsel's decisionmaking that

3   contradicts the available evidence of counsel's actions." *Richter*, 562 U.S. at 109. Thus,

4   although the Nevada Supreme Court engaged in *post hoc* rationalization, Leonard must

5   also demonstrate that the rationalization contradicts the evidence. Leonard fails in this

6   regard because, as the Nevada Supreme Court reasonably concluded, relying on more

7   inmates to point the finger at Wright's violence could have been seen as being

8   unproductive, given that those inmates' credibility was questionable at times.

9                                   **c.    Analysis**

10          Addressing first Leonard's contention that his counsel failed to present evidence

11   showing that Wright was the initial aggressor, the Nevada Supreme Court reasonably

12   concluded that Leonard's counsel were not ineffective. Before trial, Leonard moved in

13   limine for a court ruling on the admissibility of Wright's prior bad acts. (ECF No. 154-19.)

14   At a hearing on the motion, the trial court stated that "when we're talking about the threats

15   and the specific types of conduct [of the victim,] the defendant has to have some

16   knowledge about that." (ECF No. 154-20 at 14.) Otherwise, the trial court noted, "[i]f [the

17   defense] introduce[s] evidence to show that . . . the victim was more likely the aggressor,

18   then . . . the prosecution is entitled to introduce evidence that [Leonard] was more likely

19   the aggressor." (*Id*. at 8.) Leonard's first-chair trial counsel confirmed this ruling in his

20   post-conviction evidentiary hearing testimony, stating the defense was "limited to

21   instances [of Wright's violence] that Mr. Leonard was aware of" because they "would

22   affect [his] perception on the dangerousness of" Wright. (ECF No. 160-18 at 131–32,

23   112.) Leonard's first-chair trial counsel testified that the defense team attempted to find

24   other instances of Wright being an aggressor like the violence and assault Emde suffered

25

26

27                                          38

28

1    at the hands of Wright.[17] (ECF No. 160-19 at 42.) However, unlike the situation with

2    Emde, a situation that "Leonard was acutely aware of," the defense had no "information

3    that Mr. Leonard was aware of" any other assault or violence suffered at the hands of

4    Wright. (*Id*. at 42-43.)

5           Given the trial court's ruling, even though there is no question that Wright was

6    aggressive and violent (*see* ECF Nos. 138-77 at 76-82; 138-79; 138-80; 138-81 at 2; 138-

7    85; 138-91; 138-109 at 25-43; 138-111 at 9; 138-112),[18] Leonard fails to demonstrate that

8    his trial counsel acted deficiently. Leonard's trial counsel attempted to find other incidents

9    of Wright's aggressiveness that Leonard was aware of before killing Wright to support

10   Leonard's self-defense theory, but finding none, it was reasonable to not pursue general

11   evidence that Wright was aggressive and violent. *See Burgeon v. State*, 714 P.2d 576,

12   578 (Nev. 1986) ("When it is necessary to show the state of mind of the accused at the

13   time of the commission of the offense for the purpose of establishing self-defense, specific

14   acts which tend to show that the deceased was a violent and dangerous person may be

15   admitted, provided that the specific acts of violence of the deceased were known to the

16   accused or had been communicated to him."). Moreover, if Leonard's trial counsel had

17   investigated and presented general evidence that Wright was aggressive and violent, it

18   would have allowed the prosecution to introduce evidence at the guilt phase of Leonard's

19   prior violence to show that Leonard was the initial aggressor. This would have been

20   devasting to Leonard's case. Because the Nevada Supreme Court's determination that

21   Leonard failed to demonstrate that his counsel was ineffective constituted an objectively

22   reasonable application of *Strickland* and was not based on an unreasonable

23

24

25          [17]As a reminder, Emde testified at Leonard's trial that Wright sexually assaulted
     Emde while holding a razor blade to his throat. (ECF No. 155-11 at 28-38.)

26
            [18]Importantly, the jury was aware that Wright had been convicted of murder and
27   sentenced to life in prison. (ECF No. 155-5 at 140-41.)

39

28

1   determination of the facts, Leonard is not entitled to federal habeas relief on ground

2   1(d)(1).

3          Turning next to Leonard's contention that his counsel failed to present evidence

4   showing that Wright was known to possess weapons in prison, there appears to be

5   several instances of Wright's possession of weapons in prison that Leonard's trial counsel

6   could have presented: (1) on September 12, 1985, a Nevada Department of Prisons

7   misconduct report provided that Wright had been caught with a "homemade weapon"

8   (ECF No. 138-79 at 4); (2) on January 24, 1986, the Washoe County Sheriff's Office

9   informed the Nevada Department of Prisons that Wright, who had been housed by the

10  Washoe County Sheriff's Office awaiting trial, "was found to have secreted a 'skill knife'

11  blade in his medication" (ECF No. 138-80 at 2); and (3) in Wright's committee progress

12  reports from the prison, it was reported that Wright possessed a shank on May 2, 1986,

13  and possessed a weapon on June 6, 1986. (ECF No. 138-109 at 39.) The Nevada

14  Supreme Court reasonably concluded that defense counsel performed deficiently in not

15  presenting this evidence. Whether Leonard or Wright first possessed the weapon was

16  crucial to Leonard's self-defense theory, so it would have been advantageous for

17  Leonard's trial counsel to marshal all facts available that supported the defense's position

18  on that issue. However, as the Nevada Supreme Court also reasonably concluded,

19  Leonard fails to demonstrate prejudice. Emde testified that Wright possessed a razor

20  blade while incarcerated (ECF No. 155-11 at 36-38), and Hill testified that Wright sold him

21  a shank a month or two before the killing (ECF No. 155-7 at 63). Consequently, the jury

22  was aware that Wright had previously possessed weapons in prison such that Leonard

23  fails to demonstrate that further evidence in this regard would have resulted in a different

24  outcome at his trial. Because the Nevada Supreme Court's determination that Leonard

25  failed to demonstrate prejudice constituted an objectively reasonable application of

26

27                                              40

28

1    *Strickland*'s prejudice prong and was not based on an unreasonable determination of the

2    facts, Leonard is not entitled to federal habeas relief on ground 1(d)(2).

3                    **7.      Ground 1(e)**

4           In ground 1(e), Leonard alleges that counsel failed to present numerous available

5    witnesses—namely, Timothy Johnson, Burch, McFadden, Joel Burkett, C/O Withey,

6    Sergeant Coleman, and Cross—who would have testified about Wright's prior bad acts

7    and Leonard's lack of aggressiveness towards black inmates. (ECF No. 184 at 87.)

8           This Court previously found this ground to be technically exhausted but subject to

9    the procedural default doctrine. (ECF No. 205 at 42.) And this Court further ordered that

10   it would "consider *Martinez* arguments in relation to th[is] claim[ ] when it rules upon the

11   merits of Leonard's petition." (ECF No. 207 at 2.) This Court now finds that Leonard fails

12   to demonstrate prejudice to excuse the procedural default because Leonard's ineffective

13   assistance of trial counsel claim is not substantial.

14                    **a.      Background information**

15          According to Leonard, Johnson, Burch, McFadden, and Joel Burkett had testimony

16   to provide during the guilt phase of the trial about Wright. First, a defense investigator

17   interviewed Johnson on December 2, 1988, before Leonard's trial. (ECF No. 138-114 at

18   5.) Johnson told the interviewer, *inter alia*, that (1) he met Wright in "June or July of 1985

19   when they were both housed at the Washoe County Jail," (2) Wright had told Johnson

20   that "he was pending trial for murder and that he sincerely wanted the death penalty," (3)

21   Wright had told Johnson that a robber "shot [Wright] three times and that [Wright] didn't

22   care," (4) Wright was "a very violent individual" and "a homosexual who had a strong

23   desire for young white males," (5) "the actual killing of Joseph Wright didn't happen the

24   way that the prison officials ha[d] explained it," and (6) he was "quite willing to testify in

25   Bill Leonard's behalf." (*Id*. at 5-6.)

26

27                                        41

28

Similarly, Burch testified at the penalty phase of the trial, *inter alia*, that (1) Wright "was an aggressive homosexual," and (2) Wright once "threw a bucket of mop water in [his] cell and a couple cups of bleach in [his] face." (ECF No. 155-33 at 117, 118.) And McFadden testified at the penalty phase of the trial, *inter alia*, that (1) Wright told McFadden that Wright would "watch out for" McFadden in return for McFadden "tak[ing] care of [Wright] sexually," and (2) on August 6, 1989, he saw Leonard and another black inmate mistakenly released at the same time and neither inmate acted aggressively. (*Id*. at 88, 92.)

Joel Burkett testified at the penalty phase of the trial and at the post-conviction evidentiary hearing. At the penalty phase of the trial, Joel Burkett testified, *inter alia*, that (1) "Wright had sent Bill Leonard a letter pertaining to certain sex acts," (2) Leonard was upset about the letter, and (3) Unit 7 at the time was a violent place and shanks were readily available. (ECF No. 155-34 at 9-10.) And at the post-conviction evidentiary hearing, Joel Burkett testified, *inter alia*, that (1) Wright "seemed like he hated life itself," (2) Wright "was an extreme aggressive homosexual," and (3) it was his understanding that Wright "made [sexual] advances towards Mr. Leonard." (ECF No. 160-15 at 76-77.)

Next, according to Leonard, C/O Withey, Sergeant Coleman, and Cross had testimony to provide about Leonard's lack of aggressiveness. C/O Withey testified at the penalty phase of the trial that on August 6, 1989, he "accidentally operated somebody's [cell] door and let him out at the same time" as Leonard, resulting in no confrontation between Leonard and the other inmate. (ECF No. 155-33 at 96, 100.) Sergeant Coleman's and Cross's testimonies mirrored C/O Withey's testimony. (*See id*. at 28-30 (testimony of Sergeant Coleman at the penalty phase of the trial that on August 6, 1989, Leonard and another black inmate were released at the same time due to an error and Leonard did not attack the other inmate) and 40 (testimony of Cross at the penalty phase of the trial that (1) on August 6, 1989, he saw Leonard and another black inmate released

at the same time and no issues resulted therefrom, and (2) Leonard was not racist towards black people).)

In addition to Johnson, Burch, McFadden, and Joel Burkett, Leonard alleges that various other witnesses, who were included in a defense "potential witnesses" list, should have been called to testify about Wright's prior bad acts. (ECF No. 138-115 at 13-14.) It appears that this list of witnesses was compiled by looking at Wright's reported acts of misconduct during his time in prison. (*See id*.)

At the post-conviction evidentiary hearing, Leonard's first-chair trial counsel testified, *inter alia*, that (1) he had planned to call Johnson as a witness at the guilt phase of the trial and could not remember any tactical or strategic reason for not calling him, (2) he had information before the trial began that Burch had been "viciously assaulted by Joe Wright" and would testify as to Wright's "violent behavior and aggressiveness" but had no tactical reason for calling Burch at the penalty phase as opposed to the guilt phase, (3) he was aware of McFadden but could not say if he knew what McFadden would say before the penalty phase but "it would seem that [McFadden's testimony] would be more appropriate at the guilt phase," (4) he was aware of Joel Burkett but could not say if he knew what Joel Burkett would say before the penalty phase[19] but Joel Burkett's "type of testimony would have been relevant on its face in the . . . guilt phase," and (5) the list of potential witnesses who could testify as to the various acts of misconduct committed by Wright was not brought to the jury's attention during the guilt phase because the defense was "limited to instances [of Wright's violence] that Mr. Leonard was aware of," *i.e.*, incidents of Wright's past behavior were only valuable if Leonard knew about them because those incidents "played into Mr. Leonard's thought process that if [he was]

---

[19]Joel Burkett testified at the post-conviction evidentiary hearing that he did not speak to Leonard's counsel until after the guilt phase was over. (ECF No. 160-15 at 80-81.) According to Joel Burkett, before his testimony in the penalty phase, Leonard's first-chair trial counsel told Joel Burkett that they needed him to just "say something good about Leonard." (*Id.* at 82.)

1     attacked by Mr. Wright, he would have to defense himself aggressively." (ECF Nos. 160-
2     18 at 108-111, 121, 123, 131-32; 160-19 at 42-43.)

3                                    **b.      Analysis**

4            The Court first addresses Leonard's trial counsel's failure to call C/O Withey,
5     Sergeant Coleman, and Cross regarding the incident on August 6, 1989, when Leonard
6     did not attack an inmate who was accidentally released while Leonard was out of his cell.
7     Leonard fails to demonstrate that the trial court would have allowed these witnesses to
8     testify during the guilt phase of the trial had his counsel attempted to present them.
9     Indeed, during the penalty phase, Leonard's trial counsel explained that Leonard wanted
10    to move for a mistrial, in part, because he was unhappy that his counsel did not call
11    Sergeant Coleman or C/O Withey during the guilt phase of the trial to testify about the
12    August 6, 1989, incident. (ECF No. 155-21 at 8-9.) The trial court responded that it
13    "wouldn't have allowed [either Sergeant Coleman or C/O Withey] to testify" about that
14    incident. (*Id.* at 10 (explaining that "[p]eople have their doors unlocked all the time and
15    aren't routinely stabbed, so that doesn't have anything to do with reality").) Because the
16    trial court apparently concluded that evidence about the August 6, 1989, lack-of-an-attack
17    incident was irrelevant, explaining that Leonard's lack of an attack on another inmate at
18    a different time was inapplicable to his attack on Wright, Leonard fails to demonstrate
19    prejudice regarding the three witnesses who would have testified about the August 6,
20    1989, incident: C/O Withey, Sergeant Coleman, and Cross.

21           The Court now turns to the witnesses who would have testified about Wright's prior
22    bad acts. First, regarding Johnson, it appears that Leonard's trial counsel was potentially
23    deficient because he testified that he intended to call Johnson, but, for some unknown
24    reason, it never happened. However, even if Leonard's trial counsel acted deficiently,
25    Leonard fails to demonstrate prejudice. Although testimony that Wright had a death wish
26    was not presented by any other witness at the trial, this Court fails to see how this

27                                          44
28

information would have been especially favorable to Leonard's defense. In fact, it seems highly speculative and attenuated that Wright wishing he would have been sentenced to death in his unrelated murder case would have motivated him to either (1) attack and potentially kill Leonard in order to be sentenced to death in the future or (2) hope that attacking Leonard would result in Leonard overtaking and killing Wright.

Second, regarding Burch and McFadden, during the penalty phase, Leonard's trial counsel explained that Leonard wanted to move for a mistrial, in part, because his counsel failed to call Burch and McFadden during the guilt phase, explaining that (1) Burch "would have testified to the deceased's prior bad acts of violence," including "deliberately and viciously propell[ing] boiling water and chemicals," and (2) McFadden "would have testified to the deceased's forced sexual advances, propensities of violence." (ECF No. 155-21 at 13-14.) The trial court found that it would not have allowed either Burch or McFadden to testify because the evidence that they would have presented "was before the jury already." (*Id*. at 14.) Because the trial court concluded that it would not have allowed Burch and McFadden to testify because their testimony would have been cumulative to other evidence, Leonard fails to demonstrate prejudice regarding his counsel's failure to call them.

Third, regarding Joel Burkett, at the penalty phase, the trial court commented that it did not believe that Joel Burkett's testimony would have changed whether the jury believed that Leonard acted in self-defense in killing Wright because the jury (1) believed C/O Bascus's testimony that Leonard ran into Wright's cell and (2) "the medical evidence [which] establishe[d] 21 stab wounds [on Wright] and nothing on Mr. Leonard." (ECF No. 155-21 at 19.) This was a reasonable assessment by the trial court because the testimony of an inmate who did not witness the altercation between Wright and Leonard would hardly have had an impact on the jury disbelieving the testimony of C/O Bascus or the

1   medical examiner. As such, Leonard fails to demonstrate prejudice regarding his

2   counsel's failure to call Joel Burkett.

3       Based on the record, Leonard's ineffective assistance of trial counsel claim is not

4   substantial because Leonard fails to adequately demonstrate prejudice under *Strickland*.

5   Because Leonard fails to demonstrate requisite prejudice necessary to overcome the

6   procedural default of ground 1(e), that ground is dismissed.

7                    **8.    Ground 1(f)**

8       In ground 1(f), Leonard alleges that counsel failed to adequately challenge the

9   introduction of prejudicial evidence—namely, the shank recovered from the sewer which

10  was only conjectured to be the murder weapon. (ECF No. 184 at 91.)

11                  **a.    Background information**

12      Outside the presence of the jury, Leonard's first-chair trial counsel argued that the

13  shank found in the sewer was not relevant, arguing that the prosecution was "trying to

14  link the fact that Donald Hill had a knife and the fact that [prison officials] find a knife in

15  the plumbing that could have come from several sources, and therefore Donald Hill must

16  have been in some sort of conspiracy with Billy Leonard to kill Joseph Wright." (ECF No.

17  154-29 at 175.) The trial court conditionally sustained Leonard's trial counsel's objection

18  to the admissibility of the shank, explaining that "there's nothing right now for me to

19  conclude that on the basis of what I have been told that this knife has a connection to this

20  case beyond speculation." (*Id*. at 178-79.) The trial court explained that if the prosecution

21  wanted to pursue admission of the shank, the trial court would "hear what the expert has

22  to say on the metal match outside the presence of the jury." (*Id*. at 179.)

23      The next day, after Atkinson, the metal expert, testified outside the presence of the

24  jury, Leonard's first-chair trial counsel "strenuously object[ed]" to the admission of the

25  shank, arguing, *inter alia*, that (1) the prison maintenance man "sa[id] that the particular

26  instrument found in the sewer could have come from at least 15 different sources," (2)

27

28                              46

1   Atkinson said "that he doesn't have a definite match" between the shank found in the

2   sewer, the shank found in Hill's cell, and the D Wing locker, and (3) the shank "ha[d]

3   virtually no probative value, it[ was] highly confusing, and it[ was] trying to get to the jury

4   another theory that is somehow Donald Hill conspired with Billy Leonard to kill" Wright.

5   (ECF No. 154-34 at 201-03.) The trial court overruled Leonard's trial counsel's objection

6   to the admission of the shank, changing his conditional ruling from the previous day;

7   however, the trial court "suggest[ed that the defense] make [their] objections known to the

8   jury" because the weight of the evidence "is a fact that they must decide." (*Id*. at 203, 205-

9   06.)

10      The next day, in front of the jury, after the prosecution moved for the admission of

11   the shank, Leonard's second-chair trial counsel made the following objection:

12          Irrelevant, you Honor. There is no link to that exhibit specifically to
        Unit 7, D-Wing. We had a plumber that testified that that exhibit was taken
13      from the sewer from a four-inch pipe that was connecting both C-Wing and
        D-Wing. There is nothing to connect it specifically with D-Wing and it could
14      have come from any sewer chase on C-Wing.
            And we have no specific connection of that knife to D-Wing. There is
15      a lack of foundation in that that exhibit was not - - we have no idea how that
        exhibit got from the prison to the Sheriff's Office or if it's in fact the same
16      exhibit that was transported from the . . . prison to the Sheriff's Office.

17   (ECF No. 154-35 at 125-26.) Leonard's second-chair trial counsel also argued that "its

18   probative value is far outweighed by the prejudicial value." (*Id*. at 126.)

19                    **b.    State court determination**

20      In affirming the denial of Leonard's state habeas petition, the Nevada Supreme

21   Court held:

22          Leonard claims that trial counsel were incompetent because they
        failed to realize that key forensic evidence on the origins of the shank found
23      in the sewer line "actually disproved the State's theory and supported the
        defense testimony." Leonard mischaracterizes the evidence presented.
24          Leonard declares that the state's forensic criminalist testified "that
        the shank found in the sewer *could not be matched* to the angle iron" which
25      Armijo allegedly tore off the locker. Actually, the criminalist testified that he
        could not say that the shanks "likely" came from the angle iron, but they
26      were "consistent with it." Thus, the forensic evidence did not disprove the
        state's theory, as Leonard claims. In fact, Hill testified for the defense that

27

28

47

1

2

3

4

5

6

> the shanks were made from the same locker, only by Wright instead of Armijo. Therefore, failing to trace the shanks to the locker "disproved" the defense's theory as much as the prosecution's.
>
> The prosecutor argued in closing that there was little doubt that the shanks came from the locker with the missing legs based on the testimony of the criminalist and the correctional officer who had discovered the missing legs. Based on Leonard's mischaracterization of the evidence, Leonard says that his counsel were remiss for not objecting to the prosecution's arguments. We conclude that the prosecutor's argument was reasonable and any objection would have been overruled.
>
> Leonard's counsel were not ineffective in this matter.

7

(ECF No. 162-27 at 7-8 (emphasis in original) (internal footnote omitted).)

8

### c.    Analysis

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

The Nevada Supreme Court reasonably determined that Leonard's trial counsel were not ineffective. Leonard's trial counsel (1) successfully argued that the shank should not be admitted before the metal matching testimony, (2) strenuously objected to the admission of the shank after the metal matching testimony, and (3) objected to the admission of the shank in front of the jury, which allowed the defense to articulate—in addition to its objection to the shank's admissibility—its argument that the jury should not give much weight to the shank because its evidentiary value was minimal. Leonard contends that his trial "counsel failed to protest any further" (ECF No. 184 at 96), but Leonard does not identify upon what basis counsel could have protested any further. Leonard's trial counsel argued that the shank was irrelevant, was too attenuated since it could have come from a litany of sources, and was too speculative since there was no definite match to the D Wing locker or the shank found in Hill's possession. Because the Nevada Supreme Court's determination that Leonard failed to demonstrate that his trial counsel was ineffective constituted an objectively reasonable application of *Strickland* and was not based on an unreasonable determination of the facts, Leonard is not entitled to federal habeas relief on ground 1(f).

25

///

26

///

27

28

48

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 9.    Ground 1(i)

In ground 1(i), Leonard alleges that his trial counsel failed to adequately defend his right to testify and oppose the trial court's contingency ruling allowing evidence of other crimes. (ECF No. 184 at 111.)

The Court previously found this ground to be technically exhausted but subject to the procedural default doctrine. (ECF No. 205 at 42.) And this Court further ordered that it would "consider *Martinez* arguments in relation to th[is] claim[ ] when it rules upon the merits of Leonard's petition." (ECF No. 207 at 2.) This Court now finds that Leonard fails to demonstrate prejudice to excuse the procedural default because Leonard's ineffective assistance of trial counsel claim is not substantial.

### a.    Background information

After the defense's last witness at the guilt phase of the trial, Leonard's trial counsel informed the trial court "that he would prefer a ruling on if Mr. Leonard takes the stand would his convictions be available to impeach him." (ECF No. 155-11 at 48.) The trial court stated "[t]hat depends on several things." (*Id.*) The prosecution then informed the trial court of Leonard's past convictions: (1) "a second degree murder conviction sustained in Mineral County in February, 1982," (2) "a first degree murder conviction out of Manatee, . . . Florida, sustained in 1983," (3) "a conviction for battery with a deadly weapon by an incarcerated person and possession of a deadly weapon by an incarcerated person . . . in May of 1985," (4) "assault with a deadly weapon sustained in . . . March of 1986," and (5) "battery by a prisoner with the use of a deadly weapon and possession of a dangerous weapon by an incarcerated person . . . in May of 1987." (*Id.* at 48-49.) The following colloquy then occurred:

> [Defense counsel]:  Your Honor, we've discussed it with our client, and our concern is if they can inquire beyond the convictions. It's our understanding that the law itself says that the judgment of conviction in and of itself is all that can be used for impeachment.

49

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

We also believe there's case authority that would say that in light of the fact that a stipulation has already been entered into that establishes that this man is a convicted felon and the purpose of the impeachment goes to his credibility, that the judgments of convictions themselves would not be appropriate in this case; that their true purpose would be to poison the minds of the jurors and to move away from the true focus of this phase of the trial, and that is the guilt or innocence of our client.

THE COURT: Well, if your, if your client takes the stand, we're talking only about impeachment by conviction of a felony. I'm required by law to weigh the nature of the felony against the prejudicial effect of admission of the felony.

And as I have indicated when we talked about this preliminarily, in Nevada there has never been a case that I am aware of that has said that any felony, the use of any felony for impeachment is improper. So I use that as my starting point. Even though there is a balancing test inquired, there is not a case in Nevada that disapproves the use of any prior felony for impeachment.

And I invited counsel to, to find any cases they felt would support that idea or dispute that idea. Nobody's been able to show me any Nevada case concerning our rules of evidence that would make it improper to use any felony.

So that was my starting point. Has anybody found any cases that say that you cannot use this type of, these types of felonies in Nevada?

[Defense counsel]: Your Honor, the case that we rely on is Sanders v. State, and that's found at 96 Nev. 431. And I will represent to the Court that the Nevada Supreme Court did not say that it was improper to use the felony conviction, but that you have to balance and weigh the, the effect of it.

Our contention, again, is that the fact has been established that he's a convicted felon through stipulation, and therefore that credibility has been presented to the jury. To put in the judgments of conviction that he is a convicted murderer, the purpose for that is not to attack his credibility that he is truthful as a convicted felon, but to poison the minds of the jury. We have not found a case that that, said that that would be improper.

THE COURT: That case in the Nevada Rules of Evidence are not the federal rules. The federal rules discuss to use a conviction, you've got to make that balancing, and our rules don't say that. Our rules merely say that any, any felony conviction within the past ten years is admissible to impeach. So our rule in impeachment after felony doesn't even contain the balancing. That's just the general balancing test you do on any relevant evidence.

So there's, there seems to be in Nevada, in my opinion, any felony is, prima facie can be used to impeach. And then the question is should I allow these felonies to be used to impeach even if that's true and conducted a balancing best.

And likewise, the federal rules also have something on crimes or moral, you know, what shows a, an attempt to deceive, what types of convictions. We don't have that either. It's my opinion under Nevada law that the conviction of Mr. Leonard for second degree murder and first degree murder would be available to impeach him in a murder trial in Carson City.

That battery with a deadly weapon and the assault with a deadly weapon and the battery with a deadly weapon are likewise, in my opinion,

50

under Nevada law allowable to impeach solely on credibility because they are felony convictions consistent with that rule. And while they are prejudicial, they cast some light upon the defendant and his credibility if he testifies.

The other circumstance is not only do I believe that these can be used to impeach Mr. Leonard if he testifies, but likewise we're talking here about a case where Mr. Leonard's counsel has raised the defense of self-defense, and I believe, as we talked previously, that previous conduct of Mr. Leonard that would tend to discount a theory of his defense may be used likewise to, as substantive evidence as to whether he had that state of mind or not.

And so if you assume that, that Mr. Leonard would indicate in his testimony if he took the stand that this was self-defense, if you assume that would be postulated by Mr. Leonard, then I believe all of these past convictions may be inquired into to determine whether or not it really was a state of mind of self-defense. And there are a variety of things that could happen, depending upon what Mr. Leonard would say on his direct examination. You could either talk about only these prior convictions, or you might even talk about what happened substantively in these offenses.

Much of it would depend upon what Mr. Leonard would say on his testimony, and I'm unwilling to say what precisely the State could inquire to. But I merely say that if Mr. Leonard does take the stand, in my opinion, and even indicates anything remotely relating to a self-defense discussion, that all of those convictions could be inquired into to a larger or lesser extent to determine state of mind and to possibly negate the defense of self-defense.

That's what I would rule. And I don't know how much, I don't know if I'd allow the State to impeach by collateral evidence down the road or not, but there is that possibility as well, depending upon what Mr. Leonard would say in his defense, that the State might be allowed to call other people to talk about these offenses.

But I don't make any ruling on, on that hypothetical because I don't know what Mr. Leonard would testify to.

So with all that in mind, those are my, those are my rulings, that in Nevada, under Nevada law, the five prior convictions would be admissible for impeachment as to credibility and might be admissible to show state of mind as it reflects upon negating the defense of self-defense.

Whether or not there's other theories that might make them admissible, I don't know either because I don't know what Mr. Leonard might say.

(*Id*. at 50-54.) Leonard's counsel then indicated: "I've discussed this matter with my co-counsel and also my client. We have no other witnesses to offer." (*Id*. at 56.) Leonard's counsel explained, "I've asked Mr. Leonard if he feels he's had adequate information to make an informed decision on whether he is going to testify or not, and I believe he's reached that conclusion, and he does not wish to testify." (*Id*. at 56-57.)

51

Later, during the post-conviction evidentiary hearing, Leonard's counsel testified that Leonard "always" wanted to testify at the trial, "[b]ut we were, you know, skeptical of that because of, of the possibility of the prosecution impeaching him with his prior murders." (ECF No. 160-17 at 27.) Leonard's counsel later elaborated that the defense team was worried about "[t]he details of [Leonard's] prior murders could be brought in" if Leonard testified. (ECF No. 160-18 at 34.) Moreover, Leonard's counsel did not "think . . . [they] should put Mr. Leonard on the stand" due to the fact that Leonard "had confessed" that he had a shank in his possession, had hid behind the trash can knowing that Wright was going to let out of his cell next, and had intended to attack—but not kill— Wright because "he felt that something needed to be done to get the black men off their backs." (ECF No. 160-18 at 30, 34.)

### b.    Analysis

First, regarding the use of Leonard's prior judgments of conviction to be used for impeachment purposes, Leonard's trial counsel and the trial court both accurately acknowledged Nevada law. *See* NRS § 50.095(1) (providing that "[f]or the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime is admissible but only if the crime was punishable by death or imprisonment for more than 1 year under the law under which the witness was convicted"); *Yates v. State*, 596 P.2d 239, 241 n.2 (Nev. 1979) ("Prior felony convictions which are not too remote are deemed relevant to the credibility of any witness."); *Shults v. State*, 616 P.2d 388, 392 (Nev. 1980) (explaining that "when evidence of prior crimes is relevant and admissible, the trial court should cautiously weigh the probative value against the bias or prejudice likely to result," and "although a witness may be impeached with evidence of prior convictions, NRS 50.595, '(t)he details and circumstances of the prior crimes are, of course, not appropriate subjects of inquiry'"). Leonard's trial counsel accurately noted that "the law itself says that the judgment of conviction in and of itself is all that can be used

52

for impeachment," and the trial court accurately noted that "any felony . . . can be used to impeach" and "the question is [then] should [the court] allow the[ ] felonies to be used to impeach" by "conduct[ing] a balancing test." (ECF No. 155-11 at 50, 52.)

Second, regarding the use of Leonard's prior crimes, Nevada law provides that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith," but it may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." NRS § 48.045(2). Leonard's trial counsel did not make any arguments regarding the use of Leonard's prior crimes, but Leonard fails to demonstrate that his failure to do so amounted to deficient representation. In fact, the trial court only stated that, hypothetically, if Leonard took the stand and claimed that he acted in self-defense, then evidence of Leonard's prior crimes could potentially be admitted under NRS § 48.045(2) to show his intent—*i.e.*, negating his claim that he acted in self-defense. (*See* ECF No. 155-11 at 53-54.) However, the trial court did not make a definitive ruling, explaining that it was "unwilling to say what precisely the State could inquire" unless and until Leonard testified. (*Id*. at 53.) Given that no final ruling was made on the admissibility of Leonard's prior crimes, Leonard fails to demonstrate that his trial counsel inadequately opposed the ruling.

Based on the record, Leonard's ineffective assistance of trial counsel claim is not substantial because Leonard fails to adequately demonstrate deficiency under *Strickland*. Because Leonard fails to demonstrate requisite prejudice necessary to overcome the procedural default of ground 1(i), that ground is dismissed.

### 10.    Ground 1(k)

In ground 1(k), Leonard alleges that his trial counsel were ineffective for failing to adequately object to the improper impeachment of Hill. (ECF No. 184 at 115.) Specifically, in ground 1(k)(1), Leonard alleges that counsel were ineffective in their reaction to the

53

1 introduction of irrelevant letters written by Hill. (*Id*. at 116.) And in ground 1(k)(2), Leonard

2 alleges that counsel were ineffective in not objecting to hearsay that Hill and Leonard

3 were friends. (*Id*. at 118.)

4 <center>**a.     Background facts**</center>

5 Associate Warden of Operations of Nevada State Prison, Harry Koon, was asked

6 "whether or not there was any . . . friendship between Leonard and inmate Hill." (ECF No.

7 154-29 at 134, 139.) Koon responded, "[w]e have a number of reports to verify that, yes."

8 (*Id*.) Later, during cross-examination of Hill, the prosecutor asked Hill if he "use[d] any

9 other term[s] to refer to black people." (ECF No. 155-7 at 95.) Hill then stated that he calls

10 them "niggers" and "[c]oon." (*Id*.) When asked if he used those terms in a derogatory

11 fashion, Hill stated that "[i]t's just slang in the penitentiary" and he does not "disrespect

12 no man, . . . black or white." (*Id*.) The prosecutor then sought to admit a letter that Hill had

13 written to his mother. (*Id*. at 98.) Leonard's counsel objected on relevancy grounds, and

14 when the trial court asked, "[i]s that your only objection?", Leonard's counsel answered in

15 the affirmative. (*Id*.) The trial court admitted the letter. (*Id*.) The prosecutor then had Hill

16 read the first five lines of the letter to the jury: "Mom: Just a short note to let you know I'm

17 doing okay. At war with these niggers, but that ain't [sic] nothing to worry about. Niggers

18 ain't [sic] shit. I got something for them, for their ass if they run up on me." (*Id*.; *see also*

19 ECF No. 138-117 at 3.)

20 Later, the prosecutor asked Hill if Leonard "like[s] blacks." (ECF No. 155-7 at 103.)

21 Hill stated that Leonard "was neutral basically." (*Id*.) The prosecutor then sought to admit

22 a letter that Hill had written to a woman. (*Id*. at 104.) Leonard's counsel objected on

23 relevancy grounds, and the trial court overruled the objection, saying "if that's the only

24 objection you have." (*Id*. at 104-05.) The prosecutor then had Hill read two lines from the

25 letter: "You asked me what down for a minute meant. Well, it means I'm doing time, but

26

27 <center>54</center>

28

1   just a short time. I'm doing three years in prison for drunk driving." (*Id*. at 105; *see also*

2   ECF No. 138-117 at 6.)

3       The prosecutor then sought to admit another letter that Hill had written to the same

4   woman. (ECF No. 155-7 at 108.) Leonard's counsel objected on relevancy grounds. (*Id*.)

5   The trial court overruled that objection, but asked "what about 50.085?" (*Id*.) Leonard's

6   counsel then stated, "I'm sorry, Your Honor, I don't have the statute with me." (*Id*. at 109.)

7   The prosecutor then explained, "the question of the defendant's intent is at issue in this

8   case, and this witness has testified regarding the defendant's outlook on black people,

9   one of whom was the victim in this case, and I believe the evidence . . . goes to that

10  issue." (*Id*. at 109.) The trial court then asked the jury to step outside. (*Id*. at 109-110.)

11  After some argument by the parties, the trial court stated that the exhibit would not be

12  admitted because, *inter alia*, "it's a collateral source of impeachment." (*Id*. at 116.)

13                      **b.       State court determination**

14      In affirming the denial of Leonard's state habeas petition, the Nevada Supreme

15  Court held:

16          Leonard contends his counsel were ineffective in not successfully
        objecting to the prosecution's improper impeachment of defense witness
17      Hill. The prosecutor offered letters written by Hill which showed racist
        attitudes and referred to conflicts with black inmates. The district court
18      admitted one such letter after Wessel objected only on grounds of
        relevance. After the court *sua sponte* raised the issue that the letters
19      constituted improper impeachment by extrinsic evidence of specific acts, it
        excluded other letters. *See* NRS 50.085(3).
20          Leonard complains that Wessel first objected on the wrong grounds
        and then failed, after the favorable ruling, to ask that the first letter be struck.
21      Worse yet, Leonard contends, Wessel allowed "extensive discussions" in
        front of the jury on the admissibility of the evidence. In discussing the
22      admissibility of the letters, the prosecutor argued that "the defendant's intent
        is at issue in this case, and this witness has testified regarding the
23      defendant's outlook on black people, one of whom was the victim in this
        case, and I believe the evidence, as you have seen, goes to that issue." At
24      this point, the district court excused the jury. A lengthy discussion then
        ensued, and the court excluded the evidence.
25          Although defense counsel was unable to keep somewhat damaging
        evidence and argument from the jury, Leonard was not unduly prejudiced.
26      The jury already had evidence of Hill's attitude toward blacks because he
        had testified that he called them "niggers" and "coons" but maintained that
27

28                                              55

1    he meant no disrespect, and defense witness Armijo had already testified
     to the racial tensions in the prison generally.

2    (ECF No. 162-27 at 9-10.)

3                    **c.    De novo review is unwarranted**

4    Leonard argues that this ground should be reviewed de novo because it ignored

5    two aspects of the claim: the letters further impeached Hill's testimony by providing

6    concrete evidence of his views, and the letters connected Leonard to the racial tensions

7    in the prison. (ECF No. 226 at 165.) The Court is not convinced that the Nevada Supreme

8    Court neglected these portions of Leonard's claim. The Nevada Supreme Court is not

9    required to articulate all of Leonard's arguments in its order, and the Court presumes that

10   the Nevada Supreme Court considered these additional arguments in denying Leonard's

11   instant claim. Leonard fails to rebut that presumption.

12                    **d.    Analysis**

13   Regarding the letters written by Hill, NRS § 50.085(3) provides that "[s]pecific

14   instances of the conduct of a witness, for the purpose of attacking or supporting the

15   witness's credibility . . . may not be proved by extrinsic evidence." As the Nevada

16   Supreme Court appears to have reasonably concluded, Leonard's counsel were deficient

17   for failing to object to the letters Hill wrote to his mother and to a woman on the basis of

18   NRS § 50.085(3)—instead of just on relevancy grounds. However, as the Nevada

19   Supreme Court also reasonably concluded, Leonard fails to demonstrate prejudice. As

20   the Nevada Supreme Court reasonably noted, Hill testified that he freely used the terms

21   "niggers" and "coon," so evidence of Hill's hateful behavior was already in question even

22   absent his letters. And regarding Leonard's connection to the racial tensions in the prison

23   by way of his friendship with Hill, Armijo had already testified that "[b]lacks hate the whites,

24   whites hate the blacks." (ECF No. 155-7 at 24.)

25   Turning to Associate Warden Koon's testimony that it was reported that Hill and

26   Leonard were friends, even if his counsel could have objected to this testimony on

27
                                        56
28

1   hearsay grounds, *see* NRS § 51.035, Leonard again fails to demonstrate prejudice. The

2   jury was already aware that Leonard and Hill were friends, so Leonard fails to

3   demonstrate a reasonable probability of a different outcome had his counsel objected to

4   Associate Warden Koon's testimony. Hill testified that he was talking to Leonard for

5   "[a]pproximately about five to eight minutes" before the fight. (ECF No. 155-7 at 129.) And

6   Senior C/O Edwards testified that he "observed [Leonard and Hill] on the cameras in the

7   yard," "[t]hey appeared friendly," and "[i]n [his] estimation, they appeared to be good

8   friends." (ECF No. 154-35 at 14, 22.)

9       Because the Nevada Supreme Court's determination that Leonard failed to

10  demonstrate prejudice constituted an objectively reasonable application of *Strickland*'s

11  prejudice prong and was not based on an unreasonable determination of the facts,

12  Leonard is not entitled to federal habeas relief on ground 1(k).

13              **11.   Ground 1(m)**

14      In ground 1(m), Leonard alleges that trial counsel were ineffective for failing to

15  adequately respond to the prosecution's objection to introduction of a kite sent from

16  Wright to Leonard. (ECF No. 184 at 127.) Specifically, Leonard argues that his counsel

17  could have offered an argument based on an exception to the hearsay rule, an argument

18  concerning the best evidence rule, and elicited foundational testimony from Joel Burkett

19  regarding Wright's sexual advances toward Leonard. (*Id*. at 128.)

20      This Court previously found this ground to be technically exhausted but subject to

21  the procedural default doctrine. (ECF No. 205 at 42.) And this Court further ordered that

22  it would "consider *Martinez* arguments in relation to th[is] claim[ ] when it rules upon the

23  merits of Leonard's petition." (ECF No. 207 at 2.) This Court now finds that Leonard fails

24  to demonstrate prejudice to excuse the procedural default because Leonard's ineffective

25  assistance of trial counsel claim is not substantial.

26  ///

27

28

a.    **Background information**

During the defense's direct examination of Hill, the following colloquy occurred:

Q.    Now, when you purchased the shank from Mr. Wright, were you, where were you living at that time?
A.    I lived in D Wing, cell 35.
Q.    And was Mr. Wright living in D Wing at that time?
A.    He lived in D Wing Cell 37, right across the hall.
Q.    Without telling us specifically what knowledge you had, did you have any specific knowledge with regard to Mr. Wright's propensity, sexual propensities?
A.    Yeah, I had a lot of knowledge of it.
Q.    And did you ever have occasion to talk with Mr. Leonard about what you knew about Mr. Wright?
A.    Yes, I talked to Mr. Leonard about it.
Q.    And how did it occur that you and Mr. Leonard would have talked about it?
A.    Well, Joseph Wright is a homosexual, and he, he handed Leonard a kite. I read a kite. Leonard brought it down to me and he was laughing about it. So the kite said - -
[Prosecutor]: Objection, Your Honor. Hearsay and best evidence.
The witness: I read the kite.
The Court:    Just a second. Your response?
[Defense counsel]: Well, Your Honor, it would be - - I don't care if he tells us what the kite said, so I would go ahead and agree he doesn't need to tell us what the kite said.
The Court: Continue then.
Q.    Without telling us what the kite said, did you then have a discussion with Mr. Leonard about, about Mr. Wright?
A.    I told him - - see, I told him after I read the kite, I told him, I said, "You're going to have to watch that guy." I said "He's been known to be dangerous." I said "He killed his ex-lover on the streets." I said "He's in here with two life sentences," and I said "He was also up here in Unit 7 because he got arrested on the yard for having a knife or trying to stab someone on the yard." So I said "You've got to watch that guy. Don't let him, you know, don't even let him play you like that on the kite stuff."

(ECF No. 155-7 at 65-67.)

Years later, during the post-conviction evidentiary hearing, Joel Burkett testified that he was housed in Unit 7 of Nevada State Prison when Wright was killed. (ECF No. 160-15 at 74, 76.) Joel Burkett testified that Wright "was an extreme aggressive homosexual" who had "made advances towards Mr. Leonard." (*Id*. at 76-77.)

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### b.     Analysis

Leonard argues that his trial counsel could have argued that the kite was admissible under the statement against interest exception to the rule against hearsay. (ECF No. 226 at 166 (citing NRS § 51.345).) Because it is not clear what Wright wrote in the kite, Leonard fails to meet his burden of demonstrating that his trial counsel was deficient for not arguing that the kite should be admissible under this exception to the hearsay rule. Indeed, it is not clear whether the kite was a threat of sexual assault or merely a sexual proposition. Only the former possibility appears to be a statement against interest.

Turning to Joel Burkett, it is not clear how his post-conviction evidentiary hearing testimony would have had a reasonable probability of changing the result of Leonard's trial had it been presented to the jury during the guilt phase of trial. To be sure, this testimony would have shown that Wright perhaps targeted Leonard as a possible sexual partner, but that fact alone would not have supported Leonard's self-defense claim. In fact, although this fact could have shown that Wright had a reason for being the initial attacker, as Leonard contends, it also could have shown that Leonard had a reason for being the initial attacker. In other words, the jury could have concluded that Wright propositioning Leonard for sex was Leonard's motivation for attacking him on the night in question.

Based on the record, Leonard's ineffective assistance of trial counsel claim is not substantial because Leonard fails to adequately demonstrate that his trial counsel acted deficiently under *Strickland*. Because Leonard fails to demonstrate the requisite prejudice necessary to overcome the procedural default of ground 1(m), that ground is dismissed.

### 12.    Ground 1(n)

In ground 1(n), Leonard alleges that counsel were ineffective in failing to challenge the government's destruction of potentially exculpatory physical evidence, namely the

59

prison's failure to preserve a video recording of the incident. (ECF No. 184 at 129.) Leonard also alleges that counsel should have requested a spoliation instruction, explaining that the jury may have drawn an inference that the video recording would have been favorable to him. (*Id.* at 136.)

### a.    Background information

Leonard's first-chair counsel testified at the post-conviction evidentiary hearing that the prosecutor had informed the defense team that there was no tape of the incident between Leonard and Wright. (ECF No. 160-19 at 92.) The defense team concluded that Senior C/O Edward's failure to record the incident was probably due to incompetence even though he had made inconsistent statements about the lack of recording. (*Id.* at 87.) Indeed, Senior C/O Edwards had claimed in his initial statement "that he tried to videotape the incident, but the wing was too dark to see." (*Id.* at 83.) However, Senior C/O Edwards later told the Critical Incident Review Board "that the monitor and tape machine were not functioning," which the Board later concluded was untrue. (*Id.*) Leonard's second-chair counsel testified that the defense team did not consider bringing a motion regarding the loss of the videotape because "[w]e were better off without it." (ECF No. 160-17 at 81.)

### b.    State court determination

In affirming the denial of Leonard's state habeas petition, the Nevada Supreme Court held:

> Based on the state's failure to produce a videotape of his fight with Wright, Leonard says his counsel were ineffective in failing to move for dismissal or for a jury instruction that the missing evidence would be presumed favorable to the defense. He claims that Senior CO Edwards' inconsistent explanation as to why the tape was not made indicate bad faith on the part of the state.
> A conviction may be reversed when the state loses evidence if the defendant is prejudiced by the loss or the state acted in bad faith in losing it. *Sparks v. State*, 104 Nev. 316, 319, 759 P.2d 180, 182 (1988). To establish prejudice, the defendant must show that it could be reasonably anticipated that the evidence would have been exculpatory and material to the defense. *Boggs v. State*, 95 Nev. 911, 913, 604 P.2d 107, 108 (1979). Also, if the state fails out of gross negligence to gather material evidence, a defendant is entitled to a presumption that the evidence would have been

60

unfavorable to the state, and in cases of bad faith, dismissal of the charges may be an available remedy. *Daniels v. State*, 114 Nev. __, __ P.2d __ (Adv. Op. No. 32, April 2, 1998).

Leonard concludes that Edwards' failure to record the fight constituted a loss of evidence by the state. We reject this conclusion. First, although Leonard implies that Edwards may have erased the tape, there is no evidence that a video recording of the altercation was ever made. Therefore, the evidence which Leonard alludes to never existed and was never lost. Second, even assuming that failing to make a recording could be construed as loss of or a failure to gather evidence, we conclude that the rule announced in *Sparks* and *Daniels* do not apply to Edwards' negligence because, even though a state employee, Edwards was not acting for the police or prosecuting authorities when he failed to make a tape. Similarly, any bad faith by Edwards is not attributable to the state in its police or prosecutorial role; moreover, although Edwards' inconsistent statements may constitute questionable attempts after the fact to excuse his negligence in failing to make a tape, they do not indicate a deliberate, bad faith decision not to record the altercation.

Finally, even if the lack of a video recording could be construed as loss of or improper failure to gather evidence by the state, Leonard has failed to show that such a recording could be reasonably anticipated to have been exculpatory. CO Bascus testified that Leonard attacked Wright without provocation, and Wright's numerous stab wounds and Leonard's unscathed condition indicate that Leonard was the aggressor.

Leonard has shown no ineffectiveness of counsel in this regard.

(ECF No. 162-27 at 12-13.)

### c.     De novo review is unwarranted

Leonard argues that this Court should review this ground de novo because the Nevada Supreme Court failed to adjudicate this claim on federal constitutional grounds, the Nevada Supreme Court's adjudication was contrary to established federal law because federal law is an easier standard than the Nevada standard, and the Nevada Supreme Court's decision was based on an unreasonable determination of the facts because Senior C/O Edwards was acting as an agent of the state at the time of the incident and his actions amounted to bad faith. (ECF No. 226 at 174-177.) The Court finds these arguments unpersuasive: (1) the Nevada Supreme Court adjudicated this ground under *Strickland*, which is the proper federal constitutional standard for an ineffective assistance of trial counsel claim (*see* ECF No. 162-27 at 6); (2) although Leonard argued to the Nevada Supreme Court in his opening brief that "[t]his is one of those rare cases

61

where counsel was in the position of proving federal due process violations" (ECF No. 161-38 at 64), he also argued extensively that this trial counsel should have relied on Nevada law in challenging the missing evidence, making the Nevada Supreme Court's discussion of Nevada law applicable; (3) the Court presumes that, in addition to considering Nevada law as a basis for Leonard's trial counsel to challenge the missing evidence, it also considered federal law, *see Richter* 562 U.S. at 99; (4) Leonard's contentions do not overcome that presumption; and (5) although Leonard contends that they are erroneous, the Nevada Supreme Court's determinations that Senior C/O Edwards was not acting as an agent of the state and his actions did not amount to bad faith were reasonable.

### d.   Analysis

The Nevada Supreme Court reasonably concluded that Leonard failed to demonstrate that his counsel were ineffective regarding the missing evidence. The prosecution's loss or destruction of potentially exculpatory evidence violates due process only when the evidence "possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984). Moreover, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *see also Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004). "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n.*. Even negligence in failing to preserve potentially useful evidence is not sufficient to constitute bad faith and does not violate due

1  process. *See id.* at 58; *see also United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011)

2  ("Bad faith requires more than mere negligence or recklessness.").

3          The Nevada Supreme Court reasonably determined that there was no evidence

4  destroyed because it never existed in the first place. As such, because the state did not

5  lose or destroy any evidence, Leonard's counsel had no basis to challenge the destruction

6  of evidence or ask for a spoilation instruction. And even if the failure to record amounted

7  to the destruction of evidence, the Nevada Supreme Court reasonably determined that

8  Senior C/O Edwards's negligent actions did not rise to the level of bad faith. Even though

9  Senior C/O Edwards made inconsistent statements about the lack of a recording after the

10  fact, those inconsistent statements do not amount to bad faith at the time of the failure to

11  record. Further, as the Nevada Supreme Court reasonably noted, Leonard fails to present

12  any evidence that the recording, assuming it was destroyed, could reasonably be

13  anticipated to contain exculpatory evidence. Because the Nevada Supreme Court's

14  determination that Leonard failed to show that his trial counsel was ineffective regarding

15  the missing evidence constitutes an objectively reasonable application of *Strickland*,

16  Leonard is not entitled to federal habeas relief for ground 1(n).

17          **13.    Ground 1(o)**

18          In ground 1(o), Leonard alleges that counsel failed to object to the following

19  instances of prosecutorial misconduct during the guilt phase of the trial: (1) the prosecutor

20  arguing facts not supported by the evidence regarding where the sewer shank came from,

21  the sewer shank and Hill's shank coming from the same locker, and Leonard lying in wait

22  behind a trash can; (2) the prosecutor making improper closing arguments calculated to

23  inflame the passions of the jury when he argued that Leonard could escape or be released

24  if not sentenced to death;[20] (3) the prosecutor improperly shifting the burden of proof; and

25

26          ────────────

27          [20]Leonard also argues that the prosecutor argued that Leonard liked to kill, but this argument is discussed in ground 3(h) and will not be repeated here.

1   (4) the prosecutor injecting his personal beliefs and opinions about the inmate witnesses.

2   (ECF No. 184 at 138-39.)

3       This Court previously found ground 1(o) was technically exhausted but subject to

4   the procedural default doctrine. (ECF No. 205 at 42.) And this Court further ordered that

5   it would "consider *Martinez* arguments in relation to th[is] claim[ ] when it rules upon the

6   merits of Leonard's petition." (ECF No. 207 at 2.) Respondents argue that *Martinez* is

7   inapplicable to ground 1(o) because Leonard's post-conviction counsel raised this claim

8   in his initial review collateral proceedings before the state court but simply omitted it from

9   Leonard's post-conviction appeal to the Nevada Supreme Court. (ECF No. 216 at 92.)

10  Leonard rebuts that this Court can still consider the merits of this claim in assessing

11  cumulative error. (ECF No. 226 at 180.) However, the Court finds no error here.

12                          **a.      Background information**

13      During opening statements, the prosecutor told the jury that they would "hear

14  testimony and see evidence which would indicate that both of the two of the three metal

15  items or shanks . . . were similar to each other, and in fact came from the metal locker in

16  question." (ECF No. 154-28 at 260.)

17      During the trial, outside the presence of the jury, during an argument about the

18  admissibility of the shank found in the sewer, the prosecutor argued that "the evidence

19  would be that . . . approximately a week prior [to the killing], the locker with the missing

20  legs, which match up to both of the shanks in question, was removed after one of the

21  inmates there was . . . trashing it, and that those two flat knives match up in several points.

22  They're largely identical and come from the same piece of metal." (ECF No. 154-29 at

23  176.)

24      During the guilt phase closing argument, the prosecutor argued, *inter alia*, that (1)

25  the shank found in the sewer was located "in the pipe chase servicing the cells of Donald

26  Hill and Frank Armijo," (2) "there can be little question that on the night in question Don

27

28                                      64

Hill and William Leonard were the best of buddies, and that gives rise to the thought that William Leonard got the bent shank from Don Hill, used the bent shank, and got rid of the bent shank to either of them, Hill or Armijo," (3) "[t]he defense ha[d]n't explained in any of the evidence that was presented what happened to the murder weapon," (4) Armijo "was certainly shocked to see what he saw. That was the words that he used, 'I was shocked.' This rapist, robber, burglar, thief was shocked to see what he had seen," (5) "[a]lthough there was a significant amount of testimony about the genesis of the shanks, there seems . . . to be little dispute that it came from a wall locker, one which had been located inside the wing, one which was missing two legs," and (6) "I suggest to you that on that night William Leonard waited behind the garbage can." (ECF No. 155-11 at 83, 96, 97, 98, 99.)

And, during the penalty phase of the trial, the prosecutor commented, regarding Leonard's attempted escape, "that is something that you can and should take into consideration in your deliberation." (ECF No. 155-34 at 51.)

### b.    Analysis

First, regarding the prosecutor's alleged arguments about facts not in evidence, the prosecutor merely explained the facts as the prosecution believed them to be, qualifying his statements with (1) "that gives rise to the thought that . . . ," (2) "there seems . . . to be little dispute that . . . ," (3) the evidence "would indicate that . . . ," and (4) "I suggest to you that . . . ." These were proper arguments and did not warrant an objection. Next, the prosecutor's statement that the shank found in the sewer was located "in the pipe chase servicing the cells of Donald Hill and Frank Armijo," while perhaps not exhaustive of the possible places the shank came from, was not erroneous and did not warrant an objection. And the prosecutor's arguments regarding the admissibility of the shank—while more definitive of the connection between the locker, sewer shank, and Hill's shank than the evidence showed—was made outside the presence of the jury. And while Leonard's trial counsel did not object to the argument, he countered it, as is further

discussed in ground 1(f), by arguing that Atkinson said "that he doesn't have a definite match" between the sewer shank, Hill's shank, and the locker. (ECF No. 154-34 at 201-03.)

Turning to Leonard's other contentions, regarding the prosecutor's comments about Armijo, this Court finds that the prosecutor's comments did not amount to misconduct for the same reasons discussed in ground 6 *infra*; thus, Leonard's trial counsel were not deficient for not objecting to them. Second, regarding the prosecutor's comment about Leonard's attempted escape, the prosecutor did not inadmissibly argue that Leonard could escape in the future if he was not sentenced to death, as Leonard contends. Rather, the prosecutor merely commented that the jury should take the attempted escape into consideration during their deliberations. This did not amount to misconduct, so Leonard's trial counsel were not deficient in not objecting. Third, regarding the prosecutor's comment that Leonard had not explained what happened to the shank he used to stab Wright, Leonard fails to demonstrate that this comment amounted to burden shifting and warranted an objection. Commenting that the defense had not rebutted the prosecution's evidence regarding the sewer shank did not relieve the prosecution's burden of proving every element beyond a reasonable doubt (*see Sandstrom v. Montana*, 442 US 510, 520-24 (1979)); rather, it simply reinforced the prosecution's theory that the sewer shank was the one used to kill Wright.

Because Leonard fails to demonstrate deficiency on the part of his trial counsel, this claim, which is procedurally defaulted, is unavailable to help establish any cumulative error and is dismissed.

### 14.    Ground 1(q)

In ground 1(q), Leonard alleges that his trial counsel failed to make an effective closing argument. (ECF No. 184 at 140.) Specifically, Leonard alleges that his counsel should have (1) contended that the prosecution's theory that Leonard hid behind the trash

can and ambushed Wright with a shank presented a mutual combat situation, (2) argued that the complicity of the prison staff led to the offense and/or the many coincidences of negligent actions on the part of the prison staff showed a "set up," (3) seized upon the conspicuous change in C/O Bascus's version of events from the time of the preliminary hearing, (4) pointed out that C/O Bascus was observing Leonard as he walked away from Wright's body and did not see Leonard slide the shank under any door, (5) argue that the cup and powdery substance found at the scene were consistent with Hill's version of events, (6) pointed out that Wright had been disciplined for possessing a weapon and had a history of sexual assault, (7) argued that the semen discharge found on Wright's penis was consistent with his anticipation of sexually assaulting Leonard, and (8) argued that C/O Caito had testified that he was told not to mention that Hill and Armijo were acting normally after Wright's death. (*Id*. at 140-44.)

In affirming the denial of Leonard's state habeas petition, the Nevada Supreme Court held that Leonard's "claim[ ] that [his counsel] was incompetent in her closing argument . . . ha[d] no merit." (ECF No. 162-27 at 16.) Because the Nevada Supreme Court denied this ground on the merits without explanation, this Court "determine[s] what arguments or theories supported or . . . could have supported[ ] the state court's decision." *Richter*, 562 U.S. at 102; *Carter v. Davis*, 946 F.3d 489, 502 (9th Cir. 2019).

"[C]losing argument for the defense is a basic element of the adversary factfinding process in a criminal trial," so "counsel for the defense has a right to make a closing summation to the jury." *Herring v. New York*, 422 U.S. 853, 858 (1975) (explaining that "closing argument serves to sharpen and clarify the issues for resolution by the trier of fact in a criminal case. For it is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case as a whole. Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions"). Therefore, "[t]he right to effective assistance

67

[of counsel] extends to closing arguments," but "counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003). "Judicial review of a defense attorney's summation is therefore highly deferential-and doubly deferential when it is conducted through the lens of federal habeas." *Id.* at 6.

To begin, regarding Leonard's trial counsel's lack of a mutual combat defense, as this Court discussed in ground 1(b)(2) *supra* and discusses further in ground 1(r)(4) *infra*, there was no evidence to establish that the altercation between Leonard and Wright amounted to mutual combat under Nevada law.

Next, six of the arguments that Leonard contends should have been raised in his trial counsel's closing argument were actually raised, albeit perhaps not in the fashion or detail that Leonard thought they should be raised. First, regarding the complicity of the prison staff and the set of circumstances that had to happen for the altercation to even take place, Leonard's trial counsel argued that C/O Bascus knew he had made an error and that for the jury "[t]o accept the State's theory that Billy murdered Joe Wright," the jury had to believe that the following "incredible set of circumstances occur[red]": C/O Bascus did not follow orders by "watching to see Bill Leonard go into his [cell]," Senior C/O "Edwards ha[d] malfunctioning cameras," Senior C/O "Edwards turn[ed] off the monitors," and Senior C/O "Edwards [did] not watch[ ] anything." (ECF No. 155-11 at 107, 111.) Second, regarding C/O Bascus not having seen Leonard slide the shank under any door, Leonard's trial counsel argued that C/O Bascus "never sees a knife." (*Id.* at 107.) Third, regarding the powder, Leonard's trial counsel argued, "when you look at the photographs of Mr. Wright, you can see this powdery substance, the powdery substance that's consistent with what Donald Hill told you about, a powdery substance that Donald Hill said appeared to him to be used by Joe Wright to stun Billy Leonard." (*Id.* at 126.)

68

Fourth, regarding Wright's history of sexually assaulting other inmates, Leonard's trial counsel argued that "a victim of Joe Wright's" testified that "Wright takes a knife, puts it to his throat and sexually assaults him." (*Id*. at 112.) Fifth, regarding Wright's history of possessing weapons, Leonard's trial counsel argued that "[w]e know that Joe Wright liked to have knives." (*Id*.) Sixth, regarding Wright's semen discharge, Leonard's trial counsel argued, "[h]ow about the penile swab with semen? Again, consistent with the attack on Emde. Joe Wright was ready to rape [Leonard]." (*Id*. at 118.)

Finally, it appears that Leonard's trial counsel did not discuss the two remaining arguments that Leonard now contends should have been discussed: the change in C/O Bascus's version of events from the time of the preliminary hearing and C/O Caito's testimony that he was told not to mention that Hill and Armijo were acting normally after Wright's death. However, Leonard still fails to demonstrate deficiency or resulting prejudice.

Leonard argues that C/O Bascus testified at the preliminary hearing that Leonard was hiding behind the trash can whereas his trial testimony was he only saw Leonard running towards Wright's cell. (ECF No. 226 at 195.) Although Leonard's trial counsel did not argue the inconsistencies in C/O Bascus's testimony, he did argue that C/O Bascus's trial testimony failed to demonstrate that Leonard was hiding behind the trash can: C/O Bascus "does not testify that Bill Leonard jumped out of a trash can[ or] jumped from behind a trash can." (ECF No. 155-11 at 105-06.) It appears that Leonard's trial counsel strategically decided to highlight this testimony, which meant that the prosecution's argument that Leonard was lying in wait was based entirely on speculation, as opposed to arguing that C/O Bascus had previously testified at the preliminary hearing that Leonard hid behind the trash can, which was harmful to Leonard's self-defense theory. (*See* ECF No. 160-18 at 176 (containing Leonard's trial counsel's post-conviction evidentiary hearing testimony that he wanted to demonstrate to the jury during closing

argument that for the jury "to adopt the State's case, [the jury] would have to engage in speculation").) This apparent strategy was sound and is entitled to deference. *See Yarborough*, 540 U.S. at 5-6.

Leonard then argues that Leonard's trial counsel failed to argue that C/O Caito had testified he was told not to mention that Hill and Armijo were acting normally after Wright's death. (ECF No. 184 at 144.) However, C/O Caito did not testify that Hill and Armijo were acting "normally" after Wright's death and did not testify that he was specifically told not to mention them in his report, so Leonard's trial counsel was not deficient for not making these arguments. Rather, when asked if Hill "was reacting like he normally did, smart-alecky," C/O Caito responded, "[a]nd basically that's his attitude seven days a week." (ECF No. 154-29 at 210-11.) And when asked if "in the report did [he] mention Hill's behavior and demeanor, or Armijo's behavior and demeanor," C/O Caito responded, "No. I was not told to mention that in the report. I was told to prepare a report on the finding of the weapon." (*Id*. at 211.) Leonard's trial counsel then clarified: "An officer didn't say 'Don't put that in a report,' they just asked you to put down what you found in your search; is that correct?" (*Id*. at 211-12.) C/O Caito responded, "I was not asked to write a report on Armijo and Hill. I was asked to write a report on the weapon which was found the following day." (*Id*. at 212.)

In sum, having "determine[d] what arguments or theories . . . could have supported[ ] the state court's decision" and finding that it is not possible that fairminded jurists could disagree that these arguments or theories are inconsistent with *Strickland* and its progeny, *Richter*, 562 U.S. at 102, Leonard is denied federal habeas relief for ground 1(q).

### 15.    Ground 1(r)

In ground 1(r), Leonard alleges that his trial counsel were ineffective in failing to ensure proper jury instructions. (ECF No. 184 at 146.)

1

### a.    Ground 1(r)(1)

2      In ground 1(r)(1), Leonard alleges that counsel failed to object to the erroneous

3   "lying in wait" instruction. (ECF No. 184 at 146.) Leonard explains that the instruction

4   allowed for him to be convicted of first-degree murder without requiring any mens rea on

5   his part. (*Id*.) The "lying in wait" instruction provided as follows:

6           All murder which is committed by lying in wait is as a matter of law,
        murder in the first degree, whether the killing was intentional *or accidental*.
7           "Lying in wait" consists of watching, waiting and concealment from
        the person killed with the intention of inflicting bodily injury upon such
8       person or of killing such person.

9   (ECF No. 138-116 at 23 (emphasis added).)

10                           ### i.    State court determination

11      In affirming the denial of Leonard's state habeas petition, the Nevada Supreme

12   Court held:

13           Jury instruction no. 21 stated:
             All murder which is committed by lying in wait is as a
14       matter of law, murder in the first degree, whether the killing
        was intentional *or accidental*.
15           "Lying in wait" consists of watching, waiting and
        concealment from the person killed *with the intention of*
16       *inflicting bodily injury* upon such person or of killing such
        person.
17   (Emphasis added.) Leonard objects to the two emphasized phrases.
             The second paragraph is a sound statement of the law since it comes
18   directly from *Moser v. State*, 91 Nev. 809, 813, 544 P.2d 424, 426 (1975).
     Therefore, it was not ineffective for counsel not to object to it.
19           The first paragraph seems to have no direct source in Nevada law.
     However, the state cites *People v. Laws*, 15 Cal. Rptr. 2d 668, 673–74 (Ct.
20   App. 1993), which holds that under the relevant California statute, any
     "murder"—not "killing"—committed by lying in wait is first-degree murder.
21   This is so even if the murder resulted from an accidental killing. *Id*. at 674.
     For example, it is normally second-degree murder if someone shoots a gun
22   toward a person, intending only to scare the person, but hits and kills the
     person by mistake; however, such a murder perpetrated by lying in wait is
23   of the first degree. *Id*. The first paragraph of the instruction, if carefully read,
     is consistent with *Laws*.
24           However, this court need not decide whether the reasoning in *Laws*
     applies to the relevant Nevada statute (NRS 200.030(1)(a)) or whether the
25   first paragraph of the instruction might mislead a reasonable juror. Even
     assuming that the instruction was erroneous or misleading, Leonard was
26   not prejudiced. There is no basis to conclude that the jury found the killing
     accidental since Leonard stabbed Wright twenty-one times. This is

27

28                                    71

1

2

confirmed by the fact that the jurors returned a verdict form which indicated
that they found Leonard guilty of first-degree murder both by deliberation
and premeditation and by lying in wait. Therefore, the jury found the
necessary intent for first-degree murder.

3   (ECF No. 162-27 at 13.)

4                          **ii.      De novo review is unwarranted**

5         Leonard argues that the Nevada Supreme Court's decision rested on an

6   unreasonable determination of the facts because it (1) failed to consider how the defective

7   lying-in-wait instruction infected the jury's verdict on premeditated murder and (2) ignored

8   the distinction between first-degree murder and second-degree murder by relying on the

9   number of stab wounds to determine that the killing was not accidental. (ECF No. 226 at

10  201-02.) Regarding Leonard's first contention, Leonard notes another jury instruction, jury

11  instruction number 19, which provided, in part, that "[a]ll murder which is perpetrated by

12  means of lying in wait, or by any other kind of willful, deliberate and premeditated killing

13  is murder of the first degree." (ECF No. 138-116 at 21.) Leonard contends that by

14  grouping "lying in wait" with "other kind[s] of willful, deliberate and premeditated killing,"

15  the jury's verdict of guilty of killing with deliberation and premeditation incorporated the

16  erroneous "lying in wait" jury instruction. (ECF No. 226 at 202.) This Court does not find

17  that jury instruction number 19 improperly linked "lying in wait" with a "deliberate and

18  premeditated killing" when the instructions are read as a whole, and importantly, jury

19  instruction number 19 appears to be a correct recitation of Nevada law. *See* NRS §

20  200.030(1)(a) (defining first-degree murder, *inter alia*, as murder that is "[p]erpetrated by

21  means of poison, lying in wait or torture, or by any other kind of willful, deliberate and

22  premeditated killing"). Turning to Leonard's second contention, although the Nevada

23  Supreme Court mentioned the number of stab wounds to support its conclusion that the

24  jury did not find that the killing was accidental, this was not the only basis of its conclusion.

25  In fact, the Nevada Supreme Court then stated that the accidental basis of the killing was

26  "confirmed" by the special verdict form.

27

28                                          72

1

### iii.       Analysis

2       The Nevada Supreme Court reasonably determined that even if the "lying in wait"

3   jury instruction was erroneous, making Leonard's counsel deficient for not objecting to it,

4   Leonard failed to demonstrate prejudice. As the Nevada Supreme Court reasonably

5   concluded, there was no basis to find that the jury found that Leonard accidentally killed

6   Wright, thereby contradicting its first-degree murder verdict, because the jury's special

7   verdict form showed that they found Leonard guilty of first-degree murder by both

8   deliberation and premeditation *and* by lying in wait. (*See* ECF No. 155-15 at 2 (special

9   verdict form showing that the jury found Leonard guilty of first-degree murder under both

10   "deliberation or premeditation" and "lying in wait").) Because the Nevada Supreme Court's

11   determination that Leonard failed to demonstrate prejudice due to the "lying in wait" jury

12   instruction's use of the term "accidental" constitutes an objectively reasonable application

13   of *Strickland*'s prejudice prong, Leonard is not entitled to federal habeas relief for ground

14   1(r)(1).

15

### b.      Ground 1(r)(2)

16       In ground 1(r)(2), Leonard alleges that his trial counsel failed to object to the

17   unconstitutional reasonable doubt instruction. (ECF No. 184 at 150.) Specifically, Leonard

18   argues that (1) "the more weighty affairs of life" language in the instruction inappropriately

19   characterized the degree of certainty required to find proof beyond a reasonable doubt

20   and (2) the "doubt to be reasonable must be actual, not mere possibility or speculation"

21   language in the instruction improperly shifted the burden of proof to him. (*Id.* at 150-51.)

22   The reasonable doubt jury instruction provided, in part, as follows:

23           A reasonable doubt is one based on reason. It is not mere possible
24       doubt, but is such a doubt as would govern or control a person in the more
        weighty affairs of life. If the minds of the jurors, after the entire comparison
25       and consideration of all the evidence, are in such a condition that they can
        say they feel an abiding conviction of the truth of the charge, there is not a
26       reasonable doubt. Doubt to be reasonable must be actual and substantial,
        not mere possibility or speculation.

27

28

73

1    (ECF No. 138-116 at 15.)

2        The Court previously found ground 1(r)(2) was technically exhausted but subject

3 to the procedural default doctrine. (ECF No. 205 at 42.) And this Court further ordered

4 that it would "consider *Martinez* arguments in relation to th[is ] claim[ ] when it rules upon

5 the merits of Leonard's petition." (ECF No. 207 at 2.) This Court now finds that Leonard

6 fails to demonstrate prejudice to excuse the procedural default because Leonard's

7 ineffective assistance of trial counsel claim is not substantial.

8        The Ninth Circuit Court of Appeals evaluated a nearly identical reasonable doubt

9 jury instruction in *Ramirez v. Hatcher*[21] approximately a decade after Leonard's trial and

10 found that "[a]lthough [it did] not herald the Nevada [reasonable doubt] instruction as

11 exemplary, [it] conclude[d] that the overall charge left the jury with an accurate impression

12 of the government's heavy burden of proving guilt beyond a reasonable doubt" such that

13 "the jury charge satisfied the requirements of due process." 136 F.3d 1209, 1210-11, 1215

14 (9th Cir. 1998); *see also Nevius v. McDaniel*, 218 F.3d 940, 944 (9th Cir. 2000) (holding

15 that the reasonable doubt jury instruction was identical to the one in *Ramirez*, so "[t]he

16 law of this circuit thus forecloses Nevius's claim that his reasonable doubt instruction was

17 unconstitutional"). Because the language used in the reasonable doubt jury instruction

18 was constitutional, Leonard fails to demonstrate that (1) his trial counsel acted deficiently

19 in not objecting to it and (2) that this ground is substantial. Because Leonard fails to

20 demonstrate requisite prejudice necessary to overcome the procedural default of ground

21 1(r)(2), that ground is dismissed.

22 ///

23 ///

24 ///

25

26      [21]The portion of Leonard's reasonable doubt jury instruction in question here is identical to the reasonable doubt jury instruction in *Ramirez*. *Compare* ECF No. 138-116 at 15 *with Ramirez v. Hatcher*, 136 F.3d 1209, 1210-11 (9th Cir. 1998).

27

28                74

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### c.      Ground 1(r)(3)

In ground 1(r)(3), Leonard alleges that his trial counsel failed to request an instruction regarding juror discussions with family and friends attending Leonard's trial. (ECF No. 184 at 153.)

The Court previously found ground 1(r)(3) was technically exhausted but subject to the procedural default doctrine. (ECF No. 205 at 42.) And the Court further ordered that it would "consider *Martinez* arguments in relation to th[is] claim[ ] when it rules upon the merits of Leonard's petition." (ECF No. 207 at 2.) Respondents argue that *Martinez* is inapplicable to ground 1(r)(3) because Leonard's post-conviction counsel raised this claim in his initial review collateral proceedings before the state court but simply omitted it from Leonard's post-conviction appeal to the Nevada Supreme Court. (ECF No. 216 at 93.) Leonard rebuts that this Court can still consider the merits of this claim in assessing cumulative error. (ECF No. 226 at 206.) However, this Court finds no error here.

During the trial, the trial court noted that "there [was] a question whether people on the jury's spouses or friends or acquaintances could come and see the trial, and I said there's absolutely nothing to prohibit it" because "[i]t's a public trial." (ECF No. 154-34 at 102-03.) Leonard fails to demonstrate any deficiency or prejudice from his trial counsel not requesting an instruction that the jurors not discuss the case with anyone after the trial court made this notation. Indeed, two days earlier, after the jury was sworn and the prosecution gave its opening statement, the trial court gave the sworn jury its first admonition: "During the recess we take, you can't discuss the case among yourselves or with anyone else." (ECF No. 154-28 at 263.) Because the jury had already been admonished that they were not to discuss the case with anyone, Leonard fails to demonstrate deficiency or prejudice from his trial counsel's lack of request of another admonition, so this claim, which is procedurally defaulted, is unavailable to help establish any cumulative error and is dismissed.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### d.    Ground 1(r)(4)

In ground 1(r)(4), Leonard alleges that his trial counsel failed to request an instruction on mutual combat. (ECF No. 184 at 154.) The Court previously found this ground to be technically exhausted but subject to the procedural default doctrine. (ECF No. 205 at 42.) And the Court ordered that it would "consider *Martinez* arguments in relation to th[is] claim[ ] when it rules upon the merits of Leonard's petition." (ECF No. 207 at 2.) This Court now finds that Leonard fails to demonstrate prejudice to excuse the procedural default because Leonard's ineffective assistance of trial counsel claim is not substantial.

As is also discussed in ground 1(b)(2) *supra*, at the time of Leonard's trial, NRS § 200.450 provided that "[i]f any person or persons, upon previous concert and agreement, fight one with the other or give or send . . . a challenge . . . to fight any other person, the person or persons giving, sending or accepting a challenge to fight any other person shall be punished," if "death ensue to any person in such fight," by imprisonment for 1 to 10 years. *See also Pimentel v. State*, 396 P.3d 759, 765 (Nev. 2017) (explaining that under NRS § 200.450 "[t]he police and prosecutors need only look to find evidence that the fighters agree to fight beforehand, a fight actually took place, and in the case of murder charges, that one or more of the fighters died as a result"). Because there was no evidence that Leonard and Wright previously agreed to fight or challenged the other to a fight, which is discussed in greater detail in ground 1(b)(2) *supra*, Leonard's counsel was not deficient for not requesting a mutual combat instruction. Ground 1(r)(4) is not substantial, so Leonard fails to demonstrate requisite prejudice necessary to overcome the procedural default of ground 1(r)(4). Ground 1(r)(4) is dismissed.

### 16.    Ground 1(t)

In ground 1(t), Leonard alleges that his trial counsel provided ineffective assistance by committing overt, affirmative acts prejudicial to the defense. (ECF No. 184 at 156.)

76

1

#### a.      Ground 1(t)(1)

2        In ground 1(t)(1), Leonard argues that counsel informed the jury during opening

3   argument that the trial court could enter a directed verdict in favor of Leonard if the

4   prosecution did not make their case. (ECF No. 184 at 156.)

5                              **(1)      Background information**

6        During opening statements, Leonard's second-chair counsel made, *inter alia*, the

7   following comments:

8               The procedure in a criminal trial is that the prosecution will present
            their case first. At the close of their case in chief, if they fail to show beyond
9           a reasonable doubt that Mr. Leonard has committed any of the crimes that
            they've charged, Bill doesn't have to do anything. We don't have to do
10          anything, Mr. Wessel and I. We can ask the Judge to find a verdict because
            of the failure for them to present beyond a reasonable doubt any element
11          of the crimes charged.
               If that is not the case, and there is some situation where we feel that
12          we need to present the other side, we need to present to you why we feel
            that Mr. Leonard took the actions that he took, then we will do that. And it's
13          not until that, we have finished doing that, that you are to even consider
            drawing conclusions or making any inferences about this case, and even
14          not then, but not until Judge Griffin has instructed you as to the law.

15   (ECF No. 154-29 at 9-10.)

16       At the post-conviction evidentiary hearing, Leonard's second-chair counsel

17   testified that the opening statement she gave at Leonard's trial was her first opening

18   statement before a criminal jury. (ECF No. 160-17 at 36.) Leonard's second-chair counsel

19   then testified that her statement about the directed verdict was consistent with her

20   understanding of criminal law but that she understood how the comment could have been

21   taken the wrong way: "if . . . at the end of the prosecution's case, if the Judge didn't make

22   a directed verdict, then that would give the jury the impression that the Judge had found

23   that there was a reason, or there was no reasonable doubt." (*Id*. at 37-38.)

24                              **(2)      State court determination**

25       In affirming the denial of Leonard's state habeas petition, the Nevada Supreme

26   Court held:

27

28

1

In her opening statement, Leonard's counsel, Saunders, told the jury that the prosecution would present its case first and if it failed to prove its case, Leonard

2

doesn't have to do anything. We don't have to do anything, Mr. Wessel and I. We can ask the judge to find a verdict . . . .

3

If that is not the case, and there is some situation where we feel that we need to present the other side, we need to present to you why we feel that Mr. Leonard took the actions that he took, then we will do that.

4

5

Leonard says that counsel's reference to a directed verdict misstated the law and prejudiced him because once the district court did not acquit him at the end of the state's case in chief, the jury was led to believe that the court considered the evidence sufficient for conviction. We agree that counsel's statement was inaccurate. If the trial court deems the evidence insufficient, it may advise the jury to acquit, but the jury is not bound by such advice. NRS 175.381(1); *State v. Wilson*, 104 Nev. 405, 408, 760 P.2d 129, 131 (1988). But we conclude that the statement had little if any prejudicial effect. In context, counsel was telling the jury that Leonard had no duty to put on evidence and that the burden of proof lay entirely with the state. We conclude that no reasonable juror would have relied on counsel's passing remark to conclude that the state prevailed if the trial proceeded to presentation of evidence by Leonard.

6

7

8

9

10

11

12

(ECF No. 162-27 at 8.)

13

### (3)    De novo review is unwarranted

14

Leonard argues that the Nevada Supreme Court's decision was based on an

15

unreasonable application of federal law because it failed to engage in a prejudice analysis

16

under *Strickland* and instead merely substituted its judgment for that of a reasonable juror.

17

(ECF No. 226 at 211-12.) Although the Nevada Supreme Court did not cite *Strickland* in

18

its discussion of the instant ground, it accurately gave *Strickland*'s standard of review at

19

the beginning of the discussion section of its order. (*See* ECF No. 162-27 at 6 (stating

20

that "[t]o establish prejudice, the defendant must show that but for counsel's mistakes,

21

there is a reasonable probability that the result of the proceeding would have been

22

different").) Given its previous citation to *Strickland* in the order and its conclusion that

23

"the statement had little if any prejudicial effect," this Court finds that Leonard fails to

24

demonstrate that the Nevada Supreme Court failed to engage in a prejudice analysis

25

under *Strickland*.

26

///

27

28

78

**(4)     Analysis**

As the Nevada Supreme Court reasonably determined, Leonard's counsel performed deficiently in discussing a directed verdict during its opening statement. *See State v. Wilson*, 760 P.2d 129, 130 (Nev. 1988) (holding that "it was error for the trial court to take the case from the jury by dismissing the action at the close of the prosecution's case in lieu of giving the jury an advisory instruction to acquit because of insufficient evidence which instruction the jury could freely ignore"). However, as the Nevada Supreme Court also reasonably concluded, Leonard fails to demonstrate requisite prejudice.

As was reasonably noted by the Nevada Supreme Court, Leonard's counsel's comments, when examined in context of her argument as a whole, were intended to explain the burden of proof in a criminal trial and that the defense did not have to put on any evidence if it did not feel that the prosecution had met its burden. Further, even though the comment at issue, which stated that the defense "can ask the Judge to find a verdict because of the failure for [the prosecution] to present beyond a reasonable doubt any element of the crimes charged," was incorrect, there is not a reasonable probability that the result of Leonard's trial would have been different had this single comment not been made. Indeed, contrary to Leonard's argument and as the Nevada Supreme Court reasonably concluded, this single comment made at the beginning of a lengthy trial cannot be said to have impressed upon the jury that it should find Leonard guilty merely because the trial preceded to the defense's case-in-chief. Because the Nevada Supreme Court's determination that Leonard failed to demonstrate prejudice constituted an objectively reasonable application of *Strickland*'s prejudice prong, Leonard is not entitled to federal habeas relief on ground 1(t)(1).

///

///

79

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### b.      Ground 1(t)(3)

In ground 1(t)(3), Leonard argues that his trial counsel elicited testimony unfavorable to him during witness examinations. (ECF No. 184 at 160.)

The Court previously found ground 1(t)(3) was technically exhausted but subject to the procedural default doctrine. (ECF No. 205 at 42.) And the Court further ordered that it would "consider *Martinez* arguments in relation to th[is] claim[ ] when it rules upon the merits of Leonard's petition." (ECF No. 207 at 2.) Respondents argue that *Martinez* is inapplicable to ground 1(t)(3) because Leonard's post-conviction counsel raised this claim in his initial review collateral proceedings before the state court but simply omitted it from Leonard's post-conviction appeal to the Nevada Supreme Court. (ECF No. 216 at 94.) Leonard rebuts that this Court can still consider the merits of this claim in assessing cumulative error. (ECF No. 226 at 213.) However, this Court finds no definite error here.

Leonard alleges the following errors: (1) his counsel elicited testimony from Dr. Dennis Mackey on cross-examination that Wright's other wounds, besides his fatal wound, may have contributed to his death and were consistent with the shape of the shank found in the sewer, (2) his counsel used phrases such as "the attacker plunging the knife into him" and the "plunging type motion by the attacker" in his cross-examination of Dr. Mackey, (3) his counsel developed on cross-examination of the prosecution's criminalist that the negative results for the presence of human blood on the shank could simply mean that there was an insufficient sample to detect the presence of blood, (4) his counsel elicited damaging evidence from C/O Humphrey that Hill was a dangerous inmate, and (5) his counsel impeached Armijo when he admitted to destroying a locker. (ECF No. 226 at 213-14.)

First, regarding Dr. Mackey, he had already testified on direct examination that Wright's cause of death was "[m]ultiple stab wounds" and that the shank found in the sewer "would be compatible with the wounds [he] saw." (ECF No. 154-34 at 53, 56.)

Second, Leonard fails to articulate why the use of the word plunge to describe Leonard's stabbing of Wright (*see* ECF No. 154-34 at 62) supported that he was the initial attacker, rather than just supporting that he was acting in a quick fashion due to being attacked by Wright. Third, regarding the criminalist, Leonard's counsel was questioning the criminalist about the negative test results on a t-shirt. (ECF No. 155-5 at 129.) And because the t-shirt had tested presumptively positive for blood initially, the negative test result "could mean either it was blood of a different species other than human, or there was just insufficient amount of blood to even go ahead and do the . . . human determination." (*Id.*) There is no evidence that the shank was also presumptively positive for the presence of blood such that the forgoing question and answer would have any negative implications for the shank. Fourth, regarding C/O Humphrey's testimony about Hill being dangerous after being asked about Hill's "general demeanor and attitude" during cross-examination by the defense, it is apparent that counsel was asking about Hill's potential to be rowdy, not dangerous. And regardless, C/O Humphrey had just testified on direct examination that Hill was in one of the prison's isolation cells, implying that he was dangerous. (ECF No. 155-11 at 61, 64.) And fifth, Leonard's counsel merely asked Armijo whether he was singing and celebrating after Wright's death and about him sliding a locker down a hallway after he was denied a shower. (ECF No. 155-7 at 22, 26.) Armijo's answer that he was not singing or celebrating merely provided conflicting evidence to officers' testimony about his behavior; it did not impeach him. And Armijo's testimony about sliding the locker was used to show that the legs of the locker had been removed.

Based on the record, Leonard fails to demonstrate that his trial counsel acted deficiently, so this claim, which is procedurally defaulted, is unavailable to help establish any cumulative error and is dismissed.

///

///

1

### c.      Ground 1(t)(4)

2          In ground 1(t)(4), Leonard argues that his trial counsel made antagonistic remarks

3    about him and insinuated his belief in Leonard's guilt before the jury. (ECF No. 184 at

4    162.) Specifically, Leonard alleges that his counsel (1) referred to similar prison incidents

5    as "murder," (2) referred to the blood a witness observed on Leonard's arm as being

6    "someone else's apparent blood," (3) referred to the plunging of the knife by Leonard, (4)

7    labeled Hill an "obnoxious fellow," and (5) expressed agreement with the prosecutor's

8    position that there were "obvious errors" in Hill's and Armijo's testimonies. (ECF No. 226

9    at 214-15.)

10         In affirming the denial of Leonard's state habeas petition, the Nevada Supreme

11   Court held:

12              In closing argument, responding to remarks by the prosecution,
     Wessel conceded that defense witnesses Armijo and Hill provided accounts
13   of the fight which differed in some respects. He went on:
                    If these two individuals were going to concoct a story, I
14        submit to you that the story would have been perfect in every
          respect, and not such an *obvious error* in their stories.
15                  I have no explanation as to why their stories are not
          consistent, other than the fact that this was two years ago.
16        These men did not put down in written reports as to what they
          saw. And that they did their best to try to recall what
17        happened.
                    Now, you all had an opportunity to view Donald Hill.
18        There's no question about the fact that Donald Hill is an
          *obnoxious fellow*. And we're not asking you to like our
19        witnesses. . . . We are stuck with the witnesses that were there
          on the night in question.
20   (Emphasis added.)
                    Quoting only the emphasized words, Leonard contends that Wessel
21   discredited his own witnesses; however, in context the remarks are
     reasonable and not prejudicial to Leonard.
22

23   (ECF No. 162-27 at 10-11.)

24         Addressing first Leonard's counsel's closing comment about there being obvious

25   errors in Hill's and Armijo's testimonies, the Nevada Supreme Court reasonably

26   determined that this comment was reasonable. The defense's two prime witnesses—Hill

27

28                                          82

and Armijo—had conflicting stories that had to be addressed. (*See* ECF No. 155-11 at 114 (closing argument by defense that "Mr. Armijo recalls that Wright actually came out of this cell and had a knife in his hand, but didn't see a cup in his hand, and that the initial contact took place out here. Donald Hill puts Wright in this area with a cup in his hand and a knife").) Leonard's counsel's acknowledgment of the witnesses' inconsistencies and explanation thereto—that it had been two years since the killing and the witnesses were relying on their memories alone—was understandable.

Turning to Leonard's counsel's closing argument comment that Hill was an obnoxious fellow, the Nevada Supreme Court again reasonably determined that this comment was reasonable. Several witnesses testified about Hill being boisterous, so it is likely the jury had a potentially unfavorable view of Hill after he testified. However, because Leonard's counsel needed the jury to believe Hill's testimony, it was sound strategy to have been forthright in conceding that Hill was unlikeable to gain integrity with the jury. *See Yarborough v. Gentry*, 540 U.S. 1, 9 (2003) (rejecting argument that defense counsel was ineffective for referring to his client as a "'bad person, lousy addict, stinking thief, jail bird'" since "[b]y candidly acknowledging his client's shortcomings, counsel might have built credibility with the jury and persuaded it to focus on the relevant issues in the case"); *see also Fairbanks v. Ayers*, 650 F.3d 1243, 1255 (9th Cir. 2011) ("Even though at times trial counsel did not paint [the defendant] in the most sympathetic light, counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in a useless charade.") (Internal quotation marks and citation omitted).

Next, as was discussed in ground 1(t)(3), Leonard fails to articulate why the use of the word plunge was objectively unreasonable. And even if this word raises perhaps negative connotations, it was only used twice. (*See* ECF No. 154-34 at 62.) Leonard also fails to articulate why Leonard's counsel's question about wanting to clean off "someone

else's apparent blood" was objectively unreasonable. Finally, regarding Leonard's argument that his counsel referred to similar prison incidents as "murder," this appears to be a mere slip of the tongue, not rising to the level of being an unprofessional error.

In sum, because the Nevada Supreme Court's determination that Leonard failed to demonstrate his counsel acted deficiently or resulting prejudice constituted objectively reasonable applications of *Strickland*'s performance and prejudice prongs, Leonard is not entitled to federal habeas relief on ground 1(t)(4).

**B.      Ground 3—ineffective assistance of counsel at penalty phase**

**1.      Ground 3(a)**

In ground 3(a), Leonard alleges that his trial counsel's mitigation investigation and presentation were deficient. (ECF No. 184 at 184.)

Counsel's performance at the penalty phase is measured against "prevailing professional norms." *Strickland*, 466 U.S. at 688. And the Court "must avoid the temptation to second-guess [counsel's] performance or to indulge 'the distorting effects of hindsight.'" *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (citing *Strickland*, 466 U.S. at 689). Counsel's "performance [is] deficient only if, viewing the situation from his perspective at the time of trial, his decisions cannot be characterized as 'sound trial strategy.'" *Id.* (citing *Strickland*, 466 U.S. at 689); *see also Correll v. Ryan*, 539 F.3d 938, 948 (9th Cir. 2008) ("[U]nder *Strickland*, we must defer to trial counsel's strategic decisions."). When challenging a trial counsel's actions in failing to present mitigating evidence during the penalty phase, the "principal concern . . . is not whether counsel should have presented a mitigation case[, but instead] . . . whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . *was itself reasonable*." *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003) (emphasis in original) (explaining that "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant

84

at sentencing"). "In assessing prejudice, [this Court] reweigh[s] the evidence in aggravation against the totality of the available mitigating evidence." *Id*. at 534.

### a.     Ground 3(a)(1)

In ground 3(a)(1), Leonard makes various allegations regarding his trial counsel's failure to adequately present the penalty phase defense. (ECF No. 184 at 185.)

### i.     Ground 3(a)(1)(a)

In ground 3(a)(1)(a), Leonard alleges that his counsel were ineffective in developing testimony that led to a smuggled razor blade being introduced into evidence. (ECF No. 184 at 187.)

### (1)     Background information

During the defense's direct examination of Theodore Burkett, the following colloquy took place:

> Q.     Now, Mr. Burkett, before you are permitted to go to the exercise yard, are you searched by the officers?
> A.     Yes. Completely stripped and a visual body cavity search.
> Q.     And before you are transported out of Unit 7 are you strip searched?
> A.     Yes.
> Q.     Were you strip searched today?
> A.     Yes, twice.
> Q.     And can you tell us why you were strip searched?
> A.     Well, to make sure you have no contraband, weapons, keys, anything.
> Q.     That would also include the possessing [of] shanks?
> A.     Shanks.
> Q.     And to your knowledge, is the skin search a common procedure and method employed by the correctional officers?
> A.     Yes.
> Q.     Mr. Burkett, are you carrying a weapon at this time?
> A.     A razor.

(ECF No. 155-44 at 65.) The trial court immediately held a hearing outside the presence of the jury. (*Id*. at 66.) Leonard's counsel confirmed that the foregoing questions asked to Theodore Burkett were at Leonard's request. (*Id*.) The trial court then informed Leonard that "the implications of what these questions are doing may or may not be very favorable

to" him and "may cause [him] significant difficultly in the penalty phase." (*Id.* at 67.) Leonard said he understood and that he still wanted to proceed as planned. (*Id.*) When the jury returned to the courtroom, the trial court stated that "an item was taken from dentures in [Theodore Burkett's] mouth" and marked as an exhibit. (*Id.* at 69.) Theodore Burkett then testified that he did not bring the razor to harm anybody; rather, he "brought it to show in Unit 7 we ain't [sic] even supposed to have razors" and he "went through two shakedowns and brought it into a court of law." (*Id.* at 75.) Theodore Burkett further explained that he must live everyday with the fear that another inmate may have a weapon: "If a door opens, does he have anything in his hand? Have you said anything wrong to him in the last month?" (*Id.* at 76.)

Later, during closing arguments, the defense made the following comments about Theodore Burkett's razor:

> I want to open by first apologizing to you for Mr. Ted Burkett's demonstration yesterday. I assure you Mr. Wessel and I were as shocked as you were and had no knowledge [that] this was about to occur.
> Also, I think that Mr. Burkett made a sincere apology to you that I think was from the heart and told you that it was strictly for demonstration purposes.
> But there was one thing that I, I think you might have experienced from that, and you probably experienced some fear. I know a few of you did. I could tell by the changing of places.
> I feel that if you felt that fear, you know what Billy Leonard is going through every day as he lives on Unit 7 of the Nevada State Prison, that he is experiencing every day that something like this could possibly happen to him, that somebody could have a weapon that he doesn't know about, somebody that's his enemy, he may not even know they're his enemy, and it's a constant state that is part of the environment that he is subjected to at this time.

(ECF No. 155-34 at 66-67.)

At the post-conviction evidentiary hearing, Leonard's first-chair trial counsel testified that he "[a]bsolutely [did] not" know that Theodore Burkett had smuggled a weapon into the courtroom. (ECF No. 160-18 at 203-04.) During Theodore Burkett's testimony, Leonard slipped a list of questions to his trial counsel to ask Theodore Burkett.

(*Id.* at 204.) When Leonard's trial counsel asked Theodore Burkett whether he had a weapon, he "believed that he was going to say no." (*Id.* at 205.) After the incident with the razor, "several male jurors switched places with some of the female jurors who were sitting closest to the witness box." (*Id.* at 209.)

### (2)     State court determination

In affirming the denial of Leonard's state habeas petition, the Nevada Supreme Court held:

> Inmate Theodore Burkett testified for Leonard at the penalty phase that inmates possess shanks for protection. Defense counsel Wessel asked Burkett if he had been strip searched before being brought to court to ensure that he had no weapons. Burkett said yes. Wessel then asked if he was carrying a weapon, and Burkett said, "A razor."
>
> Leonard concedes that he wanted Burkett to testify and that Wessel asked this question pursuant to a written note which Leonard handed to Wessel during the examination of Burkett. Nevertheless, he blames counsel for asking the question and prejudicing his defense.
>
> At the post-conviction hearing, Wessel testified that he was asking Burkett "a series of questions, and then Mr. Leonard would supplement my questions with questions he wanted asked and answered." This was a procedure which he and Leonard had followed during the penalty phase questioning of inmates. Wessel stated, "Things were happening very quickly, and my recollection is that when he asked me to ask that question," the answer would obviously be negative.
>
> It is clear now that Wessel should not have asked the question, but we conclude that Wessel was not acting unreasonably at the time. He was simply relying on Leonard to give him appropriate questions. Up to that point, such reliance was not unreasonable. It appears that Leonard had Burkett smuggle the razor into court to prove some kind of point, apparently the laxness of prison security and the inmates' need to protect themselves. When questioned by the district court outside the presence of the jury, Leonard indicated that he wanted the jury to see the razor. We conclude that Leonard will not now be heard to accuse his counsel of ineffectiveness when it is clear that Leonard himself was responsible for any prejudice which resulted.

(ECF No. 162-27 at 14.)

### (3)     De novo review is unwarranted

Leonard argues that the Nevada Supreme Court's decision was contrary to clearly established federal law, namely, that Leonard's counsel was required to conduct a reasonable investigation *before* presenting the evidence. (ECF No. 226 at 251-252.)

87

1   While this may be a true statement of clearly established federal law, the Nevada

2   Supreme Court's decision was not contrary to this law. Indeed, the Nevada Supreme

3   Court did not discuss Leonard's trial counsel's investigation either before or after the

4   presentation of the razor. Rather than deciding this claim on an investigatory basis, the

5   Nevada Supreme Court denied Leonard relief due to his responsibility in the presentation

6   of the razor.

7                                   **(4)      Analysis**

8            Leonard's trial counsel had control over the examination of Theodore Burkett,

9   meaning he had a duty to investigate any potential consequences arising from Theodore

10  Burkett's testimony. *See Summerlin v. Schriro*, 427 F.3d 623, 638 (9th Cir. 2005)

11  (explaining that "[a]lthough the allocation of control between attorney and client typically

12  dictates that the client decides the ends of the lawsuit while the attorney controls the

13  means, it does not relieve an attorney of the duty to investigate potential defenses, consult

14  with the client, and provide advice as to the risks and potential consequences of any

15  fundamental trial decision within the client's control") (internal quotation marks and

16  citation omitted). However, "[t]he reasonableness of counsel's actions may be determined

17  or substantially influenced by the defendant's own statements or actions." *Strickland*, 466

18  U.S. at 691 (explaining that "inquiry into counsel's conversations with the defendant may

19  be critical to a proper assessment of counsel's investigation decisions, just as it may be

20  critical to a proper assessment of counsel's other litigation decisions"). As the Nevada

21  Supreme Court reasonably noted, Leonard's trial counsel's inquiry of the razor was

22  influenced by Leonard, who gave his trial counsel a list of questions to ask Theodore

23  Burkett. Given Leonard's desire for the razor to be presented to the jury and his role in

24  bringing that desire to fruition, the Nevada Supreme Court reasonably determined that

25  Leonard failed to demonstrate that his trial counsel acted unreasonably. *See Schriro v.*

26  *Landrigan*, 550 U.S. 465, 475 (2007) (explaining that if the petitioner issued an instruction

27
                                        88
28

to "his counsel not to offer any mitigating evidence," then "counsel's failure to investigate further could not have been prejudicial under *Strickland*"); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1035 (9th Cir. 1997) ("Petitioner's personal wishes . . . are entitled to respect."); *Jeffries v. Blodgett*, 5 F.3d 1180, 1197-98 (9th Cir. 1993) (finding counsel not ineffective for acquiescing in defendant's wishes regarding the nature of his defense).

Because the Nevada Supreme Court's determination that Leonard failed to demonstrate ineffectiveness constituted an objectively reasonable application of *Strickland* and was not based on an unreasonable determination of the facts, Leonard is not entitled to federal habeas relief on ground 3(a)(1)(a).

### ii.   Ground 3(a)(1)(b)

In ground 3(a)(1)(b), Leonard alleges that his counsel were ineffective in presenting "convict code" testimony, despite repeated warnings from the trial court that it was not mitigating. (ECF No. 184 at 191.)

### (1)   Background information

During the direct examination of inmate Lovell during the penalty proceeding, Lovell testified about the difference between "a convict mentality versus an[ ] inmate mentality," explaining that "a convict mentality is somebody who basically lives within the structured form that convicts has [sic] set up for theirself [sic], and an inmate is somebody who lives without that form, cooperates with the authorities and . . . doesn't live within the rules set up by the prison society." (ECF No. 155-33 at 12.) Under a convict mentality, according to Lovell, "you don't tell on people[, y]ou stand up for yourself," and when "dealing with an enemy situation," a "convict" will "do what's necessary to stay alive." (*Id.* at 13, 16.) Lovell testified that he "would describe Mr. Leonard as [having a] convict mentality." (*Id.*) Later, during cross-examination, Lovell answered in the affirmative when asked if he would say that a convict mentality "is a different way of adapting to life than people on the street by the ordinary laws and rules and regulations." (*Id.* at 21.)

89

After Lovell's testimony, the trial court met with the defense outside the presence of the jury and the prosecution. (*Id*. at 23.) The trial court then discussed a concern with Leonard:

> [T]estimony is being elicited that indicates that you are capable of bench pressing over 300 pounds and have training in martial arts. And now Mr. Lovell has talked about you being able to handle yourself, essentially.
>
> I merely asked [first-chair trial counsel] if that was being done because you felt it was a right course, or if [first-chair trial counsel] agreed with that, because I think that in the penalty phase of this case that it's not doing you any good.
>
> I have a grave concern that if, if you insist on presenting that type of evidence, that it may show you, that you can survive in a prison, but it may be the type of evidence that convinced the jury that you're far more dangerous than you are non-dangerous, and I think it's a double-edged problem.
>
> And I suggested to [first-chair trial counsel] that I ought to put this on the record so you could consider if it's really in your best interests to talk about, about lifting weights and you being trained in martial arts, because I, it, in my estimation, it may do exactly the opposite of what you hope to accomplish.
>
> So I will give you a chance to talk this over with [first-chair trial counsel] and/or if you want to tell me what you prefer now, but I just think you ought to think it over.

(*Id*. at 24.) A recess was taken to give Leonard and his counsel time to talk. (*Id*. at 25.) Following the recess, outside the presence of the jury and the prosecution, Leonard and the trial court had the following colloquy:

> THE DEFENDANT: Well, you know, you made an interesting point, you know, and I agree with that.
>
> The reason why I was pursuing that, because I feel that the jury doesn't feel I had those capabilities to disarm an inmate of that size, and it wasn't presented during the trial, so I figured I wanted, you know, to present evidence and testimony that I do have those capabilities to disarm another inmate.
>
> THE COURT: I, I understand that. I understand that as an idea and something that you may want to talk about. But once again, that information before the jury on the penalty phase could have been likewise devastating
>
> because all they would have had, if that's true, all the prosecutor has to do is stand up and say "If he could disarm this man so well, why didn't he do it, instead of stabbing 21 times?" You see, that's a double-edged problem. If you are that capable and there's 21 stab wounds, why didn't you stop?
>
> THE DEFENDANT: Well, I panicked.
>
> THE COURT: I understand. I understand there's all sorts of reasons that could be explained.

90

THE DEFENDANT: Sure.
THE COURT: It's a problem that if you talk about your abilities, it also makes it sound less and less like self-defense as you get more and more capable. And if you talk about those abilities, I don't care, you know, during the penalty phase of the trial, it makes it, it makes you have the, run the risk of making the jury perceive you as being a very, very dangerous person because you are so capable.
So if you want to make the point that you're making, that's fine.
THE DEFENDANT: But then, see, if they understand that I'm capable of disarming the guy because of my physical capabilities, then I wasn't laying in wait, it wasn't premeditated is what I'm trying to establish, even though they reached a verdict of first degree. It's obvious they had doubt. They believed the correctional officer.
THE COURT: Well I, I suggest, Mr. Leonard, that all I wanted to do -
THE DEFENDANT: Yeah.
THE COURT: - - was to make sure that it was your choice to present this evidence, because I think - -
THE DEFENDANT: It was my choice.
THE COURT: Okay. And I think from my point of view, I just wanted to apprise you of the problem that if you do that, it has a tendency to, to be used the other way.
THE DEFENDANT: Yeah, it can be blown out of proportion.
THE COURT: Okay. Well, I just wanted to make sure everybody understood that. So I don't know, if we hear more evidence on that issue, I will imagine it will be because you have chosen to do that?
THE DEFENDANT: Yes.

(*Id*. at 25-27.)

The next day, during direct examination, Joel Burkett testified about the difference between a convict and an inmate: "a convict has a certain code he goes by, his honor, loyalty" whereas "[a]n inmate is someone that is more or less under the control of the staff members at the prison." (ECF No. 155-34 at 10.) Joel Burkett testified that he would consider Leonard a convict. (*Id*. at 16.) Joel Burkett explained "that prison is a completely different society than the streets" and that, hypothetically, "[i]f somebody confronts me and tells me they're going to hurt me and I have reason to believe that they would do so, I would try in my best to hurt that person before they did me and hope I could catch them without a weapon." (*Id*. at 17-18, 19.)

Later, during the post-conviction evidentiary hearing, Leonard's second-chair trial counsel testified that she was against presenting evidence of the "convict code." (ECF No. 160-17 at 92-93.) And Leonard's first-chair trial counsel testified, *inter alia*, that (1)

91

Leonard felt that the convict mentality "was an honorable way of living your life if you were going to be serving a . . . life sentence," (2) he and co-counsel had "not anticipate[d] putting on any information about" the convict code before the penalty hearing, but "[w]hen [they] got to the penalty phase, [he] felt that . . . in light of the fact that [they] were dealing with his life . . . [and] were now in a very critical state, that [they] would give greater deference to [Leonard's] feelings on the witnesses [the defense] presented," (3) "if Mr. Leonard felt strongly about a particular witness, [he] would call that witness, if [he] felt that [that witness] would not damage Mr. Leonard's situation," and (4) during the penalty phase, he and his co-counsel "wanted to, to the extent possible, have some empathy and rapport with Mr. Leonard, to relate to him as a human being and not as simply an inmate, or a killer." (ECF No. 160-19 at 49-50, 54.)

### (2)      State court determination

In affirming the denial of Leonard's state habeas petition, the Nevada Supreme Court held:

> Leonard says that his counsel were ineffective during the penalty phase in . . . relying on convict witnesses, who presented evidence of a violent "convict code" which only prejudiced him.
> Although some evidence of a convict code was admitted during the penalty phase, it was not, as Leonard implies, the sole or even main theme of the defense. Leonard does not consider that his counsel called his mother and father to testify for him, presented further inmate testimony on Wright's bad character, and established that on one occasion Leonard and a black inmate had been mistakenly released from their cells simultaneously without incident.
> Leonard has failed to demonstrate that . . . his counsel performed unreasonably in presenting mitigating evidence.

(ECF No. 13-14.)

### (3)      De novo review is unwarranted

Leonard argues that the Nevada Supreme Court's decision was contrary to, or involved an unreasonable application of, clearly established federal law because the presentation of other evidence outside the "convict code" theme did not render counsel's

presentation of that evidence effective. (ECF No. 226 at 259-260.) This argument lacks merit. The Nevada Supreme Court did not determine that the presentation of other evidence during the penalty phase rendered counsel's presentation of "convict code" evidence effective. The Nevada Supreme Court's discussion of the other evidence presented during the penalty phase was merely to rebut Leonard's contention that the "convict code" evidence was the defense's main theme. Leonard also argues that the Nevada Supreme Court's decision was based on an unreasonable determination of the facts because the "convict code" evidence was the main theme of the defense. (*Id*. at 260.) This argument also lacks merit. Although Leonard presented numerous inmates during the penalty phase, only two of those inmates—Lovell and Joel Burkett—specifically discussed the "convict code."

### (4)    Analysis

As was the case with ground 3(a)(1)(a), it appears that Leonard's trial counsel's actions in presenting the "convict code" testimony was substantially influenced by Leonard. Leonard's first-chair trial counsel testified that Leonard lived by the "convict code," Leonard believed the "convict code" was a noble way to live his life in prison, and that deference was given to Leonard's desire to call inmates to present evidence of the "convict code." Given Leonard's desire to present this "convict code" evidence, the Nevada Supreme Court reasonably determined that Leonard failed to demonstrate that his trial counsel performed unreasonably.

Leonard contends that his trial counsel did not properly advise or discuss the risks of presenting the "convict code" testimony with him. (ECF No. 226 at 258.) Although it is not clear whether trial counsel discussed the risks of the "convict code" testimony with Leonard,[22] the trial court discussed those risks with Leonard, and Leonard was adamant

---

[22]When asked during the post-conviction evidentiary hearing if she "express[ed] her reservations [about the 'convict code' testimony] either to [Leonard's first-chair trial

1    about still pursuing that theme. Because Leonard was resistant to the trial court's advice,

2    he fails to demonstrate that he would have heeded the same advice had it been given by

3    his trial counsel.

4          Because the Nevada Supreme Court's determination that Leonard failed to

5    demonstrate ineffectiveness constituted an objectively reasonable application of

6    *Strickland* and was not based on an unreasonable determination of the facts, Leonard is

7    not entitled to federal habeas relief on ground 3(a)(1)(b).[23]

8                   **b.**      **Ground 3(a)(2)**

9          In ground 3(a)(2), Leonard alleges that if his trial counsel adequately investigated

10    and prepared for the penalty phase, they could have presented compelling mitigating

11    evidence. (ECF No. 184 at 208.)

12                   **i.**      **Ground 3(a)(2)(a)**

13          In ground 3(a)(2)(a), Leonard alleges that his trial counsel failed to investigate and

14    present evidence of his traumatic upbringing, namely evidence demonstrating that (1)

15    both of his parents came from troubled backgrounds, (2) Leonard experienced and

16    witnessed physical abuse, psychological abuse, and neglect, (3) Leonard was subjected

17    to inappropriate sexual experiences from a young age, (4) Leonard suffered from

18    addiction disease from an early age, (5) Leonard's father encouraged his drug use,

19    criminal behavior, and inappropriate sexual behavior, and (6) Leonard suffered several

20    head injuries as a child, along with neurological, psychological, and physical disorders.

21    (ECF No. 184 at 210-234.) Although not recounted in full detail here, in support of this

22

23    counsel] *or* to Mr. Leonard," Leonard's second-chair counsel answered, "of course." (ECF No. 160-17 at 93 (emphasis added).)

24         [23]In ground 3(a)(1)(c), Leonard alleges that his counsel improperly presented
25    evidence of his background, explaining that the sole evidence of his childhood came from his parents' testimony, which substantially minimized Leonard's traumatic and chaotic life.
26    (ECF No. 184 at 200.) Leonard later clarified that this subclaim "was included to provide a comparison between the evidence that was presented and the evidence that effective
27    counsel could have presented, not as a standalone claim for relief." (ECF No. 226 at 261 n.66.)

28

1
2
3
ground, Leonard discusses new evidence that his trial counsel could have uncovered, starting with evidence from before he was born and continuing to after his conviction.[24] (*See id*.)

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
This Court previously found this ground to be procedurally defaulted. (ECF No. 205 at 53.) And this Court further ordered that it would "consider *Martinez* arguments in relation to th[is] claim[ ] when it rules upon the merits of Leonard's petition." (ECF No. 207 at 2.) In comparing the upbringing mitigation evidence that was presented at the penalty phase of his trial to the supplemental upbringing mitigating evidence Leonard presents in his instant Petition, this Court finds that Leonard's supplemental upbringing mitigation evidence, which was apparently readily available had Leonard's trial counsel investigated further, more thoroughly portrayed Leonard's background and cast Leonard's upbringing in a grimmer light. Consequently, for these reasons and the reasons discussed in the merits section of this ground *infra*, this Court finds that (1) ground 3(a)(2)(a) is substantial and (2) Leonard has demonstrated cause and prejudice to overcome the procedural default of ground 3(a)(2)(a). *See Ramirez v. Ryan*, 937 F.3d at 1241 (explaining that a claim is "substantial" for purposes of *Martinez* if it has "some merit," which refers to a claim that would warrant issuance of a certificate of appealability). This Court will review de novo the merits of ground 3(a)(2)(a) with the merits of ground 3(a)(2)(b) *infra*.

19
### ii.        Ground 3(a)(2)(b)

20
21
22
In ground 3(a)(2)(b), Leonard alleges that his trial counsel failed to present expert testimony to explain the impact of his childhood traumas, addictions, and medical problems. (ECF No. 184 at 234.) Specifically, Leonard alleges that his trial counsel failed

23
24
25
26
27
[24]For example, Leonard explains that his grandparents fought and had affairs, many of his relatives suffered from addiction diseases, he witnessed domestic abuse between his father and mother and between his stepfather and mother, his father physically abused him at times and abandoned him for several years, his stepfather abused him at times, his parents were swingers and allowed him to observe sexual activity, his mother brought various men home after her divorce, his mother had him rub oil on her body at times, he started experimenting sexually at a young age, and he was sexually assaulted at a juvenile facility at age 13.

95
28

1    to (1) present testimony from a neurological or neuropsychological expert, (2) present

2    expert testimony regarding his addiction, and (3) present expert testimony to explain the

3    impact of his childhood traumas. (*Id*. at 236-244.) This Court previously found this ground

4    to be procedurally defaulted. (ECF No. 205 at 53.) And this Court further ordered that it

5    would "consider *Martinez* arguments in relation to th[is] claim[ ] when it rules upon the

6    merits of Leonard's petition." (ECF No. 207 at 2.)

7                            **iii.        Background information**

8                            **(1)        Information available at the time of trial**

9            In September 1981, Dr. Lynn Gerow conducted a psychiatric evaluation of Leonard

10   following his murder of Lawrence Dunn. (ECF No. 138-63 at 2.) Dr. Gerow concluded

11   that, at the time Leonard murdered Dunn, he "was in possession of mental faculties

12   sufficient to distinguish right and wrong and to comprehend the nature and the quality of

13   the acts with which he is charged." (*Id*. at 4.)

14           In October 1981, Dr. John Chappel also conducted an evaluation of Leonard

15   following his murder of Dunn. (ECF No. 138-64.) Dr. Chappel concluded that "Mr. Leonard

16   [was] in possession of mental faculties which enable[d] him to comprehend the nature of

17   the charges against him and to rationally aid in the conduct of his defense." (*Id*. at 4.) Dr.

18   Chappel also concluded that Leonard "present[ed] a difficult social and treatment

19   problem" because his "angry impulses towards men which apparently erupt when he is

20   intoxicated make him too dangerous to be returned to any community without extensive

21   treatment." (*Id*. at 5.) Dr. Chappel later conducted an evaluation in 1988 at the apparent

22   request of the trial court regarding Leonard's competence to stand trial in the instant case.

23   (ECF No. 152-19.) Dr. Chappel concluded that Leonard did not suffer from any mental

24   disorder and that he was "of sufficient mental ability to understand the nature of the

25   charges against him and the possible death penalty." (*Id*. at 4.)

26

27
                                        96
28

1      In November 1981, Dr. Terry Weyl, a certified psychologist, conducted a

2  psychological evaluation on Leonard following his murder of Dunn. (ECF No. 138-65 at

3  2.) Dr. Weyl made the following conclusions:

4          The testing reveals a young man who is developed mentally disabled
       by a mild bitemporal cortical dysfunction. Mr. Leonard began having
5      difficulties early in school due to the resulting learning disability and poor
       impulse control. With a lack of parental controls and early involvement with
6      drugs, he became alienated from family, school and other controlling
       influences. Due to his inadequacy and low self-esteem only the least
7      desirable routes were open to him from his point of view. A personality
       picture of characterological functioning with near psychotic features,
8      combined with some mild organic dysfunction, developed. He is a young
       man with poor impulse control, rapid mood swings, aggressive acting out
9      tendencies and limited ability to organize limited internal resources.
          Diagnosis is schizotypal personality disorder (301.22). Treatment is
10     difficult as the individual has little to no insight and forms no close
       relationships. He frequently feels that he has made significant progress and
11     drops out of treatment. The Lithium Compounds have been occasionally
       helpful in managing mood swings. Obviously, dangerousness is high as is
12     suicidal risk.

13  (*Id*. at 3.) Although he did not testify, Dr. Weyl's evaluation was entered into evidence in

14  Leonard's instant case. (*See* ECF No. 155-34 at 70.)

15     In May 1982, Dr. Mace Knapp, a psychologist, conducted a psychiatric evaluation

16  on Leonard regarding his self-mutilation while at Nevada State Prison. (ECF No. 138-68.)

17  Dr. Knapp concluded that it "appears that Leonard is . . . attempting to manipulate the

18  system in order to try to return to NNCC." (*Id*. at 2.) Dr. Knapp also concluded that Leonard

19  "has a *serious potential for violence* and escape." (*Id.* (emphasis in original).) Similarly, in

20  1982, Dr. A.T. Vogt, a clinic psychologist, found that Leonard (1) "scored in the borderline

21  impaired range" for brain damage "which could reflect some chronic cerebral dysfunction"

22  and (2) was "an irrational, nervous, unhappy, impulsive individual who under stress may

23  tend to show poor judgment or act-out impulsively instead of using his head." (ECF No.

24  138-67 at 3.)

25     In September 1982, Dr. Robert Greene, a licensed psychologist, conducted a

26  psychological evaluation of Leonard to address questions related to competency to stand

27
                                97
28

trial and insanity regarding Leonard's killing of Russell Williams in Florida. (ECF No. 138-55 at 2.) On August 19, 1989, Dr. Greene was deposed in the instant case by Leonard's second-chair trial counsel. (*Id*. at 5.) In that deposition, Dr. Greene testified, *inter alia*, as follows: (1) Leonard had an overall intellectual functioning within the borderline mental deficiency range, (2) he hypothesized that Leonard may have brain damage, (3) Leonard's childhood was unstable and exhibited a pattern of chronic dysfunction and chronic maladaptive behavior, (4) Leonard showed signs of mental illness starting at 10 years old, (5) Leonard started abusing substances at 10 years old, (6) Leonard had difficulty controlling his behavior and acted out physically due to his inability to resolve conflicts, (7) when facing a highly stressful situation, Leonard experienced a deteriorated ability to interpret what was going on and to plan a solution to the problem, and (8) Leonard had underlying schizophrenic symptoms. (ECF No. 138-72 at 16-87.) A videotape of Dr. Greene's deposition was played for the jury during the penalty phase of the instant trial. (*See* ECF Nos. 155-21 at 151-53; 155-33 at 126-129.)

In April 1988, Dr. Donald A. Molde conducted a psychiatric evaluation of Leonard at Leonard's trial counsel's request.[25] (ECF No. 152-18.) Dr. Molde opined that Leonard was "presently of sufficient mentality[ ] such that he ha[d] a rational understanding of the nature of the charges against him" and was "able to assist his attorney in his own defense or to receive the judgment of the court." (*Id*. at 2.) "In summary," Dr. Molde found "no indication of any disorder to be present in [Leonard] at this time which would adversely affect his competency to proceed with the legal matters which [were] facing him." (*Id*. at 3.)

---

[25]Although Dr. Molde's report was addressed to the trial court, Leonard's trial counsel requested the evaluation: "I believe that it would be appropriate under all the circumstances in this case to order an evaluation for purposes of determining [Leonard's] competency to stand trial." (ECF No. 152-16 at 9.)

In July 1989, Dr. Ted W. Young performed a neuropsychological examination on Leonard at the request of Leonard's first-chair trial counsel. (ECF No. 138-62.) Dr. Young's conclusions and recommendations are as follows:

> Basic capacities for focused and sustained attention/concentration were found to be broadly within normal limits.
>
> Sensory and motor findings were within normal limits.
>
> Basic visuospatial perceptual and constructional abilities were found to be within normal limits.
>
> Recent memory capacity was judged to be broadly within normal limits overall, although there was notable variability across tests.
>
> No abnormalities of speech or language were noted.
>
> As estimated by the WAIS-R, overall intelligence is within the low average range – 21st percentile for age. As estimated by a second measure, abstract reasoning ability (a concept closely related to IQ) was found to be average for age. Academic (reading, spelling, arithmetic) competencies were found to range from the 5th to 12th percentile.
>
> On tests sensitive to deficits in set flexibility, this man performed at levels suggestive of a moderate deficit overall.
>
> This latter finding, along with his poor ability to perform arithmetic calculations, constitute the only two notably abnormal findings. The meaning of these findings is not clear. His poor arithmetic ability likely has existed all of his life.
>
> His poor performance on tests of set flexibility remain unexplained. Such deficits are commonly seen following moderate to severe traumatic head injuries or following injury to the frontal lobes of the brain.
>
> Given the circumstances of my testing this man, the possibility of his faking bad on these tests has to be considered. This is a possibility I can never completely discard. Nevertheless, I do not believe that was the source of his poor scores. Part of the significance of his scores is that they stand in contrast to some other tests scores (e.g., WAIS-R, RPM). Unless this man has read textbooks in the field of neuropsychology, he wouldn't know when to do well and when not to.
>
> Frankly, I do not consider the two abnormal test findings, in isolation, as strong evidence for a frontal lobe (or similar in its consequences) injury. They are, however, of enough significance that MRI and EEG studies of the head, in my view, are called for,[26] particularly since he is charged with a capital crime. These would be to look for evidence of anterior brain injury.
>
> If an MRI scan and EEG study were negative, then I would say the test findings are likely erroneous and not indicative of cerebral pathology.
>
> If positive, then it will be of significance to note common sequela of frontal lobe dysfunction in considering this man's case. Such sequela include poor impulse control, grossly faulty judgment, limited ability to make and carry out long range plans, prioritize commitments, etc.

---

[26]Leonard's trial counsel obtained an MRI and EEG of Leonard in apparent compliance with this report. (*See* ECF No. 155-22 at 35.) Neither the MRI nor the EEG showed any indication that Leonard suffered from a brain injury. (*See* ECF No. 138-2 at 15.)

(*Id*. at 8-9.)

**(2)    Information developed after the trial**

In August 2010, Dr. Jonathan Mack performed neuropsychological testing on Leonard. (ECF No. 138-2.) Dr. Mack's formulations and impressions were as follows:

> Neuropsychological testing supports that Mr. Leonard has significant brain damage/dysfunction. There is evidence of marked and significant relative impairment of the right cerebral hemisphere involving the motor region as well as the posterior portion of the right hemisphere, predominantly. There is evidence of significant relative dysfunction in short term and working memory relative to intellectual functions with overall mild impairment of auditory memory, visual working memory and immediate memory with borderline impairment of visual memory and low average delayed memory. Significant memory problems were also noted on recall of the Rey Complex Figure and to a lesser extent on the Tactual Performance Test using NDS criteria. Neuropsychological testing is further significant for visual working memory deficits, neglect of nonverbal stimuli, impaired nonverbal, auditory and attention processing, overall impaired concept formation and with evidence of dysgraphia on handwriting screening. Motor testing is indicative of bilateral weakness and relative deficiency of the left hand in terms of motor coordination.
> From a functional standpoint, Mr. Leonard has mildly to moderately impaired immediate memory, mildly impaired auditory memory, mildly impaired visual working memory, mildly impaired auditory, nonverbal processing and attention, marked derangement of sensory-perceptual functions of the right hemisphere, bilateral motor weakness and left sided motor dyscoordination, dysgraphia, and in mathematics learning disability. From a psychosocial standpoint, Mr. Leonard's history is replete with marked physical abuse and neglect. It is this examiner's opinion that Mr. Leonard was the victim of a substantial child Posttraumatic Stress Disorder which lead to the development of a Dissociative Disorder NOS with marked emotional numbing and attempts to dissociate away from pain, which was further facilitated by rampant drug abuse.

(ECF No. 138-4 at 3.) And Dr. Mack's forensic conclusions were as follows:

> It is this examiner's opinion, as stated within reasonable degree of neuropsychological certainty, that the above diagnostic impressions were present at the time of the homicide of Doc Wright. The science of neuropsychology was present and available at the time of the trial and would have, in this examiner's opinion, brought out the above diagnoses at the time of his trial. It is this examiner's opinion that Mr. Leonard, as a consequence of underlying Organic Brain Damage, is very easily "set off" by aggressive acts towards him, and will instantaneously lose control and violently lash out without specifically formulating the intent to kill during the course of his actions. This difficulty in formulating the intent to kill under situations of extreme emotional duress due to the perception of ongoing immediate threat is extremely salient in this particular case and appears to

100

1
2
3
4
5
6

have been the case in all 3 homicides, as stated within a reasonable degree of neuropsychological certainty. Mr. Leonard's history of psychological trauma and abuse set him up to become hypervigilant and hyper-reactive in situations in which he feels threatened. This hypervigilance from his history of psychosocial abuse, in combination with his brain dysfunction, is the cause of his inability to formulate the intent to kill under conditions where he perceives threat, as stated within a reasonable degree of neuropsychological certainty. Furthermore, Mr. Leonard's history of anger at his stepfather forms the basis for his tendency to angrily over-react to other males, as stated within a reasonable degree of neuropsychological and psychological certainty.

7

(*Id.* at 4-5.)

8

In September 2010, Dr. Greene, whose deposition was played for the jury during

9

the penalty phase of Leonard's instant case, reviewed materials that "expanded relevant

10

testing data and relevant information from Mr. Leonard's psycho-social history."[27] (ECF

11

No. 138-55 at 6.) Dr. Greene provided that, "[h]ad this information been available prior to

12

[his] deposition in 1989, [his] testimony could have included the following" information:

13
14
15
16
17
18
19
20
21
22
23
24
25

There is clear multi-source external confirmation of a damaging childhood history as being marked by severe abuse, neglect, head injuries, violence, environmental instability and pathological behavior by caretakers. Extensive information is now available outlining highly problematic, dangerous and violent childhood behaviors at levels even more troublesome than that described by Mr. Leonard. Recent neuropsychological testing has supported the presence of significant brain damage/dysfunction. The availability of extended family history which included pronounced patterns of substance abuse and psychopathology in both maternal and paternal sides would support a clinical conclusion that Mr. Leonard is likely to have had a genetic contribution to mental illness and drug abuse. This genetic contributor would have predisposed him to the development of both substance abuse and major psychopathology. The expanded composite of information provides additional support for the longstanding presence of a major mental illness, impoverished inhibitory controls plus cognitive impairments and distortions of reality which are likely to have resulted in major deficits in Mr. Leonard's capacity to control and conform behaviors to social and legal standards. As previously noted, control mechanisms would have become even more compromised when personal threat (either real or delusional) is perceived. It is reported that, at the time of the 1987 Nevada prison homicide, Mr. Leonard was still a drug user. Reported fear of Doc Wright, the victim, may have been the direct result of or may have been exacerbated by Mr. Leonard's mental illness. However, with the presence of perceived danger and fear, Mr. Leonard's

26
27
28

---

[27]It is not readily apparent what "expanded relevant testing data and relevant information" Dr. Greene reviewed.

1    extremely tenuous and marginal control of violent behaviors is likely to have
     become insufficient to inhibit behavior.

2    (*Id*. at 6-7.)

3        In 2010, Dr. S. Alex Stalcup, a physician specializing in addiction medicine, who

4    reviewed materials regarding Leonard, reported the following: (1) Leonard "was born

5    genetically predisposed to addiction," (2) "[m]erely presenting instances of traumatic brain

6    injury, drug consumption and abuse cannot convey the extent of damage done to the

7    psyche of a victim of that abuse," (3) Leonard "demonstrated the classic signs of the

8    genetic basis for addiction: boredom, inattention, restlessness/irritability, hyperactivity,

9    and prominent impulsivity," (4) Leonard's "litany of toxic, traumatic, and psychological

10   brain insults combine[d] to produce extreme disturbances in behavioral control," (5) "[t]he

11   events surrounding th[e] homicide [of Wright] illustrate the interplay between

12   hypofrontality and limbic affective kindling," (6) "[i]n the circumstances surrounding the

13   Wright homicide, all the elements were present to produce violence without appreciation

14   or contemplation of the consequences," (7) "it is tragic and unjust that no medical

15   evidence was presented to the jury in Mr. Leonard's trial that would have enabled the trier

16   of fact to weigh their decision against an enormous body of evidence supporting his

17   brain's failure to inhibit strong impulses because of devasting hypofrontality," (8) "Leonard

18   was unable to form rational intent due to numerous insults to his developing brain,

19   exacerbated by acute and chronic drug use," (9) Leonard's "behavior was driven by

20   extreme emotions which are the consequence of limbic affective kindling that resulted

21   from severe psychological traumas occurring throughout his childhood," and (10) "[w]hen

22   threatened, intoxicated, or frightened, he lashes out uncontrollably, and is unable to use

23   prefrontal cortex inhibitory functions to interrupt his behavior." (ECF No. 138-73 at 2, 6,

24   8, 25, 44, 49, 52, 59, 60.)

25       In 2017, Dr. Matthew Mendel, a clinical psychologist who performed a forensic

26   evaluation on Leonard, reported the following: (1) "it is highly likely, given the severity,

27

28                                            102

duration, complexity, and range of traumas which he experienced during childhood, and the absence of treatment for these traumas, that Bill Leonard did, in fact, suffer from Post-Traumatic Stress Disorder in 1981, 1982, and 1987," (2) "[w]hile there does not appear to be any doubt that Doc Wright was pursuing Mr. Leonard, among others, sexually, it is highly likely that in killing Mr. Wright, Mr. Leonard was reacting not only to Mr. Wright's actions but also to previous instances of sexual aggression against him," (3) Leonard's "experiences during childhood and adolescence left Bill Leonard trapped on a trajectory toward sexual and aggressive maladaptive behaviors," (4) "Leonard killing a man in response to a threatened or potential sexual assault is among the most over-determined events [he] ha[s] ever examined," and (5) "[w]hen confronted with the presence of an unmistakable threat of assault – both sexual and otherwise – by Doc Wright, one would expect an individual with Bill Leonard's life history to react violently and extremely." (ECF No. 138-95 at 6, 13-16.)

### iv.    Analysis

Leonard's trial counsel had numerous previously prepared expert evaluations of Leonard at their disposal at the time of Leonard's trial in 1989: Dr. Gerow's report from 1981, Dr. Chappel's report from 1981, Dr. Weyl's report from 1981, Dr. Knapps's report from 1982, Dr. Vogt's report from 1982, and Dr. Greene's report from 1982. Additionally, Leonard's trial counsel obtained a psychiatric evaluation by Dr. Molde, a neuropsychological examination by Dr. Young, and MRI and EEG testing of Leonard. Leonard's trial counsel then deposed Dr. Greene, played the deposition for the jury, and provided Mr. Weyl's evaluation to the jury.

Like ground 3(a)(2)(a), Leonard now provides new supplemental information to demonstrate his trial counsel's ineffectiveness: a neurological report from Dr. Mack, an addiction report from Dr. Stalcup, and a report on the impact of childhood traumas from Dr. Mendel. And like ground 3(a)(2)(a), in comparing the expert evidence that was

presented at the penalty phase of his trial to the supplemental expert evidence Leonard

presents in his instant Petition, this Court finds that Leonard's supplemental expert

evidence, which appears to have been producible in 1989, provides a greater depth and

breadth of information. As such, for these reasons and the reasons discussed in the merits

section of this ground *infra*, this Court finds that (1) ground 3(a)(2)(b) is substantial and

(2) Leonard has demonstrated cause and prejudice to overcome the procedural default

of ground 3(a)(2)(b). This Court now reviews de novo the merits of grounds 3(a)(2),

discussing the aggregate mitigation evidence from grounds 3(a)(2)(a) and 3(a)(2)(b).

#### v.      Merits of ground 3(a)(2)

This Court finds that Leonard is entitled to federal habeas relief on ground

3(a)(2)—the aggregate of grounds 3(a)(2)(a) and 3(a)(2)(b)—because he demonstrates

deficiency and prejudice under *Strickland*. Leonard's supplemental upbringing mitigation

evidence would have better portrayed Leonard's turbulent childhood, detailed the

obstacles Leonard faced as a child and adolescent, and presented his family's issues and

their effect on Leonard. Moreover, in comparison with the expert evidence presented at

the penalty hearing, Leonard's supplemental expert evidence would have provided a

more detailed, concrete picture of Leonard as an individual, for example: (1) instead of

indicating that Leonard may have had brain damage, the supplemental evidence would

have affirmatively demonstrated that he had brain damage, (2) instead of indicating that

Leonard suffered from general mental illness as a child, the supplemental evidence would

have specified that Leonard suffered from posttraumatic stress disorder as a child leading

to a dissociative disorder as an adult, and (3) instead of generic information concerning

Leonard's substance abuse, the supplemental evidence would have explained Leonard's

addiction and his brain's dysfunction surrounding that addiction. Leonard's trial counsel

were deficient for not investigating and presenting this concrete, detailed, illustrative

evidence to the jury to provide clarity on Leonard's background and behavior. This

deficiency is glaring when contextualized by Leonard's counsels' inexperience and lack of preparation. Leonard's first-chair trial counsel had never represented a client in a capital case, and Leonard's second-chair trial counsel had never represented a client in a criminal case. Leonard's first-chair trial counsel was also suffering from a devasting gambling addiction throughout his representation of Leonard and was forced to divide his time in the months before Leonard's trial between preparing for Leonard's trial and preparing for trial in another capital murder case. It is difficult to imagine that Leonard's trial counsel could have come close to investigating and presenting a sufficient mitigation case at the penalty hearing given their experience levels, injurious habits, and limited preparation time.

Regarding prejudice, this Court is persuaded that the supplemental upbringing mitigation evidence and supplemental expert evidence would have changed the jury's assessment that Leonard was deserving of the death penalty. Although this supplemental evidence would not excuse Leonard's killing of Wright, Williams, or Dunn, it would have provided the jury with an accurate lens with which to view Leonard's behavior and those killings. Indeed, the jury's perception of Leonard's killings would likely have been reshaped with the knowledge that he suffered from definite brain damage and brain dysfunction. This likely shift in awareness of Leonard's cognitive hardships is especially notable when combined with the fact that the jury should have been informed that mitigation circumstances did not have to be found unanimously, which is discussed in ground 3(f)(3) *infra*. As such, in reweighing the evidence in aggravation, although violent and inexcusable, against the totality of the available mitigating evidence, including Leonard's supplemental expert evidence *and* supplemental upbringing mitigation evidence, which would have contextualized the aggravation evidence, the Court finds that the evidence in mitigation counterbalances and sufficiently eclipses the aggravation evidence. *See Wiggins*, 539 U.S. at 534 ("In assessing prejudice, [this Court] reweigh[s]

105

1    the evidence in aggravation against the totality of the available mitigating evidence.").

2    Leonard is entitled to federal habeas relief for ground 3(a)(2).[28]

3                                    c.        Ground 3(a)(3)

4          In ground 3(a)(3), Leonard alleges that his counsel were ineffective in failing to

5    present the State's complicity in the offense as a mitigating factor. (ECF No. 184 at 244.)

6                               i.       Background information

7          At the post-conviction evidentiary hearing, Leonard's trial counsel testified that he

8    did "not pursu[e] the theory of staff involvement" in the killing because the defense team

9    "didn't have any evidence to support such a theory and, quite frankly, [they] thought it was

10   preposterous." (ECF No. 160-19 at 34.) Leonard's trial counsel explained, *inter alia*, that

11   (1) "DePalma said . . . that he overheard two or more correctional officers say something

12   to the effect [of,] '[w]e killed two birds with one stone,'" but Leonard's trial counsel's

13   "recollection is that [those correctional officers] had no connection at all with this incident,"

14   and (2) he was aware that the prison's Critical Incident Review Board had concluded that

15   C/O Bascus's and Senior C/O Edwards's violations of prison rules resulted in Wright's

16   death, but after conducting interviews, it was clear to Leonard's trial counsel that C/O

17   Bascus merely made a mistake as opposed to acting intentionally or there being a

18   conspiracy. (ECF Nos. 160-19 at 35, 80, 82; 160-18 at 142.) Leonard's trial counsel also

19   explained that the defense team "felt [they] had exhausted that avenue" of correctional

20   staffing errors during the guilt phase of the trial. (*Id*. at 56.)[29]

21   _____

22   [28]As a practical matter, it may be redundant to discuss the remainder of ground 3,
     as this Court has already concluded Leonard is entitled to federal habeas relief regarding
23   his penalty hearing. However, in an abundance of caution and as an alternative ground
     for this Court's determination that penalty phase relief is warranted (*see* grounds 3(f)(3)
24   and 20 *infra*), this Court discusses the remainder of ground 3.

25   [29]Leonard urges this Court to consider an affidavit completed by DePalma in 1999,
     a letter written by DePalma in 1999, and a declaration written by Joel Burkett in 2010.
26   (*See* ECF Nos. 138-103 at 10-12, 31; 138-52.) However, this Court is precluded from
     considering any evidence that was not before the Nevada Supreme Court at the time it
27   considered Leonard's appeal of the denial of his state habeas petition in May of 1998.
     *See Pinholster*, 563 U.S. at 181.

28                                                106

1

### ii.     State court determination

2       In affirming the denial of Leonard's state habeas petition, the Nevada Supreme

3   Court held:

4           Leonard complains that his counsel did not . . . pursue the "prison's
        involvement" in Wright's death. He asserts that the jury should have been
5       instructed that this involvement was a possible specific mitigating
        circumstance.
6           . . . The jury also learned that prison staff, specifically CO Bascus,
        had negligently allowed Leonard access to Wright. We fail to see how this
7       negligence mitigates Leonard's crime in the least. In referring to the
        involvement of the prison in Wright's death, Leonard seems to be relying on
8       his theory that Senior CO Edwards intentionally instigated a fight between
        Wright and Leonard. To reiterate, this is rank speculation void of credibility.
9           We conclude that no ineffective assistance of counsel occurred in
        this regard.

10

11   (ECF No. 162-27 at 15-16.)

12

### iii.     De novo review is unwarranted

13       Leonard alleges that the Nevada Supreme Court's decision was based on an

14   unreasonable determination of clearly established federal law because, by concluding

15   that the evidence would categorically not be mitigating, the Nevada Supreme Court acted

16   contrary to the Supreme Court's holding that state courts cannot limit the jury's

17   consideration of mitigating evidence. (ECF No. 226 at 311.) The Nevada Supreme Court

18   did not conclude that the evidence would categorically not be mitigating. Rather, it merely

19   concluded that Leonard failed to demonstrate prejudice from his trial counsel's decision

20   not to pursue that avenue of alleged mitigation. Leonard also alleges that the Nevada

21   Supreme Court's decision was based on an unreasonable determination of the facts

22   because his post-conviction counsel presented evidence that prison guards orchestrated

23   the fight, and the Nevada Supreme Court seems to have rejected this evidence without

24   an evidentiary hearing. (ECF No. 226 at 311.) The Nevada Supreme Court's finding that

25   it was speculation that any officers intentionally instigated the fight was not unreasonable

26   given that the testimony concerning any intentional instigation was hearsay.

27

28                                    107

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<div align="center">

**iv.     Analysis**

</div>

The Nevada Supreme Court reasonably determined that Leonard fails to demonstrate prejudice regarding his trial counsel's decision not to present the State's complicity in the offense as a mitigating factor. The jury was aware from the testimony at the guilt phase of the trial that correctional officers violated prison policy, resulting in Leonard and Wright being out of their cells at the same time. Regardless of whether this violation of prison policy was intentional or negligent, the jury had previously found Leonard guilty of first-degree murder. Given the jury's findings regarding Leonard's culpability in killing Wright, the Nevada Supreme Court reasonably concluded that Leonard failed to demonstrate that this same evidence—had it also been presented during the penalty phase—would have mitigated Leonard's actions. Because the Nevada Supreme Court's determination that Leonard failed to demonstrate prejudice constituted an objectively reasonable application of *Strickland*'s prejudice prong, Leonard is not entitled to federal habeas relief on ground 3(a)(3).

<div align="center">

**d.     Ground 3(a)(4)**

</div>

In ground 3(a)(4), Leonard alleges that trial counsel were ineffective in failing to present all available mitigating evidence. (ECF No. 184 at 247.) Specifically, Leonard alleges that his trial counsel were ineffective for failing to present evidence of Wright's aggressiveness, evidence showing that Wright was the initial aggressor, and evidence from Leonard's childhood. (*Id*. at 248-255.)

<div align="center">

**i.     Background information**

</div>

During the post-conviction evidentiary hearing, Leonard's first-chair trial counsel testified about presenting evidence regarding Wright at the penalty phase: "My feeling was that we would not gain a lot . . . by continuing to trash Mr. Wright. The jury was aware through, particularly, the tearful testimony of Gerald Emde, that Wright was a very bad guy, and they knew that he had been convicted of a serious offense." (ECF No. 160-19

<div align="center">

108

</div>

at 55.) Rather, Leonard's first-chair trial counsel testified that he "just made a judgment call that [he] would prefer trying to paint Mr. Leonard in a more favorable light than to continue to focus on Mr. Wright." (*Id.*)

And regarding further evidence regarding Leonard's childhood, Leonard's second-chair trial counsel testified at the post-conviction evidentiary hearing that there was no defense strategy involved in not presenting the testimonies of Leonard's ex-girlfriend, teachers, or counselors at the penalty phase. (ECF No. 160-16 at 115.) Rather, the defense team "felt [they] had sufficient background information from [Leonard's] school records," which were presented, and Leonard's parents, who both "gave a good history of his background." (*Id.*) Further, regarding Leonard's teachers and counselors, Leonard's second-chair trial counsel testified that "what they had to say was only for a small period of [Leonard's] life, during . . . his grade school years," and these potential witnesses "didn't have . . . anything outstanding to tell." (*Id.* at 116.) Regarding Leonard's ex-girlfriend, Leonard's second-chair trial counsel testified that "[i]t seemed like she was afraid because of her new relationship [and] that she didn't want to get involved" in Leonard's trial. (*Id.* at 114.) And regarding Leonard's brother, Barry Leonard, Leonard's second-chair trial counsel testified that he had served time in the Florida State Penitentiary and did not "divulge to [her] whether there had been some physical abuse of him and of Bill Leonard by the[ir] stepfather." (*Id.* at 117-18.) In sum, Leonard's second-chair trial counsel testified that "the witnesses [the defense] did bring were witnesses that had a lot of outstanding things to say and were intimately involved in Mr. Leonard's life, and the ones that [the defense] didn't bring were only superficially involved in his life." (ECF No. 160-18 at 41.)

### ii.    State court determination

In affirming the denial of Leonard's state habeas petition, the Nevada Supreme Court held:

> During the post-conviction proceedings, Leonard presented an affidavit from his brother, Barry Leonard, stating that their step-father had

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

regularly beaten them both as children. Leonard says his counsel were ineffective for not discovering and presenting this evidence and for not calling as witnesses people whom Saunders interviewed in Florida before the trial, including a teacher, school counselors, and an ex-girlfriend. These people had known Leonard and had positive things to say of him.

    Other than the childhood beatings, Leonard has not alleged with any specificity what available evidence was not presented. Evidence of childhood beatings is important mitigating evidence, but Saunders provided adequate reason for not presenting any of the evidence in question. Saunders testified at the post-conviction hearing that the people she interviewed "had positive things to say" about Leonard, but nothing "outstanding." Leonard's ex-girlfriend was reluctant to testify and was not surprised that Leonard was accused of murder in Nevada because she knew of his Florida murder. The teacher and counselors had known Leonard only a short time during his grade school years and had superficial contact with him. Saunders considered that with Leonard's school records and the testimony of his mother and father, testimony by the teacher and counselors would only be cumulative. Saunders interviewed Barry Leonard, but he told her nothing about any childhood abuse. Barry had also just been released from the Florida State Penitentiary

    We conclude that counsel made a reasoned, tactical decision not to call these witnesses.

    . . . .

    Leonard complains that his counsel did not present Wright's prison record or testimony by more inmates to further attack Wright's character. . . .

    The jury heard a great deal of evidence concerning Wright's character during both the guilt and penalty phases, and Leonard fails to show how further evidence on this subject would have made a difference. . . .

    We conclude that no ineffective assistance of counsel occurred in this regard.

17 (ECF No. 162-27 at 15-16.)

18         **iii.**      **De novo review is unwarranted**

19 Leonard argues that this Court should review this claim de novo because the

20 Nevada Supreme Court's finding that he failed to show how further evidence of Wright's

21 actions would have made a difference was unreasonable given the availability of different

22 types of evidence of Wright's misconduct that were not presented. (ECF No. 226 at 319.)

23 This Court is unpersuaded. Regardless of whether further evidence of Wright's

24 misconduct was different than that presented to the jury, it is still generally cumulative,

25 making the Nevada Supreme Court's finding that Leonard failed to demonstrate prejudice

26 reasonable.

27

28

110

1

### iv.    Analysis

2      The Nevada Supreme Court reasonably determined that Leonard failed to

3   demonstrate prejudice regarding his trial counsels' decision to not present further

4   evidence of Wright's aggressiveness or actions before being killed. There is no question

5   that Wright was an aggressive, dangerous man and that there was more evidence that

6   Leonard's counsel could have presented to the jury to further establish that fact. (*See*

7   ECF Nos. 138-77 at 76-82; 138-78; 138-79; 138-80; 138-81 at 2-4; 138-85; 138-86 at 2-

8   4; 138-90; 138-109 at 25-43; 138-111 at 9; 138-112; 138-114 at 5-6; 138-116 at 65, 72.)

9   However, as the Nevada Supreme Court reasonably determined, Leonard fails to

10  demonstrate how further establishing Wright's aggressiveness would have altered the

11  jury's decision to sentence Leonard to death. Although Wright's participation in Leonard's

12  criminal conduct was a mitigating circumstance the jury found to be present (*see* ECF No.

13  121-2), it is mere speculation that adding more support to that mitigation circumstance

14  would have tipped the scales when it came time for the jury to weigh the mitigating factors

15  against the aggravating factors, especially considering the egregiousness of Leonard's

16  prior killings.

17      The Nevada Supreme Court also reasonably determined that Leonard's trial

18  counsel were not deficient in deciding to not present further witnesses to testify about

19  Leonard's childhood, namely, Leonard's brother, teachers, counselors, and ex-

20  girlfriend.[30] Indeed, the Nevada Supreme Court reasonably determined that Leonard's

21  trial counsel made a reasoned, tactical decision not to present these witnesses: (1) the

22  defense team did not present the testimony of Leonard's teachers and counselors

23  because they only knew him superficially for brief periods of time and had nothing

24

---

25  [30]Leonard urges this Court to consider various declarations from his brother,
grandfather, ex-stepmother, uncle, and aunts completed in 2009 or 2010. (*See* ECF Nos.
26  138-39, 138-40, 138-41, 138-42, 138-43, 138-44, 138-45, 138-46.) However, the Court is
precluded from considering any evidence that was not before the Nevada Supreme Court
27  at the time it considered Leonard's appeal of the denial of his state habeas petition in
1998. *See Pinholster*, 563 U.S. at 181.

28

1    exceptional to add in mitigation, (2) the defense team did not present the testimony of

2    Leonard's ex-girlfriend because she was reluctant to testify, and (3) the defense team did

3    not present the testimony of Leonard's brother because he never mentioned any abuse.

4    (ECF No. 160-16 at 114, 116-18.) These strategic decisions were sound and are entitled

5    to deference. *See Strickland*, 466 U.S. at 688 (explaining that "[j]udicial scrutiny of

6    counsel's performance must be highly deferential"); *see also Correll v. Ryan*, 539 F.3d

7    938, 948 (9th Cir. 2008) ("[U]nder *Strickland*, we must defer to trial counsel's strategic

8    decisions.").

9        Because the Nevada Supreme Court's determination constituted an objectively

10   reasonable application of *Strickland*, Leonard is not entitled to federal habeas relief on

11   ground 3(a)(4).

12            **2.      Ground 3(c)**

13       In ground 3(c), Leonard alleges that his trial counsel improperly emphasized

14   harmful evidence—namely, Leonard's attempted escape from prison—to the jury during

15   the penalty phase of the trial. (ECF No. 184 at 261.)

16            **a.      Background information**

17       At the beginning of the penalty hearing, outside the presence of the jury, Leonard's

18   trial counsel objected to the introduction of evidence of Leonard's attempted escape,

19   arguing that "by telling the jury that Mr. Leonard attempted an escape," the prosecution

20   is "tell[ing] the jury[,] '[b]oy, if you don't enter a death sentence, he'll come after you some

21   day.'" (ECF No. 155-21 at 34.) The trial court overruled Leonard's counsel's objection.

22   (*Id.* at 38.) A little later, while in the presence of the jury and before the testimony of

23   Leonard's attempted escape, Leonard's counsel objected "to the further testimony of th[e]

24   witness." (*Id.* at 122.) Leonard's counsel then argued:

25           We believe this witness is going to talk about an incident that may
            have occurred in early January of this year that we've previously discussed.
26          I believe what the State is trying to do is to inflame the passions of
            the jury by leading them to believe that Mr. Leonard is an escape risk and
27

28

therefore if they don't impose the death penalty[,] he may cause a death out onto the streets.

Particularly, Your Honor, we would rely on the State's cases of *Crump v. State*, 102 Nev. 159, and *Allen v. State*, 99 Nev. 485.

We think this type of evidence is very misleading, its probative value is virtually nil, its prejudicial value is very extensive.

It's confusing to the jury as to why they're talking about an incident that took place well after the Joe Wright death. And again, we submit that the sole purpose of this is just to frighten the jury to lead them to believe that Mr. Leonard may escape at some time and maybe cause them harm in the future.

(*Id.* at 122-23.) The trial court again overruled the objection. (*Id.* at 123.) Later, at the beginning of C/O Cupp's testimony about Leonard's attempted escape, Leonard's counsel again objected, arguing: "We think the only purpose for this testimony is to inflame the passions of the jury and frighten them and divert their attention from their true duty." (*Id.* at 130.)

During the post-conviction evidentiary hearing, Leonard's first-chair trial counsel testified about his reasoning behind his objections in front of the jury regarding the attempted escape: "We didn't want to dance around it. We wanted to meet it head on and tell them that was baloney, and that wasn't something that they should consider." (ECF No. 160-18 at 194.) Leonard's first-chair trial counsel then explained that if the defense "didn't strenuously object" and instead gave "just a simple sterile objection," the jurors "would accept th[e prosecution's] evidence as the gospel, and [the defense] wanted to put a different spin on it." (*Id.* at 187-88.) Leonard's second-chair trial counsel confirmed this reasoning, testifying that (1) the trial judge would give the parties an indication of how he would rule in chambers and then the defense "would make a calculated decision as to whether [they thought] that [they] should make th[eir] argument in front of the jury," (2) if they "knew that [they] were going to be ruled against, . . . [they] felt that [sometimes] it would be better to give [their] arguments in front of the jury to help diffuse the ruling," and (3) the defense wanted to take "some of the power, some of the punch out of [the prosecutor's] argument." (ECF No. 160-17 at 57, 68-69.)

113

1

### b.   State court determination

2     In affirming the denial of Leonard's petition for post-conviction relief, the Nevada

3   Supreme Court held:

4       Leonard also complains that here and at other times during the trial,
Wessel unsuccessfully argued evidentiary objections in the presence of the
5       jury, drawing the jury's attention to the evidence and emphasizing its
unfavorable effect on the defense. Wessel testified at the post-conviction
6       evidentiary hearing that he wanted his objections on the record and wanted
the jury to know that evidence, though admitted, still might not be
7       dependable. Further, the district court stated at the hearing that it would not
have allowed most objections to be made outside the presence of the jury
8       or sidebar.
        We conclude that Leonard has failed to show that his counsel acted
9       unreasonably or prejudiced him in objecting to the admission of evidence.

10   (ECF No. 162-27 at 9 (internal footnote omitted).)

11

### c.   De novo review is unwarranted

12     Leonard argues that the Nevada Supreme Court's decision was based on an

13   unreasonable determination of clearly established federal law because a strategy must

14   be reasonable. (ECF No. 226 at 325-26.) The Nevada Supreme Court determined that

15   Leonard had failed to show that his counsel acted unreasonably. (*See* ECF No. 162-27

16   at 9.) The Nevada Supreme Court did not simply subscribe to Leonard's counsel's

17   strategy; they also determined that that strategy was reasonable. Leonard also argues

18   that the Nevada Supreme Court's decision was based on an unreasonable determination

19   of the facts because its statement that the trial court "would not have allowed most

20   objections to be made outside the presence of the jury or sidebar" conflicts with Leonard's

21   trial counsel's understanding of the trial court's practice, so it could not serve as a basis

22   for counsel's actions. (ECF No. 226 at 326.) However, this statement by the Nevada

23   Supreme Court was about objections generally, not about the objection regarding the

24   attempted escape. (*See* ECF No. 160-18 at 185-186.) Indeed, Leonard's trial counsel's

25   objection to the attempted escape was made outside the presence of the jury and then in

26

27

28

1    front of the jury, so the statement about "most objections" not being able to be made
2    outside the presence of the jury is irrelevant to ground 3(c).

3                                    **d.      Analysis**

4              It is true that the prosecution would have committed misconduct under Nevada law
5    if it had made an argument that the jury should sentence Leonard to death so that he
6    cannot escape from prison. *See Collier v. State*, 705 P.2d 1126, 1130 (Nev. 1985)
7    (explaining that "[t]he prospect of escape is not part of the calculus that the jury should
8    consider in determining a defendant's sentence"). However, because (1) the trial court
9    had already ruled outside the presence of the jury that the evidence of Leonard's
10   attempted escape was admissible in the penalty stage and (2) the implications of this
11   attempted escape evidence—*i.e.* that the jury should sentence Leonard to death so that
12   he could not escape from prison—were likely present in the juror's minds without the
13   explicit argument being made by the prosecution, the Nevada Supreme Court reasonably
14   determined that Leonard's trial counsel acted reasonably in facing the unfavorable
15   evidence head-on. Indeed, Leonard's trial counsel reasonably testified that he wanted to
16   strategically take the punch out of the prosecution's attempted escape evidence by
17   discussing its flaws before it was even presented. The Nevada Supreme Court
18   reasonably concluded that this strategy was reasonably sound.

19             Because the Nevada Supreme Court's determination that Leonard failed to
20   demonstrate deficiency constituted an objectively reasonable application of *Strickland*'s
21   performance prong and was not based on an unreasonable determination of the facts,
22   Leonard is not entitled to federal habeas relief on ground 3(c).

23                              **3.      Ground 3(e)**

24             In ground 3(e), Leonard alleges that his trial counsel failed to object to the improper
25   special verdict form because it did not include life-sentencing options and contained

26

27
                                           115
28

misleading language by conflating death eligibility with death worthiness. (ECF No. 184 at 268, 277.)

This Court previously found this ground to be technically exhausted but subject to the procedural default doctrine. (ECF No. 205 at 42.) And this Court further ordered that it would "consider *Martinez* arguments in relation to th[is] claim[ ] when it rules upon the merits of Leonard's petition." (ECF No. 207 at 2.) This Court now finds that Leonard fails to demonstrate prejudice to excuse the procedural default because Leonard's ineffective assistance of trial counsel claim is not substantial.

### a. Background information

Penalty jury instruction number 6 provided that "[t]he jury shall fix the punishment at: (1) [d]eath, or (2) [l]ife imprisonment without the possibility of parole, or (3) [l]ife imprisonment with the possibility of parole." (ECF No. 121-3 at 7.) Penalty jury instruction number 7 then provided:

> In order to even consider the death penalty as an option for sentencing, you must first find beyond a reasonable doubt that at least one of the aggravating circumstances alleged by the State, in fact, does exist. If you do not find that any aggravating circumstances exist, you may not consider the death penalty as an option.
>
> If you find beyond a reasonable doubt that one or more aggravating circumstances exist, you must then determine whether any mitigating circumstances exist.
>
> If you determine that any mitigating circumstances exist, you must then determine if the one or more of the mitigating circumstances found to exist outweigh the one or more aggravating circumstances found to exist. If the one or more mitigating circumstances do not outweigh the one or more aggravating circumstances, you may consider the death penalty as an option.
>
> Likewise, if you find that one or more mitigating circumstances do not exist and you find the existence of one or more aggravating circumstances, you may consider the death penalty as an option.
>
> Even if you find that the one or more aggravating circumstances are not outweighed by the one or more mitigating circumstances, or if you find that there are one or more aggravating circumstances and that there are no mitigating circumstances at all, you still have the discretion to vote for the imposition of a sentence of life with the possibility of parole or life without the possibility of parole, rather than the death penalty.

(*Id*. at 8.)

1    Turning to the special verdict form, regarding aggravating circumstances, the form

2    allowed the jurors to find whether the following two aggravating circumstances had been

3    established beyond a reasonable doubt: (1) "[t]hat the murder was committed by the

4    defendant while he was under a sentence of imprisonment," and (2) "[t]he murder was

5    committed by . . . a person who was previously convicted of another murder or of a felony

6    involving the use or threat of violence to the person of another." (ECF No. 155-38 at 2-3.)

7    The jury stated "yes" to both aggravating circumstances. (*Id*.) The form then allowed the

8    jurors to designate which mitigating circumstances had been established. (*Id*. at 4.) The

9    jury stated "yes" to (1) "[t]he victim was a participant in the Defendant's criminal conduct

10   or consented to the act," and (2) "[i]f any of the aggravating factors was committed while

11   the Defendant was under the influence of drugs or alcohol." (*Id*. at 4-5.) Finally, the form

12   gave the jury the following final selections:

13       The mitigating circumstances we have found above:
         ___ Are sufficient to outweigh the aggravating circumstances found.
14       ___ Are not sufficient to outweigh the aggravating circumstances found.
         ___ We therefore unanimously set the penalty at death.
15       ___ We decline to impose the death penalty.

16   (*Id*. at 6 (emphasis in original).) The jury stated "yes" to (1) the mitigating circumstances

17   not being sufficient to outweigh the aggravating circumstances and (2) unanimously

18   setting the penalty at death. (*Id*.)

19                              **b.    Analysis**

20       Leonard contends that (1) the form's use of the word "therefore" in the third option

21   of the final selections was misleading because it indicated that the death penalty verdict

22   necessarily followed the previous clause, improperly conflating death eligibility with death

23   worthiness, (2) the form included no option for a life sentence, and (3) the form's emphasis

24   on "not sufficient" in the second option in the final selections was prejudicial because it

25   elevated that option above the rest. (ECF No. 226 at 328-332.)

26

27
                                    117
28

Regarding Leonard's first contention, it is true, as Leonard argues, that the jury must first determine whether a defendant is eligible for the death penalty and then determine whether that defendant should receive the death penalty. *See Brown v. Sanders*, 546 U.S. 212, 216 (2006) ("[T]he sentencer is called upon to determine whether a defendant thus found eligible for the death penalty should in fact receive it."); *Bennett v. State*, 901 P.2d 676, 683 (Nev. 1995) ("[D]istrict courts should plainly instruct juries in capital cases that irrespective of the predominance of aggravating circumstances over mitigating circumstances, the jury still has the discretion to return a penalty other than death.") The first two options in the final selection go towards Leonard's eligibility for the death penalty while the second two options go towards whether Leonard should receive the death penalty. The use of "therefore" in the third option—although not needed or necessarily helpful—did not eliminate the jury's determination of whether Leonard should receive the death penalty just because it followed the second option that the mitigating circumstances did not outweigh the aggravative circumstances. Rather, the jury was still presented immediately after with the fourth option: declining to impose the death penalty. Moreover, penalty jury instruction number 7 provided that even if the jury found that the mitigating circumstances did not outweigh the aggravating circumstances, meaning Leonard was eligible for the death penalty, the jury "still ha[d] the discretion to vote for the imposition of a sentence of life with the possibility of parole or life without the possibility of parole, rather than the death penalty." (ECF No. 121-3 at 8.) Consequently, the special verdict form, when read in conjunction with the penalty jury instructions, was not misleading.

Regarding Leonard's second contention, the penalty jury instructions provided that the jury was permitted to sentence Leonard to a life sentence instead of death, and the jury was given a general verdict form, which the jury declined to use, to indicate a life sentence was proper. (*See* ECF No. 121-3 at 7, 19; *see also* ECF No. 155-34 at 79.) And

118

regarding Leonard's third contention, emphasizing "not sufficient" in the second option of the final selections was merely used to distinguish it from the first option, which was the inverse of the second option.

Based on the record, Leonard's ineffective assistance of trial counsel claim is not substantial because Leonard fails to demonstrate that (1) there was a valid basis for his trial counsel to object to the special verdict form and (2) his defense counsel's performance was deficient under *Strickland*. Because Leonard fails to demonstrate the requisite prejudice necessary to overcome the procedural default of ground 3(e), that ground is dismissed.

### 4. Ground 3(f)

In ground 3(f), Leonard alleges that his trial counsel failed to seek proper jury instructions at the penalty phase of the trial. (ECF No. 184 at 268.) Specifically, Leonard alleges that his trial counsel failed to object to three[31] penalty phase jury instructions: (1) the jury instruction on reasonable doubt, (2) the jury instruction requiring that the jury find that statutory aggravation was not outweighed by mitigation beyond a reasonable doubt, and (3) the jury instruction that aggravating circumstances needed to be found unanimously and mitigating circumstances did not need to be found unanimously. (*Id*. at 318-324.) This Court previously found grounds 3(f)(1), 3(f)(2), and 3(f)(3) to be procedurally defaulted. (ECF No. 205 at 30, 42, 53 n.18.) This Court ordered that it would "consider *Martinez* arguments in relation to these claims when it rules upon the merits of Leonard's petition." (ECF No. 207 at 2.)

### a. Ground 3(f)(1)

Leonard alleges that the reasonable doubt jury instruction is unconstitutional. (ECF No. 184 at 318.) Specifically, Leonard argues that (1) "the more weighty affairs of life" language inappropriately characterized the degree of certainty required to find proof

---

[31]The ground regarding a fourth penalty-phase jury instruction, 3(f)(4), will be discussed with ground 9.

1    beyond a reasonable doubt and (2) the "doubt to be reasonable must be actual, not mere

2    possibility or speculation" language improperly shifts the burden of proof. (*Id*. at 318-321.)

3    The penalty-phase instruction at issue, jury instruction number 12, provided as follows:

4            A reasonable doubt is one based on reason. It is not mere possible
         doubt, but is such a doubt as would govern or control a person in the more
5        weighty affairs of life. If the minds of the jurors, after the entire comparison
         and consideration of all the evidence, are in such a condition that they can
6        say they feel an abiding conviction of the truth of the charge, there is not a
         reasonable doubt. Doubt to be reasonable must be actual and substantial,
7        not mere possibility or speculation.

8    (ECF No. 121-3 at 13.)

9            For the reasons discussed in ground 1(r)(2), which discusses the identical

10   reasonable doubt jury instruction given during the guilt phase of the trial, Leonard fails to

11   demonstrate that his trial counsel acted deficiently in not objecting to the reasonable

12   doubt jury instruction given during the penalty phase of the trial. As such, Leonard's

13   ineffective assistance of trial counsel claim is not substantial. Because Leonard fails to

14   demonstrate requisite prejudice necessary to overcome the procedural default of ground

15   3(f)(1), that ground is dismissed.

16                          **b.      Ground 3(f)(2)**

17           Leonard alleges that the penalty phase jury instructions failed to articulate that the

18   jury was required to find beyond a reasonable doubt that the aggravation circumstances

19   were not outweighed by the mitigation circumstances. (ECF No. 184 at 321.) This Court

20   now finds that Leonard fails to demonstrate prejudice to excuse the procedural default of

21   this ground because Leonard's ineffective assistance of trial counsel claim is not

22   substantial.

23           The instruction at issue, jury instruction number 7, provided as follows:

24           In order to even consider the death penalty as an option for
         sentencing, you must first find beyond a reasonable doubt that at least one
25       of the aggravating circumstances alleged by the State, in fact, does exist. If
         you do not find that any aggravating circumstances exist, you may not
26       consider the death penalty as an option.

27                                    120

28

1

2

3

4

5

6

7

8

9

10

> If you find beyond a reasonable doubt that one or more aggravating circumstances exist, you must then determine whether any mitigating circumstances exist.
>
> If you determine that any mitigating circumstances exist, you must then determine if the one or more mitigating circumstances found to exist outweigh the one or more aggravating circumstances found to exist. If the one or more mitigating circumstances do not outweigh the one or more aggravating circumstances, you may consider the death penalty as an option.
>
> Likewise, if you find that one or more mitigating circumstances do not exist and you find the existence of one or more aggravating circumstances, you may consider the death penalty as an option.
>
> Even if you find that the one or more aggravating circumstances are not outweighed by the one or more mitigating circumstances, or if you find that there are one or more aggravating circumstances and that there are no mitigating circumstances at all, you still have the discretion to vote for the imposition of a sentence of life with the possibility of parole or life without the possibility of parole, rather than the death penalty.

11    (ECF No. 121-3 at 8.)

12         At the time of Leonard's trial, NRS § 157.554(3) provided that "[w]hen a jury . . .

13    imposes a sentence of death, . . . [t]he finding or verdict shall designate the aggravating

14    circumstance or circumstances which were found beyond a reasonable doubt, and shall

15    state that there are no mitigating circumstances sufficient to outweigh the aggravating

16    circumstance or circumstances found." Leonard fails to demonstrate that jury instruction

17    number 7 failed to conform to NRS § 157.554(3), making his trial counsel deficient for not

18    objecting to it. Indeed, NRS § 157.554(3) did not require that the outweighing

19    determination be proven by a specific standard of proof.

20         Leonard relies on *Hurst v. Florida*, which "held that the Sixth Amendment requires

21    every eligibility finding—which, in Nevada, includes the outweighing determination—to be

22    submitted to the jury and proven beyond a reasonable doubt." (ECF No. 184 at 321-22

23    (citing *Hurst v. Florida*, 136 S.Ct. 616 (2016).) However, because *Hurst* was decided

24    approximately 27 years after Leonard's trial, it is unclear how his trial counsel was

25    deficient for not raising an objection based on *Hurst*. Further, *Hurst* has been found to not

26    apply retroactively on collateral review. *See Williams v. Filson*, 908 F.3d 546, 581 (9th

27

28

1    Cir. 2018) (explaining that the rule in *Hurst* "would not apply retroactively in cases . . . on

2    collateral review"); *Ybarra v. Filson*, 869 F.3d 1016, 1033 (9th Cir. 2017) (concluding that

3    *Hurst* does not apply retroactively).

4          Leonard's ineffective assistance of trial counsel claim is not substantial because

5    Leonard fails to demonstrate deficiency under *Strickland*. Because Leonard fails to

6    demonstrate requisite prejudice necessary to overcome the procedural default of ground

7    3(f)(2), that ground is dismissed.

8                          **c.    Ground 3(f)(3)**

9          Leonard alleges that the penalty phase jury instructions failed to instruct the jury

10   that aggravating circumstances needed to be found unanimously and that mitigating

11   circumstances did not need to be found unanimously. (ECF No. 184 at 322.)

12         Respondents argue that *Martinez* is inapplicable to ground 3(f)(3) because

13   Leonard's post-conviction counsel raised this challenge in his initial review collateral

14   proceedings before the state court but simply omitted it from Leonard's post-conviction

15   appeal to the Nevada Supreme Court. (ECF No. 216 at 105 (citing ECF Nos. 160-32 at

16   105; 161-16 at 38, 73).) Leonard rebuts that his post-conviction counsel did not properly

17   raise this claim in his initial review collateral proceedings because it was raised in

18   Leonard's opening brief in support of his supplemental petition rather than in the petition

19   itself. (ECF No. 226 at 336 (citing ECF No. 159-17).)

20         In Leonard's "opening brief in support of supplemental petition for post-conviction

21   relief," his post-conviction counsel argued that Leonard's "[t]rial counsel was ineffective

22   for failing to request an instruction that the finding of a mitigating circumstance did not

23   require a unanimous verdict." (ECF No. 160-32 at 105.) In support of this claim, Leonard's

24   post-conviction counsel argued the following:

25              In *Mills v. Maryland*, 468 U.S. 367, 384, 108 S.Ct. 1860, 100 L.Ed.2d
              384 (1988), the United States Supreme Court held that resentencing of a
26            prison inmate sentenced to death for the first degree murder of a cellmate
              was required because of the substantial probability that the jurors believed
27

28                                        122

that they were precluded from finding any mitigating circumstances unless the[y] unanimously agreed on its existence.

In this case, the jury was never instructed that it did not have to agree unanimously on a particular mitigating circumstance in order to find it true in determining Leonard's sentence. Trial counsel neither requested such an instruction nor objected to Penalty Instruction 7 on that basis. The jury was never instructed as to the burden of proof as to mitigating circumstances. However, Penalty Instructions 11 and 12 instructed the jury that the prosecution was required to prove aggravating circumstances beyond a reasonable doubt. Penalty Instruction 16 told them that its verdict had to be unanimous. Quite reasonably, but erroneously, the jury probably applied these instructions to the mitigating circumstances and concluded that their findings of mitigation required both proof beyond a reasonable doubt and unanimity.

A portion of the defense evidence was Leonard's troubled childhood. The failure of the jury to find that "the defendant's environment contributed to such an extent so as to impair his thinking and his ability to control his behavior" and other mitigating factors was probably due to their inability to agree unanimously. Therefore, counsel was prejudicially ineffective for failing to correct the misleading instructions and failing to request a proper instruction consistent with *Mills*.

(*Id*. at 105-106.)

Although Leonard's post-conviction counsel thoroughly raised this claim in his opening brief, he failed to follow Nevada law and raise it in the petition itself.[32] *See* NRS § 34.370(4) (explaining that "the *petition* must . . . set forth which constitutional rights of the petitioner were violated and the acts constituting violations of those rights") (emphasis added). And although the state court addressed the issue of unanimity of the jury's verdict at the penalty hearing on postconviction review (*see* ECF No. 161-23 at 23), it did not discuss the specific issue at hand—unanimity of mitigation circumstances. Given Leonard's post-conviction counsel's error and the fact that the state court did not address this specific issue, Leonard demonstrates that his post-conviction counsel was ineffective. And given that this Court determines that Leonard is entitled to habeas relief on the merits of this ground, as is discussed *infra*, Leonard demonstrates that this ground is substantial.

---

[32]In Leonard's supplemental petition, his post-conviction counsel only argued, in pertinent part, that Leonard's "[t]rial counsel failed to draft appropriate jury instructions for the penalty phase," including "apparently fail[ing] to draft appropriate mitigating instructions as requested by the court." (ECF No. 159-17 at 27-28.)

1   Consequently, Leonard has shown cause and prejudice to excuse the procedural default

2   of this ground.  The Court now reviews the merits of this ground de novo.

3       In *Mills v. Maryland*, the Supreme Court found a federal constitutional violation

4   exists where "there is a substantial probability that reasonable jurors, upon receiving the

5   judge's instructions in this case, and in attempting to complete the verdict form as

6   instructed, well may have thought they were precluded from considering any mitigating

7   evidence unless all 12 jurors agreed on the existence of a particular such

8   circumstance." 486 U.S. 367, 384 (1988); *see also McKoy v. North Carolina*, 494 U.S.

9   433, 442-43 (1990) ("*Mills* requires that each juror be permitted to consider and give effect

10  to . . . all mitigating evidence in deciding . . . whether aggravating circumstances outweigh

11  mitigating circumstances."). The Supreme Court based its ruling, in part, on the

12  observation that "[n]o instruction was given indicating what the jury should do if some but

13  not all of the jurors were willing to recognize something about petitioner, his background,

14  or the circumstances of the crime, as a mitigating factor." *Mills*, 486 U.S. at 379.

15  The Supreme Court relied on a line of precedent holding that "the sentencer [may] not be

16  precluded from considering, *as a mitigating factor*, any aspect of a defendant's character

17  or record and any of the circumstances of the offense that the defendant proffers as a

18  basis for a sentence less than death." *Id.* at 374-75 (first quoting *Eddings v. Oklahoma*,

19  455 U.S. 104, 110 (1982), and then quoting *Lockett v. Ohio*, 438 U.S. 586, 604

20  (1978) (plurality opinion)) (emphasis and brackets in original). The Supreme Court

21  acknowledged that it could not be certain that the jury interpreted the instructions to

22  preclude consideration of mitigating factors unless they were found unanimously but ruled

23  that "[t]he possibility that a single juror could block" consideration of mitigating evidence

24  "is one we dare not risk." *Id.* at 384.

25      Here, jury instruction number 9 informed the jury that they "*must* consider any

26  aspect of the defendant's character or record and any of the circumstances of the offense

27
                                            124
28

that the defendant proffers as a basis for a sentence less than death." (ECF No. 121-3 at 10 (emphasis added).) However, importantly, the jury was not specifically told that they did not have to agree on the finding of any mitigating circumstance. Rather, the jury was instructed that their "verdict*s* must be unanimous." (*Id*. at 17 (emphasis added).) The plural form of verdict indicates that more than just the jury's penalty verdict needed to be unanimous. Further, on the verdict form, there was a section where the foreman of the jury was to place a checkmark next to the listed mitigating circumstances found by the jury. There the verdict form stated: "We, the Jury in the above-entitled case, designate that the mitigating circumstance or circumstances which have been checked below have been established." (ECF No. 121-2 at 4.) This use of the term "[w]e" may well have been understood as an instruction for the jury to identify—and later weigh against the aggravating circumstances—only those mitigating circumstances that the jury unanimously agreed upon.

Given this language in the jury instructions and the verdict forms, it would have been reasonable for jurors to assume that they could not individually consider any mitigating circumstance unless the other jurors agreed about the existence of that mitigating circumstance. Because this assumption violates *Mills*, Leonard's trial counsel acted deficiently in not objecting to the jury instructions and the verdict forms. The gravity of this error is profound: the jury likely discredited at least one fruitful mitigating circumstance simply because it was not fully agreed upon. This error is compounded by Leonard's trial counsel's failure to present an adequate mitigation case (as is discussed in ground 3(a)(2) *supra*) because the supplemental mitigation evidence, which is compelling, would only have had to convince one juror, not the entire jury. As such, the jury's weighing of aggravating circumstances and mitigating circumstances was problematic. Accordingly, Leonard demonstrates a reasonable probability that, but for trial

1  counsel's errors, the result of his penalty hearing would have been different. Leonard is
2  entitled to federal habeas relief on ground 3(f)(3).

3          **5.      Ground 3(g)**

4          In ground 3(g), Leonard alleges that his trial counsel failed to argue non-
5  proportionality of the sentence as a mitigating factor at the penalty phase of the trial. (ECF
6  No. 184 at 269.) Specifically, Leonard alleges that his trial counsel should have presented
7  evidence that Nevada inmates rarely receive the death penalty for committing homicides
8  in prison. (*Id.*)

9          This Court previously found ground 3(g) was procedurally defaulted. (ECF No. 205
10  at 53.) And this Court further ordered that it would "consider *Martinez* arguments in
11  relation to th[is] claim[ ] when it rules upon the merits of Leonard's petition." (ECF No. 207
12  at 2.) Respondents now argue that Leonard's post-conviction counsel raised this claim in
13  his initial review collateral proceedings before the state court but simply omitted it from
14  Leonard's post-conviction appeal to the Nevada Supreme Court, so *Martinez* does not
15  serve as cause to excuse the default of this claim. (ECF No. 216 at 106.) Leonard rebuts
16  that this Court can still consider the merits of this claim in assessing cumulative error.
17  (ECF No. 226 at 345-46.) However, this Court finds no error here.

18          At the time of Leonard's trial, there was only one other person on death row in
19  Nevada for having committed a homicide while in prison: Jimmie Neuschafer. (*See* ECF
20  No. 138-109 at 2-13.) Based on this information, before trial, the defense moved to strike
21  the death penalty as applied to Leonard as disproportionate. (ECF No. 153-27.) In the
22  motion, Leonard argued that "[e]ven if the death penalty is not barred as a matter of law,"
23  he "is entitled to present evidence of the infrequency of its imposition to assist in
24  convincing the penalty jury not to impose it in this case." (*Id*. at 5.)

25          During a pre-trial hearing on the motion, the trial court noted, "I think the only
26  proportionality argument you can make, even at the time of penalty, is that argument that

27
28                                     126

1    this is a person who is in kind of the same circumstances as this person, and the death

2    penalty wasn't imposed." (ECF No. 154-9 at 28.) However, the defense did not make any

3    proportionality argument during the penalty phase of the trial, and at the time of the post-

4    conviction evidentiary hearing, Leonard's trial counsel could not recall making a strategic

5    decision not to pursue that argument. (ECF No. 160-18 at 212.)

6        Although Leonard's trial counsel may not have strategically decided not to present

7    proportionality evidence at the penalty phase of the trial, Leonard fails to demonstrate

8    that the trial court would have permitted such evidence even if it had been proffered. In

9    *Lockett v, Ohio*, the Supreme Court "conclude[d] that the Eighth and Fourteenth

10   Amendments require that the sentencer . . . not be precluded from considering, *as a*

11   *mitigating factor*, any aspect of a defendant's character or record and any of the

12   circumstances of the offense that the defendant proffers." 438 U.S. 586, 604 (1978)

13   (internal footnote omitted) (emphasis in original). However, the Supreme Court explained

14   that "[n]othing . . . limits the traditional authority of a court to exclude, as irrelevant,

15   evidence not bearing on the defendant's character, prior record, or the circumstances of

16   his offense." *Id.* at 604 n.12; *see also Smith v. Mahoney*, 611 F.3d 978, 996 (9th Cir.

17   2010) (explaining that "[s]entence proportionality is not mitigating evidence" of a

18   defendant's character or history or the circumstances of the offense). Because evidence

19   that there was only other person on death row in Nevada for having committed a homicide

20   while in prison at the time of Leonard's trial does not bear on Leonard's character or prior

21   record or the circumstances of the crime, the trial court had discretion to exclude it. Given

22   this discretion, Leonard fails to demonstrate prejudice under *Strickland*, especially since

23   the trial court declined to do a proportionality analysis pretrial and markedly limited the

24   defense's discovery motion to obtain information regarding the prosecution's use and lack

25   of use of the death penalty in the past. (*See* ECF No. 154-9 at 22-29.) Moreover, even if

26   the trial court had allowed evidence to be presented at the penalty phase of the trial that

27

28

                                        127

1   there was only other person on death row in Nevada for having committed a homicide

2   while in prison, it is pure speculation that this information would have changed the jury's

3   decision to impose the death penalty given Leonard's heinous prior murder convictions.

4         Because Leonard fails to demonstrate any prejudice, this claim, which is

5   procedurally defaulted, is unavailable to help establish any cumulative error and is

6   dismissed.

7         **6.     Ground 3(h)**

8         In ground 3(h), Leonard alleges that his counsel were ineffective for failing to object

9   to the prosecutor's improper closing argument comments during the penalty phase about

10   Leonard liking to kill. (ECF No. 184 at 270, 290.)

11         This Court previously found this ground to be technically exhausted but subject to

12   the procedural default doctrine. (ECF No. 205 at 42.) And this Court further ordered that

13   it would "consider *Martinez* arguments in relation to th[is] claim[ ] when it rules upon the

14   merits of Leonard's petition." (ECF No. 207 at 2.) This Court now finds that Leonard fails

15   to demonstrate prejudice to excuse the procedural default because his ineffective

16   assistance of trial counsel claim is not substantial.

17         As is also discussed in ground 6, during his penalty phase closing argument, the

18   prosecutor commented on several occasions about Leonard's desire to kill: (1) regarding

19   the killing of Williams, he stated that Leonard had no remorse "regarding the fact that he

20   took Russell Williams off the face of the earth," (2) regarding the killing of Dunn, he stated

21   that Leonard made the choice to take him "off the face of this earth" and did so "for no

22   reason, no good reason, and I suggest to you he did it because he's vicious" and "he likes

23   killing," (3) regarding the stabbing of Simms, another inmate, he stated that afterwards

24   Leonard "went up and shook hands with all the guys on the tier" because "[h]e was proud

25   of what he had done" and "liked stabbing another inmate, consistent with his prior

26   activities on the street," (4) regarding the killing of Wright, he stated that Leonard took

27

28

Wright "off the face of the earth . . . because he likes killing," and (5) "William Leonard does what he's got to do, and he does it at will, he does it regardless of who the victim is, and he does it because he likes it." (ECF Nos. 155-34 at 55, 56, 57, 60; ECF No. 227-6 at 4.) Leonard's trial counsel did not object to these comments. (*See id.*)

Even if it would have been prudent for Leonard's trial counsel to have objected to these statements, Leonard fails to demonstrate prejudice. These statements were relatively insignificant when evaluated in terms of the entire penalty phase, such that Leonard fails to demonstrate that he would not have been sentenced to death if his trial counsel had lodged an objection. *See Strickland*, 466 U.S. at 687 (explaining that to show prejudice, the errors must be "so serious as to deprive the defendant of a fair trial"). Accordingly, because Leonard's ineffective assistance of trial counsel claim is not substantial, Leonard fails to demonstrate requisite prejudice necessary to overcome the procedural default of ground 3(h). Ground 3(h) is dismissed.

### 7.    Ground 3(i)

In ground 3(i), Leonard alleges that his counsel was ineffective during opening and closing statements at the penalty phase. (ECF No. 184 at 271.) Specifically, Leonard alleges that his counsel made the following errors during her opening statement: (1) argued that Leonard's actions were a product of his educational deprivation and low intelligence but then presented Leonard's prison accomplishments, including tutoring other inmates, without putting Leonard's achievements in the structured prison environment into context; and (2) argued that Leonard's actions were due to his inability to identify reality while living in the prison without proof of any improvement on Leonard's part to identify reality going forward. (*Id*. at 271-72.) Leonard then alleges that his counsel made the following errors during her closing statement: (1) she made perplexing statements about enemy combat and honor killings, (2) she embraced the "convict code" testimony, and (3) she again argued that Leonard's actions were a product of his

1  educational deprivation without an expert to explain the apparent conflict this had with
2  testimony about Leonard's accomplishments in prison. (*Id.* at 272-73.)

3  ### a.     Background information

4  During her opening argument at the penalty phase, Leonard's trial counsel
5  explained what the evidence would show in mitigation: (1) Leonard "had medical
6  problems from birth," including being born prematurely, suffering head injuries "at a very
7  early age," and having "convulsions at a very early age," (2) Leonard "had a difficult time
8  in school," (3) Leonard's parents divorced "at a very critical time in Mr. Leonard's life,"
9  and his father had little contact with Leonard thereafter, (4) Leonard's mother raised him
10 and his brother "for a considerable amount of time on her own," resulting in Leonard
11 having more responsibilities than other children his age, (5) "Leonard had given
12 indications of mental problems at a very early age" and never received treatment even
13 though his condition "can be controlled" through medication and therapy, (6) Leonard
14 suffered "considerable emotional problems" and had "a history of considerable drug
15 abuse," (7) Leonard is a loyal friend, a compassionate person, and a tutor of other
16 inmates, (8) Leonard enjoys poetry and art, (9) Leonard is "hospitable and generous to
17 black inmates," and (10) the atmosphere in Leonard's unit of the prison was violent,
18 shanks were available, and correctional officers "placed prisoners in life-threatening
19 situations." (ECF No. 155-22 at 37-43.)

20 Later, during her closing argument at the penalty phase, Leonard's trial counsel
21 argued, *inter alia*, that (1) Leonard got addicted to drugs at a young age, changing his
22 "perception of the world," (2) Leonard had difficulties in school, has poor intellectual
23 capacity, has been found to have confused and irrational thinking, and is mentally ill and
24 "unable to control himself under difficult situations," (3) Leonard is a compassionate
25 person towards his family and friends and helped other inmates in prison, (4) Leonard
26 has already been punished for his other crimes, (5) "Leonard was under the influence of

27
28
130

extreme mental or emotional disturbance" and living in "an extremely stressful, tense . . . environment" at the time he killed Wright, (6) Wright was a participant in the criminal conduct, (7) the aggravating factors—namely, Leonard's prior killings—were committed while he was under the influence of a mental or emotional disturbance and under the influence of drugs or alcohol, (8) "Leonard is salvageable" and has "constructive goals," and (9) sentencing Leonard to "life imprisonment is certainly not getting away with [the] crime" because Leonard was sentenced to the possibility of parole in his other two killings. (ECF No. 155-34 at 66-80.) His counsel also argued about honor-type killings and the convict code, explaining:

> This was a situation, an enemy situation, where two men met and were in [a] combative enemy situation. Under other different circumstances, Mr. Leonard might have been honored, given some kind of an honor for killing his enemy, certainly under what circumstances he would have been honored for killing his enemy.
> Under, even in the Bible, David was applauded for killing his enemy. I'm not suggesting that we do that in this case, I'm only suggesting that under different circumstances, under enemy circumstances as these were, other things could have happened.

(*Id.* at 67-68.) Leonard's counsel also argued:

> Just because the convict mentality is not the same mentality that we have, not the mentality that we see as the code for our lives, it's nevertheless the mentality that Mr. Leonard has to live with. It's an environment where he is. He has to cope and adapt with that environment and do what he can to survive. And I agree with [the prosecutor], Mr. Leonard is a survivor. He has to survive. Just, just to stay alive, he has to do what is necessary in order to keep himself from being killed.

(*Id.* at 74.)

### b.    State court determination

In affirming the denial of his state post-conviction petition, the Nevada Supreme Court held:

> In her opening statement at the penalty phase, Saunders said that Leonard had been born prematurely, suffered serious head injuries as a child, and had a history of mental and emotional problems and drug abuse. Leonard claims that the defense team presented evidence which either failed to support these claims or disproved them.

131

1

2

3
> This claim is meritless. The defense presented testimony from Leonard's faither and/or mother that Leonard was born prematurely, had childhood head injuries, and had mental and emotional problems and abused drugs. The defense also presented expert evidence by audiotape and written report that Leonard had psychiatric problems.
> . . . .
> Leonard also complains that counsel . . . was incompetent in her closing argument. We conclude that th[is] claim[ ] ha[s] no merit.

4

5
(ECF No. 162-27 at 16.)

6
### c.    De novo review is unwarranted

7    Leonard argues that the Nevada Supreme Court's decision relied on an

8    unreasonable determination of the facts because his counsel did not fulfill her promise to

9    present evidence that his educational deprivation, low intelligence, mental illnesses, and

10    drug addiction contributed to his behavior. (ECF No. 226 at 356-58.) The Court finds this

11    argument unavailing. The Nevada Supreme Court did not make any findings of fact

12    regarding these "promises."

13
### d.    Analysis

14    The Nevada Supreme Court reasonably concluded that Leonard's trial counsel

15    were not deficient in the opening and closing arguments of the penalty phase. Addressing

16    Leonard's trial counsel's opening argument first, Leonard fails to demonstrate that the

17    following circumstances are mutually exclusive: his killing of Wright being a product of his

18    low intelligence and his prison accomplishments. Even without putting Leonard's prison

19    achievements into context by explaining that they were the result of the structured prison

20    environment, the jury could still appreciate Leonard's low intelligence and his desire to

21    help other inmates with perhaps even lower intelligence and his desire to write poetry.

22    Further, although Leonard's trial counsel argued that his actions were due, in part, to his

23    mental illnesses combined with the stressful prison environment, she also counteracted

24    that argument by explaining that "his condition can be controlled, and it can be helped

25    give the proper circumstances, proper medication and proper therapy." (ECF No. 155-22

26    at 40.)

27

28

Turning to Leonard's trial counsel's closing argument, first, the statements about killing one's enemy being honored in other contexts is perhaps peculiar, but the Nevada Supreme Court reasonably determined that these statements did not amount to deficient performance. Leonard's trial counsel could have been trying to appeal to some jurors by comparing his killing of his enemy to the killing of an enemy during wartime and appeal to other jurors by comparing Leonard's killing to David's killing in the Bible. Second, the Nevada Supreme Court also reasonably concluded that Leonard's trial counsel's discussion of the "convict code" did not amount to deficient performance. Various defense witnesses discussed the "convict code," so it was reasonable for Leonard's trial counsel to discuss it as well during closing argument to point out that Leonard acted as he did because he was forced to do what was necessary to survive in prison. And third, Leonard fails to support his argument that his trial counsel presented conflicting information by explaining that the killing was a product of his low intelligence and also presenting information about his achievements in prison. As was discussed regarding the opening argument, Leonard fails to demonstrate that his low intelligence and prison achievements are at odds with each other. Moreover, rather than arguing that the killing was a direct product of his low intelligence, it appears that his counsel was arguing that his low intelligence resulted in his drug use, which resulted in his "extremely poor experiences." (ECF No. 155-34 at 69 (explaining that Leonard "was operating clearly under a handicap, was slower than other children, and we all know what happens when we have slow children in school, they get made fun of, they are ridiculed. Mr. Leonard felt alienated all through his school experiences and his avenue was to turn to drugs").)

Because the Nevada Supreme Court's determination that Leonard failed to demonstrate deficiency constituted an objectively reasonable application of *Strickland*'s performance prong and was not based on an unreasonable determination of the facts, Leonard is not entitled to federal habeas relief on ground 3(i).

1

2          **8.      Ground 3(k)**

3          In ground 3(k), Leonard alleges that his counsel failed to present witness testimony

4   in an order that would maximize its impact at the penalty phase of the trial. (ECF No. 184

    at 275.)

5          **a.      Background information**

6          The defense's witnesses were presented in the following order at the penalty

7   phase: his father, his mother, DePalma, Lovell, Sergeant Coleman, C/O Crowley, Cross,

8   C/O Escobar, Theodore Burkett, McFadden, C/O Withey, Armijo, Burch, and Joel Burkett.

9   (*See* ECF Nos. 155-22 at 3, 155-33 at 3-4, 155-34 at 3.) However, after his parents,

10  Leonard appeared to desire the following order of inmate and correctional officer

11  witnesses: DePalma, Lovell, Theodore Burkett, Burch, McFadden, Armijo, Joel Burkett,

12  Cross, C/O Crowley, Sergeant Coleman, and C/O Withey. (*See* ECF No. 138-102 at 15-

13  17.)

14         At the beginning of the second day of the defense's case during the penalty

15  phase—after Leonard's parents and DePalma had already testified—Leonard's trial

16  counsel informed the trial court that Leonard "had designated a witness list" that provided

17  the "order that he preferred the witnesses to appear" in order "to provide a

18  comprehensible story and presentation to the jury." (ECF No. 155-33 at 7.) However,

19  because the prison authorities brought inmate Lovell before inmate Cross, Leonard's trial

20  counsel stated, "[o]bviously, that's not occurring, at least at this point." (*Id*.) The trial court

21  stated that it "didn't know there was any significance to the order [Leonard] attached to"

22  the witnesses, but the trial court would accommodate Leonard's preferences as much as

23  possible. (*Id*. at 7-8.) The prosecutor informed the trial court that Leonard's counsel had

24  provided a list of witnesses and that the list had been passed to the prison authorities.

25  (*Id*. at 8.) The prosecutor then stated that it was his "understanding . . . that inmate Cross

26

27

28

134

1    was supposed to be the first witness," and he was not sure why that had not happened.

2    (*Id.*)

3                **b.**      **State court determination**

4          In affirming the denial of his state post-conviction petition, the Nevada Supreme

5    Court held:

6             Leonard claims that his counsel mismanaged their calling of
            witnesses and presentation of other evidence. It appears that the

7             presentation of expert evidence on Leonard's mental and emotional
            problems probably could have been more effective, but Leonard has not

8             specified how particular evidence differently presented could have changed
            the result of the penalty phase.

9

10    (ECF No. 162-27 at 16.)

11               **c.**      **De novo review is unwarranted**

12          Leonard argues that the Nevada Supreme Court's decision was based on an

13    unreasonable determination of the facts because he presented facts supporting the

14    *Strickland* prejudice analysis. (ECF No. 226 at 368.) This argument lacks merit. In his

15    opening brief to the Nevada Supreme Court, Leonard discussed the mismanagement of

16    witnesses, and although he discussed prejudice regarding counsel's alleged

17    ineffectiveness towards individual witnesses, Leonard did not discuss prejudice due to

18    the sequence of witnesses. (*See* ECF No. 161-38 at 86-88.)

19                **d.**      **Analysis**

20          Because Leonard's trial counsel gave Leonard's witness list to the prosecution and

21    immediately informed the trial court that there was a problem with the order of inmate

22    witnesses when the prison authorities brought Lovell instead of Cross, it does not appear

23    that there was much else that Leonard's trial counsel could have done. Indeed, it

24    appeared that the prison authorities controlled which inmates were brought at what time—

25    not Leonard's trial counsel. However, even if Leonard's trial counsel acted deficiently for

26    discontinuing any further objection to the sequence of defense witnesses after his initial

27

28                                       135

1    complaint, the Nevada Supreme Court reasonably determined that Leonard failed to

2    demonstrate prejudice. Although the sequence of witnesses may not have been ideal, the

3    defense witnesses were by no means presented haphazardly, as Leonard contends.

4    Rather, because the testimonies of Leonard's witnesses were all rather straightforward

5    and did not rely on any other witness's testimony to be understood, Leonard fails to

6    demonstrate that the jury would not have imposed the death penalty merely if the

7    witnesses had been presented in Leonard's desired sequence.

8         Because the Nevada Supreme Court's determination that Leonard failed to

9    demonstrate prejudice constituted an objectively reasonable application of *Strickland*'s

10   prejudice prong and was not based on an unreasonable determination of the facts,

11   Leonard is not entitled to federal habeas relief on ground 3(k).

12        **C.     Ground 5—excessive security measures**

13        In ground 5, Leonard alleges that his conviction and death sentence are invalid

14   under federal constitutional guarantees of due process, equal protection, a fair trial, a

15   reliable sentence, an impartial jury, effective assistance of counsel, and freedom from

16   cruel and unusual punishment because of the oppressive security measures used

17   throughout the trial. (ECF No. 184 at 280.)

18        **1.     Background information**

19        Before trial, Leonard moved for an "order limiting unnecessary and prejudicial

20   security matters at the time of trial." (ECF No. 154-7.) At a hearing on the motion, the trial

21   court stated that it would grant Leonard's request that "[n]o shackles or other restraints

22   be used on [Leonard] in the presence of the jury . . . so long as everybody . . . behaves

23   themselves." (ECF No. 154-9 at 7.) The trial court also granted Leonard's request to wear

24   street clothes during the trial. (*Id*. at 8.) However, the trial court denied Leonard's request

25   "that there be a limitation on the number of officers in court." (*Id*. at 9.) The trial court

26   explained, "I don't know who or what the security of the trial will be until I get into the trial.

27

28
                                           136

1   I don't anticipate using any unnecessary security, but by the same token, I am going to

2   make sure everybody feels secure in the courtroom." (*Id.*)

3       Following the trial, Leonard moved for a new trial on several bases, including

4   "undue prejudice to [him] by unnecessary and prejudicially heavy security." (ECF No. 156-

5   22 at 2.) Leonard explained that "on numerous occasions during [his] trial eight to ten

6   security officers were in the courtroom," and "[o]n two different occasions [he] was viewed

7   by juror[s] while he was in the prison van in the parking lot with both legs and arms

8   shackled and chained." (*Id.* at 5-6.)

9       During a hearing on Leonard's motion for a new trial, the trial court's bailiff testified,

10  *inter alia*, that (1) there was security in the parking lot because there was "information that

11  there . . . may be a possible [escape] attempt," (2) security officers in the courtroom, with

12  the exception of "hands-on officers," were all armed, (3) he had Leonard get to the

13  courthouse early "because we don't like to let the jury see somebody that's incarcerated

14  in chains and so on," (4) "[i]f there was a possibility of the jury seeing [Leonard, he] . . .

15  had the guards take the chains off [downstairs] prior to bringing him upstairs," (5) "it was

16  very important and very strictly enforced that we didn't allow anybody to see him in chains

17  that was associated with the jury," and (6) there were six or seven officers at the most in

18  the courtroom at any given time during the trial. (ECF No. 157-27 at 8, 11, 13-15.)

19      The trial court denied Leonard's motion for a new trial, making, *inter alia*, the

20  following findings of fact: (1) "[t]he security surrounding the trial of this case was

21  necessitated by several factors, including the record of serious violent offenses by

22  Leonard and the probability of the need for testimony by several other inmates," (2) the

23  trial court possessed information that "a recently released inmate and possible other

24  associates were also actors in some plot to in some way breach the security of the trial

25  of this case," (3) "the very fact that this was an inmate trial required a commanding armed

26  presence to ward off any disruptive activity in the parking lot, the streets surrounding the

27

28                                          137

courthouse, the courthouse and the courtroom itself," and (4) Leonard "may have been seen by one or more jurors while unshackled and in the escort of several armed correctional officers on one occasion" and "[o]n yet another occasion he may have been seen for a few seconds by other jurors while shackled prior to being 'rushed' into the courthouse." (ECF No. 157-28 at 10-12.) The trial court then made the following findings of law: (1) "[t]he security arrangements attending the trial, including the presence of armed guards, were necessitated by the nature of the case, the defendant's background and possible breaches of security which could have endangered the defendant, the court, the court staff and the public at large," (2) "[t]he security actually imposed was consistent with security needs and was minimally necessary to ensure a fair, safe trial for everyone involved in the proceedings," (3) "[t]he security imposed, including armed escort of the defendant and on occasion, shackled movement of the defendant into the courthouse, did not deny him the due process of law nor did it impair at all the presumption of innocence to which all criminal defendants are entitled," (4) "[a]ny viewing of the defendant on the two occasions mentioned at the evidentiary hearing . . . were fleeting and nonprejudicial," and (5) "[a]ny error as the result of Leonard having been seen for an instant on either occasion was harmless beyond a reasonable doubt." (*Id*. at 13-14.)

### 2. Standards for assessment of security measures

The right to a fair trial includes "the principle that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'" *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986) (quoting *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978)). However, the United States Supreme Court has held that "the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial is [not] the sort of inherently prejudicial practice that . . . should be permitted only where justified by an essential state interest

138

1    specific to each trial." *Id.* at 568-69. Rather, "[i]n view of the variety of ways in which such

2    guards can be deployed, . . . a case-by-case approach is more appropriate." *Id.* at 569.

3           Regarding shackles, the United States Supreme Court has held that "the

4    Constitution forbids the use of visible shackles during the penalty phase, as it forbids their

5    use during the guilt phase, *unless* that use is 'justified by an essential state interest'—

6    such as the interest in courtroom security—specific to the defendant on trial." *Deck v.*

7    *Missouri*, 544 U.S. 622, 624 (2005) (emphasis in original) (quoting *Holbrook*, 475 U.S. at

8    568-69); *see also Illinois v. Allen*, 397 U.S. 337, 344 (1970) ("Not only is it possible that

9    the sight of shackles and gags might have a significant effect on the jury's feelings about

10   the defendant, but the use of this technique is itself something of an affront to the very

11   dignity and decorum of judicial proceedings that the judge is seeking to uphold."). This

12   determination may "take into account the factors that courts have traditionally relied on in

13   gauging potential security problems and the risk of escape at trial." *Deck*, 544 U.S. at 629;

14   *see also Wilson v. McCarthy*, 770 F.2d 1482, 1484 (9th 1985) (explaining that "[t]he trial

15   court has discretion to use shackles or other security measures when circumstances

16   dictate," and "[t]he trial court must balance the prejudicial effect of shackling with

17   considerations of courtroom decorum and security.").

18          "An unjustified decision to restrain a defendant at trial requires reversal only if the

19   shackles or handcuffs had 'substantial and injurious effect or influence in determining the

20   jury's verdict.'" *Williams v. Woodford*, 384 F.3d 567, 591 (9th Cir. 2004). The Ninth Circuit

21   Court of Appeals has "held that a jury's brief or inadvertent glimpse of a defendant in

22   physical restraints outside of the courtroom does not warrant habeas relief unless the

23   petitioner makes an affirmative showing of prejudice." *Id.* at 593. And "[t]o determine

24   whether the imposition of physical restrains constitutes prejudicial error, [the Ninth Circuit

25   Court of Appeals has] considered the appearance and visibility of the restraining device,

26   the nature of the crime with which the defendant was charged and the strength of the

27

28
                                           139

1    state's evidence against the defendant." *Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th

2    Cir. 2008).

3              **3.       State court determination**

4    In affirming Leonard's judgment of conviction, the Nevada Supreme Court held:

5         Leonard also argues that his due process rights were violated
         because several security officers guarded him at the courthouse, and some
6         of the jurors saw him being shackled and unshackled outside the courtroom.
         However, the record evidence demonstrated that the jury knew Leonard
7         was an inmate at Nevada State Prison. "'No prejudice can result from
         seeing that which is already known.'" *Shuman v. State*, 94 Nev. 265, 272,
8         578 P.2d 1183, 1187 (1987) (quoting *Estelle v. Williams*, 425 U.S. 501, 507
         (1976)). Therefore, Leonard was not unfairly prejudiced by the necessary
9         security measures.

10   (ECF No. 158-15 at 4-5.)

11             **4.       De novo review is unwarranted**

12   Leonard argues that this ground should be reviewed de novo because (1) the

13   Nevada Supreme Court's decision was based on an unreasonable application of federal

14   law because the trial court did not justify its decision to shackle Leonard inside the

15   courtroom, and (2) the Nevada Supreme Court's decision was based on an unreasonable

16   determination of the facts because it did not contemplate jurors viewing Leonard in

17   shackles inside the courtroom. (ECF No. 226 at 377, 378.) To prove these points, Leonard

18   points to declarations obtained from jurors by his federal post-conviction counsel. (*Id.*)

19   Leonard's attempt to circumvent review under § 2254(d)(1) is unavailing. Leonard argues

20   that these declarations, which had yet to be produced at the time of his direct appeal,

21   demonstrate that the order on direct appeal is unreasonable so that this ground can be

22   reviewed de novo and the declarations can be considered. This circular argument lacks

23   merit.

24             **5.       Analysis**

25   The Nevada Supreme Court reasonably determined that the increased number of

26   security officers employed at Leonard's trial were necessary. Here, as the trial court

27

28                                     140

1    explained in its order denying the motion for a new trial, the following circumstances of

2    Leonard's trial dictated the increased security: Leonard's violent history, testimony by

3    other inmates, the nature of the case, and Leonard's prior escape attempt. As such, using

4    "a case-by-case approach," *Holbrook*, 475 U.S. at 569, the Nevada Supreme Court

5    reasonably found that Leonard was not unfairly prejudiced by the increased security

6    measures.

7            Turning to Leonard being viewed in his shackles outside the courtroom by some

8    jurors, as the Nevada Supreme Court appears to have reasonably determined, any error

9    did not have a substantial or injurious effect was in determining the jury's verdict. *See*

10   *Williams*, 384 F.3d at 591. In fact, as the Nevada Supreme Court reasonably noted, the

11   jury knew that Leonard was an inmate at Nevada State Prison at the time of his trial.

12   Given this knowledge, coupled with the fact that the juror's glimpse of Leonard in shackles

13   was brief, the Nevada Supreme Court reasonably found that Leonard was not unfairly

14   prejudiced by being viewed in shackles outside the courtroom.

15           In sum, the Nevada Supreme Court's determination that Leonard was not entitled

16   to relief on his excessive security measures claim constituted an objectively reasonable

17   application of federal law and was not based on an unreasonable determination of the

18   facts. Leonard is not entitled to federal habeas relief for ground 5.

19                    **6.      Related grounds: 1(j) and 3(j)**

20           In ground 1(j), Leonard alleges that his trial counsel were ineffective for failing to

21   object to, litigate, and create an adequate record regarding the shackling of him and the

22   imposition of excessive security measures during the guilt phase of trial. (ECF No. 184 at

23   114.) And, in ground 3(j), Leonard alleges that his trial counsel were ineffective in failing

24   to prevent jurors from seeing Leonard and defense witnesses shackled during the penalty

25   phase of trial. (*Id*. at 274.) This Court previously determined that these two grounds were

26   procedurally defaulted. (ECF No. 205 at 53.) And this Court further ordered that it would

27

28

1   "consider *Martinez* arguments in relation to these claims when it rules upon the merits of

2   Leonard's petition." (ECF No. 207 at 2.) This Court now finds that Leonard fails to

3   demonstrate prejudice to excuse the procedural default because Leonard's ineffective

4   assistance of trial counsel claims are not substantial.

5          Even if Leonard's trial counsel acted deficiently in not objecting to the security

6   measures or making a record of them at the guilt and penalty phases, Leonard fails to

7   demonstrate a reasonable likelihood of a different result had counsel objected.[33] The trial

8   court denied Leonard's post-trial motion for a new trial, finding, in part, that (1) "[t]he

9   security arrangements . . . were necessitated by the nature of the case, the defendant's

10  background and possible breaches of security which could have endangered the

11  defendant, the court, the court staff and the public at large," and (2) "[t]he security actually

12  imposed was consistent with security needs and was minimally necessary to ensure a

13  fair, safe trial for everyone involved in the proceedings." (ECF No. 157-28 at 13-14.) Given

14  these conclusions by the trial court, which was intimately aware of the security measures

15  from the recent trial, Leonard fails to demonstrate that the trial court would have limited

16  any of the security arrangements had Leonard's counsel simply posed an objection.

17  Further, regarding the shackling, the trial court concluded that any viewings of Leonard in

18  shackles "were fleeting and nonprejudicial." (*Id*. at 14.) Given the limited and brief nature

19  of any shackle viewings, Leonard fails to demonstrate that the trial court would have done

20  anything had Leonard's counsel made an objection to the viewings.

21         Leonard argues that "[h]ad [his] trial counsel objected and made a record of the

22  shackling and security measures, [he] would have had a reasonable likelihood of a more

23

24         [33]Leonard cites to declarations from various jurors that there was lots of security
       during the trial, and the jurors saw Leonard in shackles more times than Leonard testified
25     to at the hearing on the motion for a new trial. (*See* ECF No. 138-87 at 2, 4, 6, 8.) Although
       this Court cannot consider these declarations regarding ground 5, it does consider them
26     for grounds 1(j) and 3(j) since it is reviewing grounds 1(j) and 3(j) de novo. However,
       notably, these declarations were completed 20 years after the trial, so this Court
27     questions their reliability.

28

favorable outcome on appeal" because the record would have been shown that there were more issues with the security arrangements than just the security officers being present in the courtroom and the jurors seeing Leonard shackled outside the courtroom. (ECF No. 226 at 149.) This Court finds this argument unpersuasive. The Nevada Supreme Court found on appeal that any error in the security arrangements did not have a substantial or injurious effect was in determining the jury's verdict due to the jury knowing that Leonard was an inmate at the Nevada State Prison at the time of his trial. (ECF No. 158-15 at 4-5.) Leonard fails to demonstrate that the Nevada Supreme Court would have varied this determination, which was based on the jury's knowledge of Leonard's inmate status, if Leonard's counsel had made a better record of the security arrangements. *See also Dickinson v. Shinn*, 2 F.4th 851, 864 (9th Cir. 2021) (holding that the petitioner could not "satisfy *Strickland*'s prejudice requirement for an IATC claim for failure to object to a jury instruction based on the consequent loss of a more favorable standard of appellate review").

Based on the record, Leonard's ineffective assistance of trial counsel claims are not substantial because Leonard fails to adequately demonstrate prejudice under *Strickland*. Because Leonard fails to demonstrate requisite prejudice necessary to overcome the procedural default of grounds 1(j) and 3(j), these grounds are dismissed.

### D.    Ground 6—prosecutorial misconduct

In the remaining portion of ground 6, Leonard alleges that his conviction and sentence are invalid under federal constitutional guarantees of due process, freedom from cruel and unusual punishment, a fair trial, equal protection, a reliable sentence, and trial before an impartial jury because the prosecutor made improper comments during both closing arguments. (ECF No. 184 at 290.) Leonard takes issue with the prosecutor's comments (1) alleging unproven motivations for his previous offenses during penalty phase closing argument, (2) remarking on his character, (3) mocking his subscription to

1    a magazine, (4) implying defense witnesses were untrustworthy, and (5) referencing his

2    failure to testify. (ECF No. 226 at 379.)

3                         **1.        Background information**

4           During his guilt phase closing argument, the prosecutor stated that "[t]he defense

5    ha[d]n't explained in any of the evidence that was presented what happened to the murder

6    weapon." (ECF No. 155-11 at 96.) And referring to Armijo's testimony, he stated that he

7    "was certainly shocked to see what he saw. That was the words that he used, 'I was

8    shocked.' This rapist, robber, burglar, thief was shocked to see what he had seen." (*Id*. at

9    97.)

10          Later, during his penalty phase closing argument, the prosecutor commented on

11   several occasions about Leonard's desire to kill: (1) regarding the killing of Dunn, he

12   stated that Leonard made the choice to take him "off the face of this earth" and did so "for

13   no reason, no good reason, and I suggest to you he did it because he's vicious" and "he

14   likes killing," (2) regarding the stabbing of Simms, another inmate, he stated that

15   afterwards Leonard "went up and shook hands with all the guys on the tier" because "[h]e

16   was proud of what he had done" and "liked stabbing another inmate, consistent with his

17   prior activities on the street," and (3) regarding the killing of Wright, he stated that Leonard

18   took Wright "off the face of the earth . . . because he likes killing." (ECF No. 155-34 at 56,

19   57, 60.) The prosecutor also commented on Leonard's character: (1) regarding the

20   stabbing of a correctional officer, he stated that Leonard may have apologized but "[i]t

21   means nothing coming out of his mouth," (2) he commented on Leonard's allocution that

22   he subscribes to the Rising Sun, commenting that it is a "born[-]again publication for

23   condemned inmates throughout the land," and (3) he commented that "Leonard is devoid

24   of good character" and "devoid of th[e] ability to place any kind of value on anyone else's

25   life." (*Id*. at 59, 61, 62, 64.)

26   ///

27

28
                                              144

## 2.    Standard for prosecutorial misconduct

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In making that determination, this Court looks to various factors: "the weight of the evidence, the prominence of the comment in the context of the entire trial, whether the prosecution misstated the evidence, whether the judge instructed the jury to disregard the comment, whether the comment was invited by defense counsel in summation and whether defense counsel had an adequate opportunity to rebut the comment." *Floyd v. Filson*, 949 F.3d 1128, 1150 (9th Cir. 2020) (quoting *Hein v. Sullivan*, 601 F.3d 897, 914 (9th Cir. 2010)). "[P]rosecutorial misconduct[ ] warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

## 3.    State court determination

In affirming Leonard's judgment of conviction, the Nevada Supreme Court held:

> Leonard also contends his trial was tainted by prejudicial prosecutorial misconduct related to characterizations, innuendos, and conclusions. The prosecutor's statement that Leonard did what he did because he "likes it" was improper. However, we conclude that the statement was harmless beyond a reasonable doubt. The defense attorney did not object, overwhelming evidence of Leonard's guilt exists, and the prosecutor's inappropriate comments did not contribute to the verdict. Under these circumstances, this court will not interfere with the sentence because of prosecutorial misconduct. *Pellegrini v. State*, 104 Nev. 625, 628-29, 764 P.2d 484, 487 (1988). As to Leonard's other assignments of misconduct, we conclude that they are without merit.

(ECF No. 158-15 at 5-6.)

///

145

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 4.    De novo review is unwarranted

Leonard argues that the Nevada Supreme Court's decision was based on an unreasonable determination of the facts because the prosecutor made more than one statement that he likes to kill. (ECF No. 226 at 381.) Leonard also argues that the Nevada Supreme Court's decision is based on unreasonable application of the law because it did not consider the cumulative impact of the prosecutorial misconduct. (*Id*.) This Court finds these arguments lack merit. First, although the prosecutor may have made a few statements in his closing argument that Leonard likes to kill, he only made that comment once regarding the killing of Wright. Therefore, the Nevada Supreme Court's statement that "[t]he prosecutor's statement that Leonard did what he did because he 'likes it'" does not appear to be based on an unreasonable determination of the fact; rather, it appears that the Nevada Supreme Court was focusing on only one statement: the one regarding Wright. Second, the Nevada Supreme Court did not consider the cumulative impact of the prosecutorial misconduct because it found that Leonard's other allegations did not amount to misconduct, meaning that there was nothing to cumulate.

### 5.    Analysis

As the Nevada Supreme Court reasonably determined, the prosecutor committed misconduct when he stated that Leonard killed Wright because he liked killing. *See, e.g.*, *United States v. Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir. 2005) ("We have consistently cautioned against prosecutorial statements designed to appeal to the passions, fears and vulnerabilities of the jury."). However, as the Nevada Supreme Court also reasonably concluded, Leonard fails to demonstrate that he is entitled to relief because this comment, even when considered in aggregate with the other comments about Leonard liking to kill, did not "so infect[ his] trial with unfairness as to make [his] resulting conviction a denial of due process." *Darden*, 477 U.S. at 181. Indeed, as the Nevada Supreme Court reasonably noted, there was overwhelming evidence of

146

1    Leonard's guilt. Moreover, the jury was instructed that the prosecutor's statements were

2    not evidence.[34] *See Allen v. Woodford*, 395 F.3d 979, 998 (9th Cir. 2005) (finding that

3    prosecutorial misconduct did not amount to a due process violation where the trial court

4    gave an instruction that the attorneys' statements were not evidence and where the

5    prosecutors presented substantial evidence of the defendant's guilt).

6         Turning to Leonard's other allegations of prosecutorial misconduct, the Nevada

7    Supreme Court reasonably determined that they did not amount to misconduct. First,

8    regarding remarking on Leonard's character, the prosecutor commented that Leonard

9    lacked good character, his apology for stabbing a correctional officer did not mean much,

10   and he does not place value on other people's lives. (ECF No. 155-34 at 59, 61, 64.)

11   While these comments about the prosecutor's opinion regarding Leonard's character may

12   have been improper if they were made in the context of arguing that he was guilty, these

13   comments were made regarding whether the death penalty was warranted. *See United*

14   *States v. Molina*, 934 F.2d 1440, 1444-45 (9th Cir. 1991) (explaining that while "a

15   prosecutor may not express his opinion of the defendant's guilt[,] . . . the prosecution must

16   have reasonable latitude to fashion closing arguments," and "[i]nherent in this latitude is

17   the freedom to argue reasonable inferences based on the evidence"); *see also United*

18   *States v. Birges*, 723 F.2d 666, 672 (9th Cir. 1984) ("It is neither unusual nor improper for

19   a prosecutor to voice doubt about the veracity of a defendant."). Indeed, the jury is tasked

20   with the "constitutional[ ] mandate[ ] of basing the penalty decision on the character of the

21   defendant and the nature of the offense." *California v. Ramos*, 463 U.S. 992, 998 (1983).

22        Second, regarding mocking his subscription to a magazine, the prosecutor merely

23   commented that the magazine the Rising Sun is a "born[-]again publication for

24   condemned inmates throughout the land." (ECF No. 155-34 at 62.) Leonard fails to

25   articulate how this comment amounts to misconduct. *See Jones v. Gomez*, 66 F.3d 199,

26   ───────────

27   [34]*See* ECF No. 155-13 at 5 (jury instruction number 4 stating that "[s]tatements, arguments and opinions of counsel are not evidence in the case").

28

205 (9th Cir. 1995) (denying habeas relief because the petitioner's "conclusory allegations did not meet the specificity requirement").

Third, regarding implying defense witnesses were untrustworthy, the prosecutor simply stated that Armijo, a "rapist, robber, burglar, [and] thief was shocked to see what he had seen." (ECF No. 155-11 at 97.) Although the comment criticized Armijo, it was well within the bounds of professional conduct, as the prosecutor was merely arguing that Armijo's testimony that he was shocked by the killing was unbelievable due to his violent history. *See Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000) (concluding that "the prosecutor's statements were supported by the evidence and reasonable inferences that could be drawn from the evidence").

And fourth, regarding referencing Leonard's failure to testify, the prosecutor simply argued that "[t]he defense ha[d]n't explained in any of the evidence that was presented what happened to the murder weapon." (ECF No. 155-11 at 96.) The prosecution's comments on a defendant's silence violate the self-incrimination clause of the Fifth Amendment. *See Griffin v. California*, 380 U.S. 609, 614 (1965). However, while the prosecution violates *Griffin* when it "direct[ly] comment[s] about the defendant's" silence, the prosecution only violates *Griffin* when it "indirect[ly] comment[s about the defendant's silence] . . . 'if it is manifestly intended to call attention to the defendant's [silence] or is of such a character that the jury would naturally and necessarily take it to be a comment on the [defendant's silence].'" *Hovey v. Ayers*, 458 F.3d 892, 912 (9th Cir. 2006) (quoting *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987)). Considered objectively, the prosecutor's comment was not manifestly intended to call attention to Leonard's failure to testify or was of such a character that the jury would naturally and necessarily take it to be a comment on Leonard's failure to testify. Rather, the prosecutor's comment was merely highlighting the fact that Leonard failed to produce evidence to support his claim of self-defense because the murder weapon was disposed of. *See Cook v. Schriro*, 538

148

1    F.3d 1000, 1021 (9th Cir. 2008) ("Prosecutors may comment on the failure of the defense

2    to produce evidence to support an affirmative defense so long as it does not directly

3    comment on the defendant's failure to testify.").

4          The Nevada Supreme Court's denial of relief on Leonard's prosecutorial

5    misconduct claims was neither contrary to, nor an unreasonable application of, clearly

6    established federal law and was not based on an unreasonable determination of the facts.

7    Leonard is not entitled to federal habeas relief for ground 6.

8          **E.    Grounds 3(f)(4) and 9—penalty-phase jury instructions**

9          In ground 9, Leonard alleges that his sentence is invalid under federal

10   constitutional guarantees of due process, equal protection, the right to a fair penalty

11   hearing, and the right to be free from cruel and unusual punishment because the trial

12   court gave the jury erroneous and unconstitutional jury instructions during the penalty

13   phase of his trial. (ECF No. 184 at 318.) Specifically, in ground 9(d), Leonard alleges that

14   the trial court violated his constitutional rights by telling the jury that his sentence could

15   be modified. (*Id*. at 323.) Leonard contends that the instructions could have led jurors to

16   erroneously believe that he might be released and that the only way to keep him in prison

17   is to impose the death penalty. (*Id*. at 323-24.) Leonard also contends that the trial court

18   failed to instruct the jury that Nevada law would not allow him to be released from prison

19   for several decades, even if his sentence was commuted. (*Id*. at 324 (citing NRS §

20   213.1099(4)).) Relatedly, in ground 3(f)(4), Leonard alleges that his trial counsel's failure

21   to object to his jury instruction amounted to ineffectiveness. (*Id*. at 268.)

22         The instruction at issue, penalty jury instruction number 13, provided as follows:

23              Life imprisonment with the possibility of parole is a sentence to life
         imprisonment which provides that the Defendant would be eligible for parole
24       after a period of ten years. This does not mean that he would be paroled
         after ten years, but only that he would be eligible after that period of time.
25              Life imprisonment without the possibility of parole means exactly
         what it says, that the Defendant shall not be eligible for parole.
26              If you sentence the Defendant to death you must assume that the
         sentence will be carried out.
27
                                        149
28

1
2

Although under certain circumstances and conditions the State Board of Pardons Commissioners has the power to modify sentences, you are instructed that you may not speculate as to whether the sentence you impose may be changed at a later date.

3    (ECF No. 121-3 at 14.)

4                          **1.    State court determination**

5    Leonard did not assert a claim like ground 9(d) in his direct appeal. In his state

6    post-conviction proceedings, Leonard asserted the claim that his trial counsel was

7    ineffective for not objecting to the instruction at issue in ground 9(d). In affirming the denial

8    of Leonard's petition for post-conviction relief, the Nevada Supreme Court ruled on the

9    claim of ineffective assistance of trial counsel as follows[35]:

10
11
12
13
14
15
16

Leonard contends that his counsel were ineffective in failing to object to the jury instruction on the Pardons Board's power to modify sentences, given pursuant to *Petrocelli v. State*, 101 Nev. 46, 692 P.2d 503 (1985), *modified by Sonner v. State*, 112 Nev. 1328, 1334, 930 P.2d 707, 711-12 (1996). He says that NRS 213.1099(4) would prevent him from ever receiving parole; therefore, the instruction was erroneous under *Hamilton v. Vasquez*, 17 F.3d 1149 (9th Cir.), *cert. denied*, 512 U.S. 1220 (1994), and *Geary v. State*, 112 Nev. 1434, 930 P.2d 719 (1996), *reh'g granted on other grounds*, 114 Nev. __, 952 P.2d 431 (1998). Even assuming that those cases would preclude this instruction in Leonard's case, we conclude that *Hamilton* and *Geary* announced a new rule of law and that Leonard has failed to show that his counsel were ineffective for failing to anticipate that rule.

17
18
19
20

In *Geary*, this court relied on *Simmons v. South Carolina*, 512 U.S. 154 (1994). Although *Simmons* was a plurality opinion, a majority of the United States Supreme Court agreed that a state cannot constitutionally preclude a defendant from informing a jury that he has little chance of receiving parole if the jury otherwise faces a false choice between sentencing the defendant to death or sentencing him to a limited period of incarceration, at least where the state argues future dangerousness. *Simmons*, 512 U.S. at 161, 176-77.

21
22
23

The Supreme Court recently concluded that *Simmons* announced a new rule of law and does not apply retroactively in federal habeas proceedings. *O'Dell v. Netherland*, 521 U.S. __, 117 S.Ct. 1969 (1997). Leonard's conviction became final when the Supreme Court denied his petition for certiorari in 1992. *Simmons* and *Hamilton* were decided in 1994 and *Geary* in 1996. Therefore, we decline to apply the new rule announced in these cases to this post-conviction proceeding.

24
25

[FN6] In supplemental authorities filed April 29, 1998, Leonard cites *Gallego v. McDaniel*, 124 F.3d 1065, 1074-76 (9th Cir. 1997). *Gallego* relies

26
27

[35]In ruling on Leonard's motion to dismiss, this Court found "that the Nevada Supreme Court addressed the propriety of the instruction as a matter of federal law." (ECF No. 205 at 34.)

150

28

1

2

3

on *Simmons* and thus may be undermined by *O'Dell*. Assuming that *Gallego* is sound authority, we conclude that it does not apply here because the jurors who sentenced Leonard did not receive the executive clemency instructions deemed misleading in *Gallego*. *See Sonner v. State*, 114 Nev. __, 955 P.2d 673 (1998).

4

(ECF No. 162-27 at 16-17.)

5

### 2.     De novo review is unwarranted

6

7

8

9

10

11

12

13

14

Leonard argues that this Court should review this ground de novo because he was relying principally on *Ramos* and *Caldwell*, and because the Supreme Court decided both of these cases before his trial, the Nevada Supreme Court's decision was contrary to, or involved an unreasonable applicable of, established federal law. (ECF No. 226 at 388.) This Court finds this argument unpersuasive. Leonard did not principally rely on *Ramos* and *Caldwell* in his opening brief to the Nevada Supreme Court; rather, his reliance on those cases only spanned a single paragraph. (*See* ECF No. 161-38 at 91-92.) On the contrary, he relied heavily on *Hamilton* and *Geary*, discussing these cases for several pages. (*Id.* at 92-94.)

15

### 3.     Standard for assessing jury instructions

16

17

18

19

20

21

22

23

Issues relating to jury instructions are not cognizable in federal habeas corpus unless they violate due process. *See Estelle v. McGuire,* 502 U.S. 62, 72 (1991); *see also Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("[W]e have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error."). The question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process', . . . not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973)).

24

25

26

Jury instructions that inform the jury of the possibility of commutation of a sentence of life without the possibility of parole to a life sentence with the possibility of parole may not violate the federal Constitution if the instructions are accurate. *See*

27

28

151

*California v. Ramos*, 463 U.S. 992, 1004 (1983). However, an instruction that is accurate in the abstract might nonetheless violate the Constitution if it is misleading given the facts of the particular case. *See Coleman v. Calderon*, 210 F.3d 1047, 1050-51 (9th Cir. 2000) ("[I]nstruction was misleading because it told the jury that the Governor had the power to commute Coleman's sentence but left out the additional hurdles to be overcome to obtain such a commutation."); *Gallego v. McDaniel*, 124 F.3d 1065, 1074-77 (9th Cir.1997) (instruction misleading because defendant was under sentence of death in another jurisdiction, essentially ruling out any possibility of parole).

### 4.    Analysis

Leonard makes no showing that the penalty jury instruction was inaccurate, misleading, or confusing, given his particular circumstances, or that it otherwise violated his federal constitutional rights. *See Ramos*, 463 U.S. at 1009 (emphasizing importance of accuracy of jury instructions regarding possibility of commutation of a sentence of life without the possibility of parole). The instruction did not erroneously suggest to the jury that sentencing Leonard to death was the only way to prevent him from someday being released into society as Leonard alleges. In fact, the instruction did not refer to a particular sentence with respect to the Board of Pardons Commissioner's power to modify sentences. *Cf. Coleman v. Calderon*, 210 F.3d 1047, 1050 (9th Cir. 2000) (finding instruction constitutionally infirm because it plainly misled the jury as to the Governor's power "to commute a sentence from life imprisonment without the possibility of parole to some lesser sentence that would include the possibility of parole"). Rather, the instruction merely informed the jury that the Board of Pardons Commissioners could *modify* Leonard's sentence in the instant case in some capacity—not release him or grant him parole. This ability to modify Leonard's sentence in the instant case, by, for example, commuting his sentence of death to life without the possibility of parole, was accurate even taking into account that Leonard was serving life sentences in prison for his other

1   convictions. *See* NRS § 213. For these reasons, Leonard also fails to demonstrate that

2   his counsel acted deficiently in not objecting to the instruction.

3       Because the Nevada Supreme Court's denial of relief was neither contrary to, nor

4   an unreasonable application of, clearly established federal law and was not based on an

5   unreasonable determination of the facts, Leonard is not entitled to federal habeas relief

6   for grounds 3(f)(4) or 9.

7       **F.     Ground 12—improper judicial conduct and bias**

8       In ground 12, Leonard alleges that his conviction and death sentence are invalid

9   under federal constitutional guarantees of due process, a fair and impartial tribunal,

10  effective assistance of counsel, a reliable sentence, and equal protection due to judicial

11  bias and misconduct during the guilt and penalty phases of the proceedings. (ECF No.

12  184 at 336.) In ground 12(a), the only sub-ground remaining in ground 12, Leonard

13  alleges that by becoming a potential witness against him for a separate incident, the trial

14  judge abandoned his role as an impartial arbiter. (*Id*.)

15      **1.     Background information**

16      On January 17, 1989, approximately 8 months before trial, the trial court held a

17  hearing on Leonard's original counsel's motion to withdraw. (ECF No. 153-5.) During that

18  hearing, the trial judge noted that Leonard's original counsel "brought a book that he

19  represented had been requested by somebody who [was a friend of Leonard's] to transfer

20  to [Leonard], and it's the Fundamentals of Corporate Taxation." (*Id*. at 11.) The trial judge

21  noted that he "entered a minute order having that book deposited with the Court." (*Id*.)

22  That same day, the Attorney General Office's filed a receipt, noting that it had received

23  the book from the Carson City Clerk of the District Court. (ECF No. 138-116 at 53.)

24      At the beginning of the penalty phase of Leonard's trial, Leonard's counsel

25  informed the trial court, *inter alia*, that Leonard was unhappy with his "[c]ounsel's refusal

26  to inquire as to whether the Judge was prejudiced towards Mr. Leonard due to his direct

27

28                                              153

knowledge of an alleged incident" regarding Leonard's alleged manipulation of his original counsel "to attempt to introduce narcotics and hacksaw blades into the Nevada State Prison." (ECF No. 155-21 at 27.) The trial court responded, "[a]ll I'm a witness to is the fact that [Leonard's original counsel] came to me saying he had a problem and filed a sealed . . . envelope," which "has remained sealed," and "gave me a book that he said that Mr. Leonard was insisting be delivered to the Nevada Department of Prisons." (*Id*. at 28.) The trial court then explained that because "it was a rather unusual request," he "called the Attorney General's Office and had them look at that, and they ran it through some detectors . . . and ultimately found there were some blades in there." (*Id*.) The trial court stated that it "formed no opinion about it" and only had the opinion "that Mr. Leonard is a dangerous person," which was an opinion that he had been previously formed. (*Id*. at 29.) The trial court explained that "since [Leonard] ha[d] been incarcerated, [he] ha[d] been a control and discipline problem." (*Id*. at 30.) The trial court ultimately denied any allegation of bias, saying, "I don't care what the jury does in this case. I never have, I never will." (*Id*. at 30-31.)

Later, Leonard moved for a new trial, arguing, *inter alia*, that the trial judge "failed to recuse himself from the trial in this case." (ECF No. 156-22 at 5.) At a hearing on Leonard's motion for a new trial, the trial judge asked Leonard if he remembered when his original counsel moved to withdraw that "there was an allegation . . . that somebody threatened to kill him if he didn't bring a book containing some kind of blade into the prison." (ECF No. 157-27 at 112.) Leonard stated that he had no knowledge of that allegation. (*Id*.) The trial court then stated that he sealed "an affidavit by the attorney saying that he had been threatened that if he did not bring that book into Mr. Leonard, that he had gotten a threat from somebody in Carson City that he and/or his family would be killed." (*Id*.)

///

1

## 2.      Standards for assessing judicial bias

2      "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*,

3   349 U.S. 133, 136 (1955). Fairness "requires an absence of actual bias," but it is

4   "endeavored to prevent even the probability of unfairness." *Id.* This "most basic tenet of

5   our judicial system helps to ensure both the litigants' and the public's confidence that

6   each case has been adjudicated by a neural and detached arbiter." *Hurles v. Ryan*, 752

7   F.3d 768, 788 (9th Cir. 2014). "[W]hen a defendant's right to have his case tried by an

8   impartial judge is compromised, there is structural error that requires automatic reversal."

9   *Greenway*, *v. Schriro*, 653 F.3d 790, 805 (9th Cir. 2011).

10      "[T]he floor established by the Due Process Clause clearly requires a . . . judge

11   with no actual bias against the defendant or interest in the outcome of his particular case."

12   *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997). Actual bias is shown if the judge "has a

13   direct, personal, substantial pecuniary interest in reaching a conclusion against him in his

14   case." *Tumey v. Ohio*, 273 U.S. 510, 523 (1927). But a due process violation occurs

15   whenever "the probability of actual bias on the part of the judge or decisionmaker is too

16   high to be constitutionally tolerable." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). To this

17   end, the Supreme "Court has asked whether, 'under a realistic appraisal of psychological

18   tendencies and human weakness,' the interest 'poses such a risk of actual bias or

19   prejudgment.'" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883-84 (2009) (quoting

20   *Withrow*, 421 U.S. at 47); *see also Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016)

21   (explaining that the Court ask "whether, as an objective matter, 'the average judge in his

22   position is likely to be neutral, or whether there is an unconstitutional potential for bias'"

23   (quoting *Caperton*, 556 U.S. at 881)). Indeed, "[e]very procedure which would offer a

24   possible temptation to the average man as a judge to forget the burden of proof required

25   to convict the defendant, or which might lead him not to hold the balance nice, clear, and

26

27                                                155

28

1  true between the state and the accused denies the latter due process of law." *Tumey*,

2  273 U.S. at 532.

3  ### 3.  State court determination

4  In affirming Leonard's judgment of conviction, the Nevada Supreme Court held:

5
6  > Leonard's next contention is that the district court judge was biased
> against him and erred by not recusing himself. Specifically, Leonard
> contends that the judge demonstrated bias by stating "Mr. Leonard is a
> dangerous person . . . [and] has been a control and discipline problem."

7  > We conclude that the judge's statements do not demonstrate bias.
8  > Rather, the judge's statements demonstrate a realistic concern that
> Leonard posed a serious safety risk in court. Leonard had killed three
9  > people, battered others, threatened his attorney, and was nearly successful
> in escaping from prison. "[T]he burden is on the party asserting the
> challenge to establish sufficient factual grounds warranting disqualification."
10 > *In re Petition to Recall Dunleavy*, 104 Nev. 784, 788, 769 P.2d 1271, 1273-
> 74 (1988) (citing *Ritter v. Bd of Com'rs of Adam County, Etc.*, 637 P.2d 940,
11 > 946 (Wash. 1981)). We conclude that Leonard failed to establish any
12 > grounds necessitating the judge's disqualification.

13 (ECF No. 158-15 at 4.)

14  ### 4.  De novo review is unwarranted

15  Leonard argues that the Nevada Supreme Court only addressed one aspect of his

16  judicial bias claim on direct appeal, so it failed to adjudicate the claim on the merits. (ECF

17  No. 226 at 50.) On direct appeal, Leonard discussed the trial judge's direct knowledge of

18  the incident regarding the book, his original counsel, and the death threat. (ECF No. 158-

19  6 at 14-16.) In its order affirming Leonard's judgment of conviction, the Nevada Supreme

20  Court only addressed the trial judge's statements regarding Leonard being a dangerous

21  person. (ECF No. 158-15 at 4.) This Court presumes that the Nevada Supreme Court

22  adjudicated the entirety of Leonard's instant claim on the merits. *See Johnson v. Williams*,

23  568 U.S. 289, 293 (2013) ("[W]hen a state court issues an order that summarily rejects

24  without discussion all the claims raised by a defendant, including a federal claim that the

25  defendant subsequently presses in a federal habeas proceeding, the federal habeas court

26  must presume (subject to rebuttal) that the federal claim was adjudicated on the merits."

27
28  156

1

2

3

4

(Emphasis in original)). Leonard fails to adequately rebut that presumption. Indeed, the Nevada Supreme Court's statement about Leonard's dangerousness was made at the same time as the discussion of the book and Leonard's original counsel, so presumably, it considered all the facts regarding the trial judge's alleged bias.

5

6

7

8

9

10

11

12

13

Leonard also argues that the Nevada Supreme Court only addressed whether there was actual bias even though clearly established federal law required courts to determine any risk of bias. (ECF No. 226 at 53 (citing *Echavarria v. Filson*, 896 F.3d 1118, 1129 (9th Cir. 2018) ("Here, the Nevada Supreme Court's explanation of its decision on state habeas shows that it adjudicated only Echavarria's claim of actual bias. It did not adjudicate his distinct claim of risk of bias.")).) Because the Nevada Supreme Court held that "Leonard failed to establish any grounds necessitating the judge's disqualification" (ECF No. 158-15 at 4 (emphasis added)), this Court does not find that the Nevada Supreme Court neglected to address any risk of bias.

14

15

16

17

Finally, Leonard argues that the Nevada Supreme Court's finding that the judge had "a realistic concern that Leonard posed a serious safety risk in court" was based on an unreasonable determination of the facts. (ECF No. 226 at 54.) Because the record supports this factual finding, the Court finds that it was not unreasonable.

18

### 5.    Analysis

19

20

21

22

23

24

25

26

27

The Nevada Supreme Court reasonably determined that Leonard was not entitled to relief. While the trial judge had information that an unnamed individual had given Leonard's original counsel a book containing blades and threatened Leonard's original counsel with death if he did not give the book to Leonard, there was no information given directly implicating Leonard in the illegal activity. Indeed, Leonard told the trial court that he had no knowledge of the allegations. As such, even though the trial judge gave the book to the attorney general, which could have potentially resulted in criminal charges being filed against the unnamed individual, the trial judge was not involved in any

28

1    accusatory process implicating Leonard. *See Martinez v. Ryan*, 926 F.3d 1215, 1226 (9th

2    Cir. 2019) ("The Supreme Court, for its part, has recognized an appearance of impropriety

3    in only a few cases in which the judge had a direct pecuniary interest in the case, was

4    involved in a controversy with a litigant, or was part of the accusatory process."). Thus,

5    considering all the circumstances, Leonard fails to demonstrate that a due process

6    violation occurred because the record fails to show any actual bias or risk of bias on the

7    part of the trial judge as it concerned Leonard.

8         The Nevada Supreme Court's denial of relief on Leonard's judicial bias claim was

9    neither contrary to, nor an unreasonable application of, clearly established federal law

10   and was not based on an unreasonable determination of the facts. Leonard is not entitled

11   to federal habeas relief for ground 12.

12                    **6.        Related ground: ground 1(p)**

13        In ground 1(p), Leonard alleges that his trial counsel were ineffective in failing to

14   raise, litigate, and make a record of the instances of judicial bias. (ECF No. 184 at 140.)

15        This Court previously determined that this ground was procedurally defaulted.

16   (ECF No. 205 at 53.) And this Court further ordered that it would "consider *Martinez*

17   arguments in relation to th[is] claim[ ] when it rules upon the merits of Leonard's petition."

18   (ECF No. 207 at 2.) This Court now finds that Leonard fails to demonstrate prejudice to

19   excuse the procedural default because Leonard's ineffective assistance of trial counsel

20   claim is not substantial.

21        Leonard argues that his trial counsel should have (1) filed a formal motion before

22   the start of the penalty hearing concerning judicial bias, (2) addressed judicial bias and

23   requested a new judge step in during its argument at the hearing on the motion for a new

24   trial, and (3) objected to and made a record of the trial judge's *ex-parte* contacts. (ECF

25   No. 226 at 181-188.)

26

27

28

Regarding Leonard's first argument, the trial judge made the following comment before the start of the penalty phase after noting that no challenge was made against him: "had that motion been filed, I would have A, denied it, and B, called for a hearing by another judge, at which point I would have denied any allegation of bias or prejudice." (ECF No. 155-21 at 29.) Given this statement by the trial judge that he would have denied any motion based on his alleged bias, Leonard fails to demonstrate that the trial court would have granted a formal judicial bias motion if his trial counsel had filed one instead of making a mere oral request before the penalty hearing. Further, given this statement, Leonard also fails to support his second argument. Indeed, even if his trial counsel had made a request at the hearing on the motion for a new trial for a new judge to step in, Leonard fails to demonstrate that that other judge would have found judicial bias on the part of the trial judge given the trial judge's comment that he would have denied the allegations made against him.

Finally, turning to Leonard's final argument, as is shown by Leonard's citation to the record, the trial court made a record of its contacts with law enforcement and the jury. (*See* ECF No. 226 at 184-187.) Consequently, Leonard's trial counsel had no need to make a record. Additionally, the alleged *ex parte* comments merely concerned the trial judge telling the jury members not to come into a hallway without knocking and that guards would be behind any testifying inmate as a matter of procedure. And the alleged *ex parte* comments with law enforcement merely regarded the trial judge's concern about security because he was aware that Leonard had attempted an escape and had contact with certain unsavory individuals. Given (1) that the comments to the jury were rather innocuous and (2) *ex parte* communication with law enforcement only regarded the trial court's knowledge of Leonard's escape attempt, Leonard fails to demonstrate that that the trial court would have taken any action had his trial counsel made objections.

159

1   Based on the record, Leonard's ineffective assistance of trial counsel claim is not

2   substantial because Leonard fails to adequately demonstrate prejudice under *Strickland*.

3   Because Leonard fails to demonstrate requisite prejudice necessary to overcome the

4   procedural default of ground 1(p), that ground is dismissed.

5   ### G.   Ground 19—ineffective assistance of direct appeal counsel

6   In ground 19, Leonard alleges that his direct appeal counsel was ineffective. (ECF

7   No. 184 at 386.) Specifically, in the remaining portions of the sub-grounds of ground 19,

8   Leonard alleges that his appellate counsel was ineffective regarding the "lying in wait"

9   instruction, the executive clemency instruction, and the trial court's comment during voir

10  dire disparaging Leonard's right to not testify. (*See* ECF No. 205 at 53 n.19.)

11  The *Strickland* standard is also utilized to review appellate counsel's actions: a

12  petitioner must show "that [appellate] counsel unreasonably failed to discover

13  nonfrivolous issues and to file a merits brief raising them" and then "that, but for his

14  [appellate] counsel's unreasonable failure to file a merits brief, [petitioner] would have

15  prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

16  ### 1.   Ground 19(e)

17  In the remaining portion of ground 19(e), Leonard alleges that his appellate

18  counsel unreasonably failed to challenge the "lying in wait" instruction in his direct appeal.

19  (ECF No. 184 at 394.)

20  The Nevada Supreme Court did not discuss Leonard's appellate counsel's failure

21  to challenge the "lying in wait" instruction in its affirmation of the denial of Leonard's state

22  habeas petition,[36] but it did address Leonard's trial counsel's failure to challenge it. As

23  was discussed in ground 1(r)(1), the Nevada Supreme Court held:

24

25  [36]When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "determine[s] what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the United States Supreme] Court." *Richter*, 562 U.S. at 102.

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

> Jury instruction no. 21 stated:
> All murder which is committed by lying in wait is as a matter of law, murder in the first degree, whether the killing was intentional <u>or accidental</u>.
> "Lying in wait" consists of watching, waiting and concealment from the person killed <u>with the intention of inflicting bodily injury</u> upon such person or of killing such person.
> (Emphasis added.) Leonard objects to the two emphasized phrases.
> The second paragraph is a sound statement of the law since it comes directly from *Moser v. State*, 91 Nev. 809, 813, 544 P.2d 424, 426 (1975). Therefore, it was not ineffective for counsel not to object to it.
> The first paragraph seems to have no direct source in Nevada law. However, the state cites *People v. Laws*, 15 Cal. Rptr. 2d 668, 673–74 (Ct. App. 1993), which holds that under the relevant California statute, any "murder"—not "killing"—committed by lying in wait is first-degree murder. This is so even if the murder resulted from an accidental killing. *Id*. at 674. For example, it is normally second-degree murder if someone shoots a gun toward a person, intending only to scare the person, but hits and kills the person by mistake; however, such a murder perpetrated by lying in wait is of the first degree. *Id*. The first paragraph of the instruction, if carefully read, is consistent with *Laws*.
> However, this court need not decide whether the reasoning in *Laws* applies to the relevant Nevada statute (NRS 200.030(1)(a)) or whether the first paragraph of the instruction might mislead a reasonable juror. Even assuming that the instruction was erroneous or misleading, Leonard was not prejudiced. There is no basis to conclude that the jury found the killing accidental since Leonard stabbed Wright twenty-one times. This is confirmed by the fact that the jurors returned a verdict form which indicated that they found Leonard guilty of first-degree murder both by deliberation and premeditation and by lying in wait. Therefore, the jury found the necessary intent for first-degree murder.

17

(ECF No. 162-27 at 13.)

18

19

20

21

22

23

24

Because Leonard's trial counsel did not object to the "lying in wait" instruction, the Nevada Supreme Court would have reviewed the instruction for plain error had his appellate counsel raised the issue: "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." NRS § 178.602. In the case of plain-error review, "the burden is on the defendant to show actual prejudice or a miscarriage of justice." *See Green v. State*, 80 P.3d 93, 95 (Nev. 2003); *see also Sanders v. State*, 609 P.2d 324 (Nev. 1980).

25

26

Even if Leonard's appellate counsel were deficient for not challenging the "lying in wait" instruction in Leonard's direct appeal, Leonard would also have to demonstrate the

27

28

161

following prejudice from that failure: the result of his direct appeal would have been different because the Nevada Supreme Court would have found that Leonard was prejudiced by, or a miscarriage of justice occurred from, the "lying in wait" instruction. Leonard fails to meet this burden. Indeed, in rejecting Leonard's claim that his trial counsel failed to challenge the "lying in wait" instruction, the Nevada Supreme Court determined that Leonard could not demonstrate prejudice. Therefore, because the Nevada Supreme Court determined during post-conviction review that Leonard was not prejudiced by the "lying in wait" instruction, Leonard fails to show that the same court—the Nevada Supreme Court—would have found that he was prejudiced by the "lying in wait" instruction on direct appeal.

Because the Nevada Supreme Court's implicit denial of Leonard's appellate counsel ineffectiveness claim constituted an objectively reasonable application of *Strickland*, Leonard is not entitled to federal habeas relief on ground 19(e).

### 2.      Ground 19(f)

In the remaining portion of ground 19(f), Leonard alleges that his appellate counsel unreasonably failed to challenge the executive clemency instruction. (ECF No. 184 at 395.)

As was the case with ground 19(e), the Nevada Supreme Court did not discuss Leonard's appellate counsel's failure to challenge the clemency instruction in its affirmation of the denial of Leonard's state habeas petition, but it did address Leonard's trial counsel's failure to challenge it. As was discussed in ground 3(f)(4), the Nevada Supreme Court held:

> Leonard contends that his counsel were ineffective in failing to object to the jury instruction on the Pardons Board's power to modify sentences, given pursuant to *Petrocelli v. State*, 101 Nev. 46, 692 P.2d 503 (1985), *modified by Sonner v. State*, 112 Nev. 1328, 1334, 930 P.2d 707, 711-12 (1996). He says that NRS 213.1099(4) would prevent him from ever receiving parole; therefore, the instruction was erroneous under *Hamilton v. Vasquez*, 17 F.3d 1149 (9th Cir.), *cert. denied*, 512 U.S. 1220 (1994), and *Geary v. State*, 112 Nev. 1434, 930 P.2d 719 (1996), *reh'g granted on other*

*grounds*, 114 Nev. __, 952 P.2d 431 (1998). Even assuming that those cases would preclude this instruction in Leonard's case, we conclude that *Hamilton* and *Geary* announced a new rule of law and that Leonard has failed to show that his counsel were ineffective for failing to anticipate that rule.

In *Geary*, this court relied on *Simmons v. South Carolina*, 512 U.S. 154 (1994). Although *Simmons* was a plurality opinion, a majority of the United States Supreme Court agreed that a state cannot constitutionally preclude a defendant from informing a jury that he has little chance of receiving parole if the jury otherwise faces a false choice between sentencing the defendant to death or sentencing him to a limited period of incarceration, at least where the state argues future dangerousness. *Simmons*, 512 U.S. at 161, 176-77.

The Supreme Court recently concluded that *Simmons* announced a new rule of law and does not apply retroactively in federal habeas proceedings. *O'Dell v. Netherland*, 521 U.S. __, 117 S.Ct. 1969 (1997). Leonard's conviction became final when the Supreme Court denied his petition for certiorari in 1992. *Simmons* and *Hamilton* were decided in 1994 and *Geary* in 1996. Therefore, we decline to apply the new rule announced in these cases to this post-conviction proceeding.

[FN6] In supplemental authorities filed April 29, 1998, Leonard cites *Gallego v. McDaniel*, 124 F.3d 1065, 1074-76 (9th Cir. 1997). *Gallego* relies on *Simmons* and thus may be undermined by *O'Dell*. Assuming that *Gallego* is sound authority, we conclude that it does not apply here because the jurors who sentenced Leonard did not receive the executive clemency instructions deemed misleading in *Gallego*. *See Sonner v. State*, 114 Nev. __, 955 P.2d 673 (1998).

(ECF No. 162-27 at 16-17.)

Because the Nevada Supreme Court determined that Leonard's trial counsel were not deficient at the 1989 trial for failing to anticipate the new rule of law regarding clemency instructions announced in *Hamilton* and *Geary* in 1994 and 1996, respectively, it appears that the Nevada Supreme Court implicitly found that Leonard's appellate counsel was also not deficient for the same reasons regarding the same instruction. Indeed, Leonard's direct appeal opening brief and direct appeal reply brief were both filed before *Hamilton* and *Geary* were announced. (*See* ECF Nos. 158-6 (opening brief filed on March 21, 1991) and 158-11 (reply brief filed on May 31, 1991).) And for the reasons discussed in ground 3(f)(4), the Nevada Supreme Court's implicit denial of Leonard's appellate counsel's ineffectiveness claim constituted an objectively reasonable application of *Strickland*. Leonard is not entitled to federal habeas relief on ground 19(f).

163

1

2

3

4

### 3.    Ground 19(g)

In the remaining portion of ground 19(g), Leonard alleges that his appellate counsel unreasonably failed to challenge the trial court's statements on voir dire disparaging Leonard's right to not testify. (ECF No. 184 at 396.)

5

#### a.    Background information

6

During voir dire, the following colloquy occurred between the trial court and a juror:

7

8

> JUROR . . . : The only thing that I've really, that has really occurred to me is my roommate was a Douglas County Sheriff's Deputy for four years, and a lot of conversations has centered around - -
> THE COURT: Around job?

9

10

> JUROR . . . : Yeah, around job and around the fact that in Nevada the rights of, say, the deputies versus the rights of the people they're arresting, there seems to be an awful lot of emphasis placed on protection of the criminal as opposed to the protection of the person.

11

> THE COURT: Sure.
> JUROR . . . : Arresting them.

12

> THE COURT: As a matter of fact, the Constitution doesn't say anything about the rights of victims.

13

> JUROR . . . : No, I'm not talking about the victim, I'm talking - -
> THE COURT: It doesn't say anything about the rights of police officers.

14

> JUROR . . . : Right.

15

> THE COURT: *Unfortunately, our system says, you know, for example, the Constitution says no person can be compelled to give evidence against himself. It doesn't say anything about a police officer.* So we understand, do you have that same attitude?

16

17

> JUROR . . . : So I have a slight, I may have a slight bias in that direction, but I would certainly try to overlook it. I would try to.

18

19

(ECF No. 154-28 at 192-93 (emphasis added).)

20

#### b.    State court determination

21

In affirming the denial of Leonard's petition for post-conviction relief, the Nevada Supreme Court held:

22

23

24

25

26

> During voir dire of venire members, one prospective juror voiced a concern about the emphasis placed on protecting the rights of "criminals" as opposed to the rights of police. The district court said, "*Unfortunately*, our system says, you know, for example, the Constitution says no person can be compelled to give evidence against himself. It doesn't say anything about a police officer. So we understand, do you have the same attitude?" (Emphasis added.)

27

28

164

1

2

       Leonard asserts that the district court improperly commented on his failure to testify and that his appellate counsel ineffectively overlooked this error. He cites numerous cases for the proposition that direct comment on a defendant's failure to testify is reversible error.

3

4

5

6

7

8

       To begin with, the district court's remark did not comment on Leonard's failure to testify because the remark was not aimed at Leonard and was made long before Leonard declined to testify. The court erred in stating that the constitutional protection against self-incrimination was "unfortunate." However, the remark was brief and in passing, and the context shows that the court was not disparaging that protection. The court went on to ask the venire member if his attitude would affect his decision in the case, and he said that he "would certainly attempt to keep it from affecting it." We conclude, therefore, that it was clear to those present in the courtroom that the court was not espousing a critical view of defendants' constitutional rights but instead expected all jurors to respect those rights. Therefore, appellate counsel was not ineffective in failing to raise this issue.

9

(ECF No. 162-27 at 19.)

10

### c.    De novo review is unwarranted

11

     Leonard argues that the Nevada Supreme Court's conclusion that the judge's

12

comments were unfortunate but harmless was contrary to federal law because reversal

13

is automatic when the right to have a case tried before an impartial judge is compromised.

14

(ECF No. 226 at 373.) This Court is not persuaded. The Nevada Supreme Court did not

15

find that the judge was biased but any result was harmless. Rather, the Nevada Supreme

16

Court reasonably found that the judge's phrasing of his response was regrettable, but

17

there was no bias when the innocuous remark was examined in context.

18

### d.    Analysis

19

     The Nevada Supreme Court reasonably concluded that Leonard's appellate

20

counsel was not ineffective for not raising this issue. The trial court merely added the word

21

"unfortunate" at the beginning of his explanation. As the Nevada Supreme Court

22

reasonably noted, the remark was not aimed at Leonard personally, and the context of

23

the remark shows that it was not reflective of the trial court's attitude about any

24

constitutional protection. Rather, it appears to have been a slip of the tongue. Leonard

25

fails to demonstrate that his appellate counsel was deficient in not raising this issue on

26

appeal. Further, the Nevada Supreme Court, acting in its review of the denial of Leonard's

27

28

1   state post-conviction petition, is in the exclusive position to determine whether it would

2   have granted relief on direct appeal if the issue had been raised. Because the Nevada

3   Supreme Court found that it would not have granted relief on direct appeal, Leonard also

4   fails to demonstrate prejudice from his appellate counsel's actions.

5       Because the Nevada Supreme Court's determination that Leonard's appellate

6   counsel was not ineffective constituted an objectively reasonable application of *Strickland*

7   and was not based on an unreasonable determination of the facts, Leonard is not entitled

8   to federal habeas relief on ground 19(g).

9           **H.    Ground 20—cumulative error**

10      In ground 20, Leonard alleges that the cumulative effect of the errors that infected

11  his trial entitle him to a new trial and sentencing hearing. (ECF No. 184 at 397-99.)[37]

12      In affirming Leonard's judgment of conviction, the Nevada Supreme Court held:

13  "Leonard argues that the cumulative impact of trial error mandates reversal and that the

14  evidence against him was not overwhelming. We disagree. The State presented an

15  overwhelming basis for the conviction and sentence through witnesses and medical and

16  physical evidence." (ECF No. 158-15 at 6.) This determination was reasonable.

17      Cumulative error applies where, "although no single trial error examined in isolation

18  is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may

19  still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996);

20  *see also Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004) (explaining that the court

21  must assess whether the aggregated errors "'so infected the trial with unfairness as to

22  make the resulting conviction a denial of due process'") (citing *Donnelly*, 416 U.S. at 643).

23      Leonard is not entitled to relief on his cumulative error assertion because neither

24  the cumulative effect of any errors from his direct appeal proceedings nor the cumulative

25

26      [37]The Court previously concluded that ground 20 was unexhausted and dismissed
27  to the extent that it incorporates claims not presented together in either his direct appeal
    or state post-conviction proceedings. (ECF No. 205 at 39.)

28

1    effect of any errors from his post-conviction proceedings rise to the level of warranting

2    reversal. Leonard is denied federal habeas relief for ground 20.

3    **V.    CERTIFICATE OF APPEALABILITY**

4         This is a final order adverse to Leonard. Rule 11 of the Rules Governing Section

5    2254 Cases requires this Court to issue or deny a certificate of appealability ("COA"). This

6    Court has *sua sponte* evaluated the claims within the petition for suitability for the

7    issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65

8    (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner

9    "has made a substantial showing of the denial of a constitutional right." With respect to

10   claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would

11   find the district court's assessment of the constitutional claims debatable or wrong." *Slack*

12   *v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4

13   (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate

14   (1) whether the petition states a valid claim of the denial of a constitutional right and (2)

15   whether this Court's procedural ruling was correct. *See id.* Applying these standards, this

16   Court finds that a certificate of appealability is warranted for grounds 1(a), 2, and 1(d)(2).

17        First, reasonable jurists could debate whether an actual conflict of interest

18   existed—indeed was likely inherent—regarding Leonard's first-chair trial counsel's

19   representation of Hill such that the Petition should be granted on ground 2. Due to Hill's

20   importance to the defense's case and Hill being deposed by the prosecution before

21   Leonard's trial, reasonable jurists could debate whether the harm Leonard suffered

22   because of his first-chair trial counsel's representation of Hill, which resulted in that

23   deposition taking place, outweighed the benefit Leonard received. In fact, the prosecution

24   received a compelling advantage at trial by learning Hill's testimony before he testified on

25   Leonard's behalf at trial. This knowledge likely affected the prosecution's trial strategy

26   and certainly eliminated many risks the prosecution faced in cross-examining Hill at trial.

27

28                                     167

It is at least troublesome—and likely alarming—that Leonard's first-chair trial counsel agreed to represent both Leonard and Hill given the facts at hand. For these reasons, reasonable jurists could also debate whether Leonard's first-chair trial counsel performed deficiently by breaching his duty of loyalty to Leonard and whether prejudice resulted therefrom such that the Petition should also be granted on ground 1(a).

Second, reasonable jurists could debate whether Leonard demonstrated prejudice in ground 1(d)(2) regarding his trial counsel's deficiency in presenting evidence showing that Wright was known to possess weapons. In addition to Emde's and Hill's testimonies that Wright had possessed weapons, there appears to be four other reports of Wright possessing a weapon while in prison. Reasonable jurists could debate whether these additional reports of Wright's prior possessions of weapons would have resulted in a different outcome at Leonard's trial. Indeed, Wright's aggregate prior possession of weapons could have bolstered Leonard's defense that Wright possessed the shank on the night of his death and was the initial attacker—not Leonard.

A certificate of appealability is unwarranted for the remainder of Leonard's grounds.

**VI.     CONCLUSION**

It is therefore ordered that the amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 (ECF Nos. 138, 184) is granted as to grounds 3(a)(2) and 3(f)(3) and denied as to the remaining grounds. Petitioner William Leonard's death sentence is vacated. Within 60 days[38] of the later of (1) the conclusion of any proceedings seeking appellate or certiorari review of this Court's judgment, if affirmed, or (2) the expiration for seeking such appeal or review, Leonard must either be sentenced to a non-capital sentence consistent with Nevada law or be given a new penalty hearing.

---

[38]Reasonable requests for modification of this time may be made by either party.

It is further ordered that a certificate of appealability is granted for grounds 1(a), 2, and 1(d)(2) and denied as to the remaining grounds.

The Clerk of Court is directed to: (1) enter judgment accordingly; (2) provide a copy of this order and the judgment to the Clerk of the First Judicial District Court of Nevada in connection with that court's case number 88-00461C; and (3) close this case.

DATED THIS 10th Day of August 2023.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE